IN THE UNITED STATES DISCTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VICTORIA MANNINA,<br>    on behalf of herself and as<br>    Personal Representative of<br>    the Estate of Paul Mannina,<br>17717 Pond Road<br>Ashton, MD  20861<br><br>           v.<br><br>HON. MURIEL BOWSER,<br>    Mayor of the District of<br>    Columbia, in her<br>    official capacity,<br>Serve:<br>c/o Mayor's Designated Representative<br>1350 Pennsylvania Ave, NW<br>Washington, DC   20004<br><br>Carl A. Racine, Attorney General of<br>    the District of Columbia<br>c/o Designated Representative<br>400 6th Street, SW<br>Washington, DC 20024<br><br>       and<br><br>THOMAS FAUST,<br>    Director of the District<br>    of Columbia Department of<br>    Corrections, in his<br>    official capacity,<br>2000 14th Street, NW, Seventh Floor,<br>Washington, DC 20009 | Civil Case No. 15-931 |

**COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL RIGHTS**

1.      This is an action filed on behalf of the Estate of Paul Mannina and his

widow, Victoria Mannina.  Mr. Mannina died while in the custody of the employees

of the District of Columbia Jail after ample notice of his deteriorating mental condition when his jailors allowed him to sneak a razor into his cell.  He committed suicide within twenty-four hours after being returned to the Jail's custody after his arraignment for an alleged crime.  They failed to exercise the requisite duty of care to ensure his safety and their failure was a proximate cause of his death.

### Jurisdiction and Venue

2.      Jurisdiction in this Court is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332.  Mr. Paul Mannina (the "Decedent") and his widow, Ms. Victoria Mannina are, or were at all times relevant to this action, citizens of the State of Maryland and the Mayor is a resident of the District of Columbi  and Department of Corrections is a municipal agency of the District of Columbia.  The amount in controversy is in excess of $75,000, exclusive of interests and costs.

3.      Venue in this Court is proper because the negligent acts or omissions of the Defendants, its employees and its agents were committed in the District of Columbia and the wrongful death occurred in the District of Columbia.

### Parties

4.      At all times relevant to this action Paul Mannina was a resident of the State of Maryland, having resided at 1171 Pond Road, Ashton, Maryland.

5.      Plaintiff Victoria Mannina is the widow of the Decedent and at all times relevant to this action was and is a resident of the State of Maryland, residing at 17717 Pond Road, Ashton, Maryland.

6.      Defendant Hon. Muriel Bowser is the Mayor of the District of Columbia and has management responsibility for the Department of Corrections, the Metropolitan Police Force of the District of Columbia and all other District of Columbia personnel that were responsible for the care and custody of the Decedent, Paul Mannina.

7.      Defendant Thomas Faust is the Director of the Department of Corrections for the District of Columbia and is responsible for the management of the District of Columbia Jail where Mr. Mannina took his life.  For the purposes of this complaint "Defendant" shall include all employees or agents of the District of Columbia government.

8.      On July 31, 2013, the Montgomery County Register of Wills appointed Ms. Mannina as the Personal Representative of the Estate of Paul Mannina. (A true and correct copy of the appointment order is attached as Exhibit 1.)

9.      Ms. Mannina, as Personal Representative of the Estate and for herself, timely gave written notice of her claims pursuant to D.C. Code § 12-309, describing the time, place and circumstances of the injury to Mr. Mannina.  (A true and correct copy of the Notice is attached as Exhibit 2.)

**Facts**

10.      On June 5, 2013, the Decedent met his supervisor from his workplace, Leslie Perlman, at her home on Chesapeake Street, NW in Washington, DC.  He had known Ms. Perlman for more than two decades and upon information and belief had an intimate personal relationship with her outside of work.

11.     A violent altercation ensued, resulting in injuries to Ms. Perlman that required medical treatment and ultimately surgery to repair broken facial bones.

12.     Mr. Mannina returned home after the meeting with Ms. Perlman. Despondent over his situation, he did not go to work on June 6th and that night began drinking heavily. The next morning, June 7th, Ms. Mannina could not wake her husband and called for an ambulance. He was admitted to Montgomery General Hospital for a "changed mental state" according to the nurse on the unit where Mr. Mannina was a patient. High levels of alcohol, opiates and Tylenol in his system and was unresponsive. Transcript of Preventive Detention Hearing ("Transcript"), June 17, 2013, at 21-22. (A true and correct copy of relevant pages of the transcript of this hearing is attached as Exhibit 3.)

13.     At first, Ms. Perlman declined to name the Decedent as her assailant. Then, on or about Friday, June 7th, Ms. Perlman changed her story and told District of Columbia Metropolitan Police Detectives that Mr. Mannina was the person who injured her. In the course of subsequent interviews with the police detectives, Ms. Perlman reported that upon leaving her home, Mr. Mannina declared "I guess I'll just blow my brains out." This statement was repeated in the Court's Preventive Detention Hearing on June 17, 2013. Transcript, at 10.

14.     The police arrested Mr. Mannina sometime after 2 pm on Friday, June 7th, while he was still a patient at Montgomery General Hospital while under treatment for his altered mental state and while he was non-responsive and despondent affect as a result of the drug and alcohol overdose. He remained in the

hospital for two more days.  His family was barred from seeing him.  He was most certainly alone and scared in his hospital room under police guard.

15.     On or about Sunday, June 9th, Mr. Mannina was transferred from the hospital to a Montgomery County Jail on Seven Locks Road.  He was subsequently extradited to the District of Columbia.

16.     On June 17, 2013, the Superior Court of the District of Columbia held a Preventive Detention Hearing.  Mr. Mannina's counsel urged the Court to release Mr. Mannina so that he could receive needed mental health treatment.  During the hearing, the Court observed the Mr. Mannina had "obviously experienced some sort of imbalance at this time" and "[Mr. Mannina] sounds like someone who had everything to lose." "Obviously, Mr. Mannina's a wonderful person in most respects; but based on the evidence, there is something dark floating out there." However, concerned for the safety of the Complainant, he refused to permit Mr. Mannina to be released back to the community.  Mr. Mannina, depressed and despondent, was returned to the D. C. Jail.  Transcript at 39, 40, 42.

17.     Despite ample warning from the detectives' report and the testimony at the Preventive Detention Hearing, including:

- The Metropolitan Police detective's report that Mr. Mannina had declared an intent to kill himself

- A nurse on Mr. Mannina's unit that he had been admitted to the hospital for a "changed mental state;" and,

- The Court observing what everyone could see – that a gentle, kind man had "experienced some sort of imbalance,"

the Department of Corrections and the D. C. Jail took no special precautions and

returned Mr. Mannina to the general population.  Indeed, they allowed Mr. Mannina

***to sneak a razor into his cell***, which he used to kill himself in the early morning

hours of June 18, 2013, alone and desperate, his life in total tatters.  He had almost

certainly lost his job, his license to practice law, his standing in the community and

quite possibly his marriage.

**Count I**
**(Negligence: Survival Action)**

18.     Plaintiff incorporates by reference paragraphs 1 through 17, above

and further alleges that this claim arises under the District of Columbia Survival

Statutes, D.C. Code § 12-101.

19.     Plaintiff alleges that the District of Columbia government, the city's

Department of Corrections and the D.C. Jail owed Mr. Mannina the duty of

reasonable care to protect him from harm and ensure his safety.

20.     Plaintiff further alleges that the Defendant breached its duty to due

care for the following reasons:

21.     Defendant knew or should have known of the precarious mental state

of the Mr. Mannina.  After the alleged criminal incident, the Decedent had been

hospitalized for a changed mental state, was non-responsive and despondent and

was suffering from a self-inflicted overdose of drugs and alcohol.

22.     Plaintiff further alleges that the Defendant was apprised of the mental

condition of the Mr. Mannina when, during the arraignment and bond hearing, the

Decedent's counsel requested that he be placed in a psychiatric facility.  Given that

Mr. Mannina had no history of violent behavior, Defendant should have taken notice of his aberrational and despondent behavior.

23.     Plaintiff further alleges that Defendant failed to ensure the safety of the Mr. Mannina by not confiscating and allowing him to secret a razor blade into his cell.  This razor blade was the instrument by which he killed himself.

24.     Plaintiff further alleges that in light of all the facts that Defendant possessed at the time of Mr. Mannina's return to the D.C. Jail, Defendant should have placed Mr. Mannina on a suicide watch, which would have likely saved his life.

25.     As a direct and proximate cause of Defendant's negligence, Mr. Mannina suffered extreme mental distress, hopelessness and mental anguish.

26.     As a further direct and proximate cause of Defendant's negligence, in the final minutes of his life, Mr. Mannina suffered severe physical pain, mental anguish and fear of his impending death.

27.     As a further and direct proximate cause of Defendant's negligence, Mr. Mannina's estate lost the probable future earnings and other economic and non-economic damages recoverable under the applicable District of Columbia law.

28.     Under D.C. Code § 12-101, Mr. Mannina's right of action for these injuries prior to his death survives in favor of his widow, Victoria Mannina, the Personal Representative of his estate.

## Count II
## (Negligence: Wrongful Death)

29.     Plaintiff incorporates by reference paragraphs 1 through 28, above,

and further alleges that this claim arises under the District of Columbia Wrongful

Death Statute, D.C. Code § § 16-2701, *et seq.*

30.     Plaintiff further alleges that as a direct and proximate cause of the

negligence of the D.C. Jail, the Department of Corrections and the District of

Columbia, Plaintiff Victoria Mannina, as widow and next of kin, incurred cremation

expenses and loss of financial support, a loss of pecuniary value of services expected

to be performed by the Decedent, loss of consortium, loss of companionship and any

additional losses or damages recoverable under the statute.

WHEREFORE, Plaintiff, Victoria Mannina, individually, as the widow of Paul

Mannina and as the duly appointed Personal Representative of the Estate of Paul

Mannina, deceased, demand judgment against the District of Columbia, the District

of Columbia Department of Corrections in the full and just amount of One Million,

Two Hundred and Fifty-Four Thousand Dollars ($1,254,000), plus interest and

costs.

**<u>Jury Demand</u>**

Plaintiff hereby demands a trial by jury with respect to each claim in this

Complaint.

Respectfully submitted,

JOHN BICKERMAN
DC Bar No. 423059

Bickerman Dispute Resolution, PLLC
The Willard
1455 Pennsylvania, NW, Suite 400
Washington, DC  20004-0017
jbickerman@bickerman.com
202-289-0400

*Counsel for Plaintiff*

# EXHIBIT 1



# STATE OF MARYLAND
# LETTERS OF ADMINISTRATION
# OF A SMALL ESTATE

### Estate No. W77008

I certify that administration of the Estate of

**PAUL D. MANNINA**

was granted on the _____31st_____ day of _____JULY, 2013_____,

to <u>VICTORIA M MANNINA</u>

as personal representative(s) and the appointment is in effect

this ___31st___ day of _JULY, 2013_____

☐ Will probated _____
                                (date)

☑ Intestate estate

☐ Unprobated Will - Probate Not Required

_Joseph M. Griffin_
_____

JOSEPH M GRIFFIN

**Register of Wills for**

MONTGOMERY COUNTY
_____

**VALID ONLY IF SEALED WITH THE SEAL OF THE COURT OR THE REGISTER**

RW1107

ROWNET
11/2009

# EXHIBIT  2

# JOSEPH, GREENWALD & LAAKE, P.A.
## ATTORNEYS AT LAW

**Steven B. Vinick**
*Attorney at Law*

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Direct Dial: (240) 553-1221
Facsimile: (301) 220-1214
Email: svinick@jgllaw.com
www.jgllaw.com

August 1, 2013

**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
Office of Risk Management
ATTN: Claims
441 4th Street, NW, Suite 800 South
Washington, DC 20001

Mayor Vincent Gray
Executive Office of the Mayor
1350 Pennsylvania Avenue, NW, Suite 316
Washington, DC 20004

> **RE:   Notice of Claim Pursuant to Section 12-309 of the D.C. Code**
> **Vicky Mannina, Individually and as the Personal Representative of the**
> **Estate of Paul Mannina**

Dear Mayor Gray:

Please be advised that this office has been retained to represent Vicky Mannina, individually and as Personal Representative of the Estate of Paul Mannina, for injuries, damages, and the wrongful death of Paul Mannina, which occurred on or about the late evening hours of June 17, 2013 and/or the early morning of hours of June 18, 2013 at the District of Columbia Central Detention Facility, which is located in the District of Columbia.  Please accept this letter as Ms. Mannina's formal written notice of claim pursuant to §12-309 of the District of Columbia Code.

| | |
|---|---|
| Identity of Claimant: | Vicky Mannina<br>17717 Pond Road<br>Ashton, Maryland 20861<br>DOB: 3/1/1957<br>SSN: 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 |
| Identity of Decedent: | Paul Mannina<br>17717 Pond Road<br>Ashton, Maryland 20861<br>DOB: 5/29/1955<br>SSN: 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 |
| Date/Time of Incident: | Late evening hours of June 17, 2013/Early morning hours<br>of June 18, 2013 |

**JOSEPH, GREENWALD & LAAKE, P.A.**

ATTORNEYS AT LAW

Risk Management
Re: Vicky Mannina
August 1, 2013
Page 2 of 3

Location of Incident:        D.C. Central Detention Facility
                             1901 D Street SE
                             Washington, D.C. 20003

Cause of Damage or Injury:   Failure of the Detention Center to adequately assess,
                             monitor, segregate and/or supervise Paul Mannina,
                             resulting in his death

     With respect to the circumstances under which the damages, injuries and death were
sustained, and the reason for the District of Columbia's liability, it is the Claimant's contention
that the City, and its agents, servants and employees, was negligent in assessing, monitoring,
segregating and supervising Paul Mannina while he was incarcerated.  Upon information and
belief, the District of Columbia owns, operates, manages and/or maintains the premises known as
the D.C. Central Detention Facility, 1901 D Street SE, Washington, D.C. 20003.  In addition, the
City employs the correctional officers and other officials and individuals who work in and for the
D.C. Central Detention Facility.

     On the late evening hours of June 17, 2013 and/or the early morning hours of June 18,
2013, Paul Mannina was a pretrial detainee.  Prior to his incarceration, Paul Mannina had been a
in-patient at the psychiatric ward of Montgomery General Hospital  Mr. Mannina had been
released only a few days before.  He had gone to the psychiatric ward because of severe
problems with depression.  This information was known to the employees at the D.C. Central
Detention Facility.  Despite this knowledge, Mr. Mannina was never medically assessed, was not
placed in a unit or a cell where he would be prevented from harming himself or from having
other individuals harm him, and was not properly monitored or supervised.  At some point
during the late evening hours of June 17, 2013 and/or the early morning hours of June 18, 2013,
Mr. Mannina died.  Mr. Mannina was discovered on June 18, 2013 with his throat slashed.  The
District of Coumbia failed to properly assess Mr. Mannina's medical and psychiatric issues and
failed to act accordingly.  As a direct and proximate result of the negligence of the District of
Columbia, the D.C. Central Detention Facility, and their agents, servants and employees, Paul
Mannina was caused to suffer severe injuries and death.

     Ms. Mannina is providing statutory notice of all claims, both individually and as the
Personal Representative of the Estate of Paul Mannina, deceased.  These claims include, but are
not limited to, claims for wrongful death, survivorship, personal injury, conscious pain, mental
anguish, emotional distress, physical suffering, loss of affection, loss of companionship, loss of
consortium, loss of love, and all claims which can be made pursuant to D.C., Federal and
common law.  In addition, Ms. Mannina is providing notice of claims which include, but are not
limited to, claims that the District of Columbia has engaged in a pattern and practice of failing to
appropriately assess, monitor, segregate and supervise the inmates and detainees, including
pretrial detainees, who present medical and mental health risks.  The District of Columbia has
failed to establish a system to protect inmates suffering from mental illness or who exhibit or
report suicidal ideations or tendencies.  Paul Mannina's death was the second death at the D.C.
Central Detention Facility within the past year, and Ms. Mannina, both individually and as the



**JOSEPH, GREENWALD & LAAKE, P.A.**
ATTORNEYS AT LAW

Risk Management
Re: Vicky Mannina
August 1, 2013
Page 3 of 3

Personal Representative of the Estate of Paul Mannina, reserves the right to pursue all claims against the District of Columbia for any and all governmental and institutional failures to prevent inmates and detainees, including pretrial detainees, from harming others, themselves and from killing themselves.

Ms. Mannina provides notice to the District of Columbia for negligence as described above. Please acknowledge receipt of this claim and the identity of the investigator assigned to the claim.

Thank you very much for your attention to this matter. Should you have any questions or concerns, please do not hesitate to contact me.

Yours very truly,

JOSEPH, GREENWALD & LAAKE, P.A.

By:    Steven B. Vinick

# EXHIBIT  3

1          SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                   CRIMINAL DIVISION

3    ----------------------------x
                                :
4    UNITED STATES OF AMERICA    :
                                :
5            V.                  : Criminal Action No.
                                : 2013 CF1 9990
6    PAUL MANNINA,               :
                                :
7                  Defendant.    :
                                :
8    ----------------------------x

9                            Washington, D.C.
                             Monday
10                           June 17, 2013

11          The above-entitled action came on for a
     preliminary hearing before the Honorable ROBERT RICHTER,
12   Associate Judge, in Courtroom Number 321, commencing at
     approximately 9:33 a.m.
13
            THIS TRANSCRIPT REPRESENTS THE
14          PRODUCT OF AN OFFICIAL
            REPORTER, ENGAGED BY THE COURT,
15          WHO HAS PERSONALLY CERTIFIED
            THAT IT REPRESENTS THE TESTIMONY
16          AND PROCEEDINGS OF THE CASE AS
            RECORDED.
17
            APPEARANCES:
18
            On behalf of the Government:
19
            ANDREA HERTZFELD, Esquire
20          Assistant United States Attorney

21
            On behalf of the Defendant:
22
            MICHAEL MCAULIFFE, Esquire
23          Washington, D.C.

24

25   Julie T. Richer, RPR
     (202) 879-1279

                                                          1

1    what she had recalled from the assault.  And she had stated

2    that at one point the defendant during the assault, while he

3    was assaulting her, on top of her, said to her, "Show me

4    your tits, show me your tits."  That was during the assault.

5         Q    Did she make any other additions in terms of

6    things that she recalled that the defendant said during the

7    assault?

8         A    In addition she stated something to the effect of,

9    "Everybody loves you" to the defendant.

10             And in response to that, he said, "Well, you

11   don't."

12        Q    Okay.  And do you know -- did the complainant

13   represent to you at what point during the course of the

14   assault the defendant was making those statements?

15        A    I believe it was when he was on top of her.

16        Q    Okay.  Is there anything else that she added in

17   terms of additional facts that she remembered as far as you

18   can recall at this point?

19        A    At one point the defendant, when he was -- at some

20   point when he was leaving the premises, he said something to

21   the effect of, "I guess I'll just go shoot myself,"

22   something along those lines.

23        Q    Okay.  Now, is there anything else?

24        A    Not that I can recall right now.

25        Q    Okay.  Now, during the course the course of your

                                                        10

1    It's the fact that, you know, 10 days ago, 12 days ago, he

2    was capable of something like this reflecting -- I'll accept

3    that he's not this evil person.  There's no history.

4              I assume you have no history.

5              MS. HERTZFELD:  No, Your Honor.

6              THE COURT:  But that he's obviously experienced

7    some sort of imbalance at this point, and I have heard

8    nothing that would assure me that he wouldn't repeat the

9    kind of desperate thing reflected here.  I mean it's -- you

10   know, what would be convincing to me is some doctor that

11   says, "There was this gross chemical imbalance that caused

12   him to act this way; we've rectified it."  But people

13   telling me he's been a good neighbor and a good father

14   doesn't really help a whole lot.

15             MR. McAULIFFE:  I understand the issue that you

16   have, and obviously we scrambled in a few days to put this

17   together.  What I would suggest to Your Honor -- one of the

18   things I wanted to show, if Your Honor were to order -- and

19   a stay-away order is already in place -- whatever monitoring

20   would be required to maintain that stay-away order to assure

21   the Court about a lack of contact with the victim, that that

22   would -- obviously we have no objection to that.  I think

23   it's appropriate under the allegations.

24             But the -- to hold him in detention would seem to

25   ignore, sir, the idea that even if everything the government

40

1          MR. McAULIFFE:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  He was -- the nurse had purported to

4     me that he had a .12 blood alcohol level in his system, in

5     addition to opiates as well as high levels of Tylenol, and

6     he was for the most part unresponsive, and that he had

7     been -- we found out later that he was released on Monday,

8     approximately three days after he was admitted.

9          Q     And when he was released, was that into custody?

10         A     Yes.

11         MS. HERTZFELD:  At this time, Your Honor, I have

12    no further questions.

13         THE COURT:  Mr. McAuliffe.

14                     **CROSS-EXAMINATION**

15         Q     Detective, were you on the scene June 5, the date

16    of all this?

17         A     Yes.

18         Q     Did you interview the complaining witness?

19         A     Yes.

20         Q     When you first interviewed her, she told you that

21    she did not know who did this, correct?

22         A     Correct.

23         Q     And when you first interviewed her, she told you

24    that this stranger sort of forced his way in the door and

25    attacked her and pushed her back right away; isn't that

                                                            22

1      Q      And where was it that you learned that

2   information?

3      A      From a family member.

4      Q      And did you have an opportunity to speak to anyone

5   at the hospital with respect to the defendant's admission to

6   the hospital?

7      A      Yes.

8      Q      And who was it that you spoke to at the hospital?

9      A      I spoke with a nurse that was working on the unit

10  where he was a patient.

11     Q      Okay.  And did you learn from that nurse who was

12  working at that unit where he was a patient what the basis

13  for his admission was?

14     A      Yes.

15     Q      And what was the basis?

16            MR. McAULIFFE:  Objection.

17            THE COURT:  Overruled.

18            THE WITNESS:  She reported to me that they

19  classified it, for lack of a better word, as a change in

20  mental state, and that's why he was admitted to the

21  hospital.

22     Q      Okay.  And did you learn any other information in

23  terms of his condition at that point?

24     A      Yes.

25     Q      And what was it?

21

1    It's the fact that, you know, 10 days ago, 12 days ago, he

2    was capable of something like this reflecting -- I'll accept

3    that he's not this evil person.  There's no history.

4              I assume you have no history.

5              MS. HERTZFELD:  No, Your Honor.

6              THE COURT:  But that he's obviously experienced

7    some sort of imbalance at this point, and I have heard

8    nothing that would assure me that he wouldn't repeat the

9    kind of desperate thing reflected here.  I mean it's -- you

10   know, what would be convincing to me is some doctor that

11   says, "There was this gross chemical imbalance that caused

12   him to act this way; we've rectified it."  But people

13   telling me he's been a good neighbor and a good father

14   doesn't really help a whole lot.

15             MR. McAULIFFE:  I understand the issue that you

16   have, and obviously we scrambled in a few days to put this

17   together.  What I would suggest to Your Honor -- one of the

18   things I wanted to show, if Your Honor were to order -- and

19   a stay-away order is already in place -- whatever monitoring

20   would be required to maintain that stay-away order to assure

21   the Court about a lack of contact with the victim, that that

22   would -- obviously we have no objection to that.  I think

23   it's appropriate under the allegations.

24             But the -- to hold him in detention would seem to

25   ignore, sir, the idea that even if everything the government

40

1    to get the kind of mental health care, but I can't do that

2    when he's in jail.  I want to take advantage of those

3    things.

4              MS. HERTZFELD:  Your Honor, may I just respond to

5    one point briefly?  I just want -- nobody predicted that

6    Mr. Mannina would show up in a premeditated fashion with

7    weaponry with him in order to perpetrate this kind of a

8    violent assault on this woman either.  And so the question

9    of whether or not we may be able to predict whether he would

10   do something further to her, a man that has access to

11   firearms in his home, or to someone else -- I think that

12   question of whether or not it's a limited danger to this

13   person, I think -- I do think he's a danger to the victim in

14   this case.

15             But I think the predictability of whether or not

16   he's a danger to other people, given what happened here, is

17   exactly the issue.  And I just want to point out that that

18   is a factor that the Court should take into consideration in

19   fashioning the bond conditions here and, I think, militates

20   in favor of the fact that the defendant should be held, to

21   prevent exactly this kind of unpredictable, extremely

22   violent and premeditated attack either again on this victim

23   or on some other member of her family or the community or

24   anybody else.

25             THE COURT:  I mean it's -- there's no question

                                                              42