IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VICTORIA MANNINA,<br><br>                    Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA, ET AL.<br><br>                    Defendants. | Case No.: 1:15-cv-0931 (KBJ) |

**SECOND AMENDED COMPLAINT
FOR DENIAL OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
AND FOR WRONGFUL DEATH AND SURVIVAL RIGHTS**

Plaintiff Victoria Mannina, individually and as personal representative for the Estate of

Paul Mannina, by counsel, pursuant to Fed. R. Civ. P. 15(a)(2), files this Second Amended

Complaint against Defendants, the District of Columbia, et al., alleging as follows:

**Nature of the Action**

1.      Plaintiff brings this action individually, as a widow, and as personal

representative of the Estate of Paul Mannina. Paul Mannina died while in the custody of the

District of Columbia Department of Corrections ("DCDOC") at its Central Detention Facility

("D.C. Jail") after ample notice of his deteriorating mental condition when his jailors at the D.C.

Jail gave him a razor that he used to slit his throat hours after returning from a court hearing in

which he was denied his pretrial release.

2.      The District of Columbia acted with negligence and deliberate indifference to the

safety of Mr. Mannina despite knowledge it had or should have had of the serious risks he faced

to harm himself, or general risk of self-harm that all inmates in Mr. Mannina's particular

situation face. The District's actions fell below the applicable standard of care and were in

1

violation of the Fifth Amendment guarantee of due process under the United States Constitution because the District (a) failed to provide adequate medical care to persons in the custody of the DCDOC, (b) failed to provide adequate mental health care to persons in the custody of the DCDOC, (c) failed to protect detainees from unsafe conditions leading to suicide by indiscriminately distributing razor blades to all detainees upon admission to D.C. Jail, (d) failed to protect persons in the custody of the DCDOC from self-destruction by placing detainees in conditions known to be inadequate for suicidal persons, (e) failed to have adequate systems for the collection or sharing of information from other departments or agencies that have relevant mental health information about MPD arrestees or D.C. Jail detainees in order to protect persons in the custody of the DCDOC from self-injury, and (f) failed to ensure that D.C. Jail personnel have adequate and relevant suicide prevention and mental health training to prevent self-harm.

       3.     These failures, well known to the District, amounted to a de facto policy of deliberate indifference to detainees in its custody, and this indifference resulted in the denial of care and tragic death of inmates, like Mr. Mannina, and a suicide rate that was three times the national average at jails between November 2012 and August 2013.

       4.     Plaintiff therefore seeks monetary damages, punitive damages, costs of suit, including reasonable attorneys' fees, and such other relief as equity and law require as a result of the District's negligence, unsafe conditions, harmful policies and practices, and exhibited deliberate indifference which caused the instant tort, statutory, and constitutional injuries.

## Jurisdiction and Venue

       5.     Plaintiff's claims arise under the Fifth Amendment of the United States Constitution and federal law, 42 U.S.C. § 1983. Consequently, jurisdiction is proper under 42 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) to adjudicate a federal question and redress the

deprivation of a right secured by the Constitution. Because the wrongful death and survival claims are derived from the same common nucleus of operative facts as the federal claim, this Court has pendent jurisdiction to hear and decide the remaining state law claims.

6.  Venue is proper because the acts Plaintiff complains of occurred in the District of Columbia and Mr. Mannina's death occurred in the D.C. Jail located in the District of Columbia.

### Parties

7.  Paul Mannina, deceased, was a resident of the State of Maryland, having resided at 17717 Pond Road, Ashton, Maryland 20861. He died at D.C. Jail while in the custody of the District.

8.  Plaintiff Victoria Mannina is the widow of the Decedent, Paul Mannina, and is a resident of the State of Maryland, residing at 17717 Pond Road, Ashton, Maryland 20861. On July 31, 2013, the Montgomery County Register of Wills appointed Victoria Mannina as the personal representative of the Estate of Paul Mannina, a true copy of such Appointment Order being attached hereto as Exhibit 1.

9.  Defendants are the District of Columbia and all of its agencies, instrumentalities, and municipal employees and officers who acted under color of authority and came in contact with Mr. Mannina, including, but not limited to, the Department of Corrections, D.C. Jail, and the Metropolitan Police Department ("MPD") and their respective personnel, as well as agents, and contractors of the District of Columbia.

10. Victoria Mannina, as personal representative of said Estate and for herself, timely gave written notice of her claims pursuant to D.C. Code § 12-309, describing the time, place, and circumstances of the injury to Mr. Mannina, a true copy of such Notice being attached hereto as Exhibit 2.

## Factual Allegations

11.     On June 13, 2013, Mr. Mannina was arraigned before the Superior Court of the District of Columbia on a criminal complaint that charged him with one count each of first degree burglary while armed and third degree sexual abuse while armed.

12.     Supporting police records allege that on Wednesday, June 5, 2013, Mr. Mannina drove to a home on Chesapeake Street Northwest in Washington, D.C. to meet with Leslie Perlman, a coworker. Upon information and belief, Mr. Mannina and Ms. Perlman had an intimate, personal relationship outside of work for more than twenty years. An altercation ensued between them, which resulted in injuries to Ms. Perlman that required medical treatment.

13.     Mr. Mannina returned home after meeting with Ms. Perlman. Despondent and depressed, he did not go to work on June 6th and, that night, attempted suicide by ingesting a multi-substance cocktail of drugs and alcohol.

14.     On June 7th, in the early morning hours, Victoria Mannina could not wake her husband and called for an ambulance. Paramedics rushed him to the emergency room of Montgomery General Hospital, where doctors admitted Mr. Mannina, as recalled by the MPD detective assigned to the case, for a "change in mental state." (*See* Preventive Detention Hearing Transcript, June 17, 2013 Tr. at 21-22, a true copy of all relevant transcript pages being attached hereto as Exhibit 3.) High levels of alcohol, opiates, and Tylenol were found in his system and he was found unresponsive even to painful stimuli, which was also known to the District. (*Id.*)

15.     During the criminal investigation, Ms. Perlman declined to name Mr. Mannina as her assailant. But in post-interviews, she changed her story and told MPD detectives that he was the person who injured her. She also reported that he said "I lost control" and made the suicidal statement "I guess I'll just go shoot myself," all of which was recorded in police records and

adopted by MPD Detective Alexander MacBean in his testimony during the preventive detention hearing. (*See* June 17, 2013 Tr. at 10.)

16.     The police arrested Mr. Mannina sometime after 2:00 p.m. on Friday, June 7th, while he was still a patient at Montgomery General Hospital receiving treatment for his attempted suicide and multi-substance overdose. He remained there for three days during which the police barred his family from seeing him. Having no criminal past and never having been arrested before, Mr. Mannina was alone, disoriented, and unaware why he was in the hospital and under 24-hour police surveillance.

17.     On or about June 10th, Mr. Mannina was transferred from the hospital to a jail facility on Seven Locks Road in Montgomery County. On or about June 12th, he was extradited by MPD transport to 300 Indiana Avenue Northwest in Washington, D.C., where he was processed for arrest.

18.     Restrained and still in hospital garments, Mr. Mannina was then brought before a judge on June 13th as "Lockup Number 9" to be formally arraigned on the above-mentioned counts in Superior Court Case No. 2013 CF1 009990. The D.C. Pretrial Services Agency ("PSA") officer who met Mr. Mannina prior to his arraignment observed and thus reported that Mr. Mannina had thoughts and attempts to harm himself.

19.     At the government's request, during the arraignment, the court denied Mr. Mannina's release and committed him to D.C. Jail on a three-day hold subject to further order of the court. Thereafter, he was transported to D.C. Jail where he was processed for intake and received into custody by DCDOC as a pretrial detainee.

20.     In June 2013, all detainees and prisoners at D.C. Jail received on-site mental health services from the D.C. Department of Mental Health and clinicians from Unity Health

Care, an outside vendor contracted by the District to provide medical health care services to inmates in DCDOC facilities.

21. However, as demonstrated in the audit and investigative findings of Lindsay Hayes per his *Report on Suicide Prevention Practices within the District of Columbia Department of Corrections Central Detention Facility* (the "Hayes Report"), a true copy of such report being attached hereto as Exhibit 4 and incorporated herein by reference, DCDOC had a systemic lack of care for detainees by providing inadequate and irrelevant training to its employees and clinicians that fell below applicable national standards, and a custom of performing hollow inmate medical evaluations that were comprised of cursory, incomplete, or meaningless questions that lead to flawed data and avoidable failures to diagnose and treat seriously ill and obviously afflicted inmates.

22. In June 2013, D.C. Jail also had only nine suicide-resistant cells, even though more than nine inmates were on suicide observation status each day. As a result, DCDOC had a recurring problem and practice of placing suicidal detainees, potentially suicidal detainees, or other detainees in crisis in non-suicide resistant housing that subjected inmates, like Mr. Mannina, to a substantial risk of serious harm or death.

23. During Mr. Mannina's intake and so-called medical evaluation on or about June 13, DCDOC failed to identify the obvious medical needs of Mr. Mannina, leaving his psychological distress untreated and subjecting him to the unsafe condition of general population and other dangerous policies and practices.

24. On June 17th, Mr. Mannina returned to Superior Court for his subsequent preventive detention hearing. Per its updated report, the PSA restated its belief for a second time that Mr. Mannina had thoughts and attempts to harm himself.

25.     Mr. Mannina's counsel thus urged the court to release Mr. Mannina so that he could receive the medical care and mental health treatment he needed. In response, the court found that Mr. Mannina had "obviously experienced some sort of imbalance," that he "sounds like someone who had everything to lose," and that "there's obviously something that's gone wrong here[.]" (*See* June 17, 2013 Tr. at 40, 43.) The court denied his release, re-committing him to D.C. Jail, because it did not see how pretrial supervision or active monitoring would provide sufficient protection to the complainant, Leslie Perlman. (*Id*. at 43.)

26.     Visibly upset, crying, and depressed, Mr. Mannina was then walked back to the holding cells behind the courtroom to be returned to D.C. Jail. He had no occasion to speak to his family or attorney, and the June 17th hearing was the last time he saw either because he committed suicide hours later.

27.     Despite such cries for help, despite the court recognizing that Mr. Mannina had a fragile mental state, and despite the court alerting for all to hear, including his jailors, that Mr. Mannina had the warning signs of "a desperate man" in need of mental health treatment (*see id.*), the District failed to provide adequate care and act affirmatively to prevent his self-harm. Instead, DCDOC left him in open population housing without further medical treatment, let alone plans for the same, and gave him a razor blade that he used to take his life.

28.     The District had ample notice to infer that Mr. Mannina faced a substantial risk of serious harm. Based on, not at the exclusion of all else, the criminal investigation, hospital reporting, MPD reporting, PSA reporting, testimony from the detention hearing, counsel representations from the detention hearing, court findings from the detention hearing, and known facts that Mr. Mannina had been charged with a violent crime of notoriety, was a senior lawyer with the federal government, was a professional incarcerated for the first time, had declared an

intent to kill himself, and was arrested in a hospital after a bona fide attempt of suicide, the District had knowledge of Mr. Mannina's vulnerability and that he suffered from mental illness, depression, had attempted suicide and was at a continued risk for suicide.

29.     The DCDOC nonetheless left Mr. Manina untreated and subject to a substantial risk of serious harm that included unnecessary pain, injury, and death.

30.     The District's clear pattern of giving razor blades to inmates, as well as its callous convention of failing to provide prisoners with adequate health care, made the District deliberately indifferent or, at least, negligent to the fact that the DCDOC's lawless razor blade distribution practice and systemic failure to provide due care cause significant injury and a substantial risk of serious harm to vulnerable inmates like Mr. Mannina.

31.     In June 2013, DCDOC routinely distributed razor blades throughout its facilities for inmates to shave without regard to an inmate's mental health. Razor blades were permitted to be taken and used privately by inmates in housing units and cells, and these razor blades were not regulated, collected or accounted for by DCDOC employees in any meaningful or well-preserved way for the welfare of inmates.

32.     Giving razor blades to inmates like Mr. Mannina, whose fragile mental state and risk for self-harm was readily apparent, was an extraordinarily reckless tradition that, upon information and belief, the District knew was problematic and required change and discontinuation because it failed to protect inmates for whom the DCDOC was charged with housing and providing care.

33.     Failing to have adequate resources for suicide prevention and failing to provide relevant mental health training to municipal employees and officers to abate self-harm, as

8

supported by the Hayes Report, was also a deficient custom and recurrent problem that similarly posed a substantial risk of significant injury.

34. Mr. Mannina was incarcerated under these conditions that posed substantial risks of serious harm.

35. He killed himself in the early morning hours of June 18, 2013 desperate and alone, and the District is responsible for his wrongful death because it exposed Mr. Mannina to the unsafe conditions it created that ultimately led to his death.

## Count 1: Violation of Mr. Mannina's Civil Rights under 42 U.S.C. § 1983

36. Plaintiff repeats and reiterates each and every allegation contained in the above paragraphs 1 through 35 as if fully set forth herein.

37. Plaintiff, as personal representative of the Estate of Paul Mannina, alleges that this claim arises under federal law, 42 U.S.C. § 1983, and is based on the deprivation of Paul Mannina's rights under the due process clause of the Fifth Amendment of the United States Constitution.

38. Detained prior to trial and not convicted of a crime, Mr. Mannina had the right to be free from *any* form of punishment which, at a minimum, meant that he had the right to adequate medical care and right to be free from the substantial risk of serious harm or unsafe conditions that cause the sufferance of constitutional injuries, including self-harm or self-injurious behavior.

39. Despite knowledge that the District had or should have had of the serious risks Mr. Mannina faced to harm himself—risks that were so obvious to make the need for preventative action and care abundantly clear because, in part, all inmates in his particular

situation face such risks of self-harm—the District showed no concern for his health or safety and disregarded his risk of suicide and need for preventative care.

40. Because of the District's deliberate indifference to the obvious, known medical needs of Mr. Mannina and because of the District's constitutionally inadequate resources to care for suicidal or potentially suicidal detainees like Mr. Mannina, he went without appropriate diagnosis and management of his medical condition and died from the District's failures to treat.

41. Moreover, or in the alternative, because of the District's systemic failure to train, and because of the clear pattern of denying medical care to inmates with serious medical conditions or providing such inmates with care that is so cursory or grossly incompetent that it amounts to a denial of care, as evidenced and exposed by the Hayes Report, the District created an unsafe condition that caused Mr. Mannina's death.

42. And because of the District's brazen practice of making razor blades freely and indiscriminately available to every new detainee, the District showed reckless indifference to the vulnerability of inmates like Mr. Mannina and created the unsafe condition that brought about his untimely death.

43. The District's misconduct, constitutionally inadequate resources, and its clear pattern of general indifference as well as systemic failures as a whole, created an environment that placed suicidal detainees like Mr. Mannina at enormous risk of harm, and the District's conduct constitutes nothing short of deliberate indifference and a violation of Mr. Mannina's constitutional guarantee of due process.

## Count 2: Negligence (Survival Action)

44. Plaintiff repeats and reiterates each and every allegation contained in the above paragraphs 1 through 43 as if fully set forth herein.

45.     Plaintiff further alleges that this claim arises under the District of Columbia Survival Statute, D.C. Code § 12-101.

46.     The District owed Mr. Mannina a duty of reasonable care under the circumstances to protect him from self-harm and ensure his safety as an arrestee and later pretrial detainee under the custody and control of MPD and DCDOC, respectively.

47.     Codified at D.C. Code § 24-211.02 (formerly § 24-442), this duty provides that the District is "responsible for the safekeeping, care, protection, instruction, and discipline of persons committed" to its facilities, which has been held to impose on prison authorities at D.C. Jail and members of MPD alike, a common law duty to exercise reasonable care under the circumstances in the protection and safekeeping of arrestees, prisoners, and detainees.

48.     Based on the special relationship between the officer and arrestee or jailer and prisoner, this duty includes a responsibility to prevent the arrestee or prisoner's own suicide.

49.     Mr. Mannina had never been arrested or convicted of a crime before and had a heightened risk of suicide while in the complete custody and control of the District.

50.     For the reasons set forth above, including the District's unlawful acts, omissions, policies and practices as alleged herein, the District failed to act reasonably to secure Mr. Mannina's safety and breached its duty of care.

51.     The District is therefore guilty of negligence and, as a direct and proximate cause of such negligence, is liable for Mr. Mannina's injuries including severe physical pain, mental anguish, hopelessness, distress, death and resulting damages suffered by him and his survivors. As a further and direct proximate cause of the District's negligence, Mr. Mannina's estate lost the future earnings and other economic and non-economic damages recoverable per applicable District of Columbia law.

52.     Under D.C. Code § 12-101, Mr. Mannina's right of action for these injuries prior to his death survives in favor of his widow, Victoria Mannina, the personal representative of his Estate.

## Count 3: Wrongful Death

53.     Plaintiff repeats and reiterates each and every allegation contained in the above paragraphs 1 through 52 as if fully set forth herein and further alleges that this claim arises under the District of Columbia Wrongful Death Statute, D.C. Code § 16-2701 *et seq*.

54.     As a direct and proximate cause of the negligence of the District and its DCDOC and D.C. Jail, Plaintiff, Victoria Mannina, as a widow and next of kin, incurred cremation expenses, similar consequential losses, and the loss of financial support furnished and expected to be furnished by the Decedent, together with any other pecuniary losses or damages recoverable under the statute.

## Prayer for Relief

WHEREFORE, your Plaintiff, Victoria Mannina, individually and as the duly appointed personal representative of the Estate of Paul Mannina, deceased, prays that judgment be entered against Defendants, the District of Columbia, et al., on all counts set forth herein and that Plaintiff be awarded the full and just amount of $8,500,000 for the damages to Mr. Mannina and Plaintiff, plus punitive damages, costs of suit, including reasonable attorneys' fees allowed under 42 U.S.C. § 1988, and pre-judgment and post-judgment interest and any other relief that this Court deems just and proper.

## Jury Demand

Plaintiff hereby demands a trial by jury with respect to each claim in this Second Amended Complaint

Dated: May 11, 2017                    Respectfully submitted,

/s/ Ray M. Aragon
RAY M. ARAGON, Bar No. 41822
Press, Dozier & Hamelburg, LLC
7910 Woodmont Avenue, Suite 1350
Bethesda, Maryland 20814
Tel: (301) 913-5200
Fax: (301) 913-5205
Email: raragon@pressdozierlaw.com
*Counsel for Plaintiff*

ALFRED D. CARRY
Press, Dozier & Hamelburg, LLC
*Cocounsel for Plaintiff*

and

/s/ John Bickerman
JOHN BICKERMAN, Bar No. 423059
Bickerman Dispute Resolution, PLLC
1455 Pennsylvania NW, Suite 400
Washington, D.C. 20004-0017
Tel: (202) 289-0400
Email: jbickerman@bickerman.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 11th day of May, 2017 via

the Court's CM/ECF System on the following:

Steven J. Anderson
Office of the Attorney General for the District of Columbia
441 4th Street NW, Suite 630 South
Washington, DC 20001
*Counsel for Defendants*

/s/ Ray M. Aragon
Ray M. Aragon
*Counsel for Plaintiff*

13

# Exhibit 1

**State of Maryland Letters of Appointment of
Victoria Mannina as Personal Representative of the Estate of Paul Mannina**

(FILE IN DUPLICATE)

JAMES D. WALSH, Attorney

Walsh & Company, P.A.
9841 Broken Land Parkway
Suite 206
Columbia, Maryland 21046

**SMALL ESTATE**
**NOTICE OF APPOINTMENT**
**NOTICE TO CREDITORS**      Estate No._____
**NOTICE TO UNKNOWN HEIRS**

TO ALL PERSONS INTERESTED IN THE ESTATE OF ___PAUL D. MANNINA_____

Notice is given that __Victoria M. Mannina, 17717 Pond Road,_____

____Ashton, Maryland  20861_____
                          (name and address)
was on _____, 2013 appointed personal representative of
              (date)
the estate of _Paul D. Mannina_, who died on _June 18, 2013_, without a
                                                        (date)
will.

Further information can be obtained by reviewing the estate file in
the office of the Register of Wills or by contacting the personal
representative or the attorney.

All persons having any objection to the appointment (or to the probate
of the decedent's will) shall file their objections with the Register of
Wills within 30 days after the publication of this Notice.

All persons having claims against the decedent must serve their claim
on the undersigned personal representative or file them with the Register
of Wills with a copy to the undersigned on or before the earlier of the
following dates:

(1)     Six months from the date of the decedent's death; or

(2)     Thirty days after the personal representative mails or otherwise
        delivers to the creditor a copy of this published notice or other
        written notice, notifying the creditor that the claim will be
        barred unless the creditor presents the claims within thirty days
        from the mailing or other delivery of the notice.  Any claim not
        served or filed within that time, or any extension provided by
        law, is unenforceable thereafter.

_Victoria M Mannina_____

_____

Personal Representative(s)

**RW 1109 - Page 1 of 2**



# STATE OF MARYLAND
# LETTERS OF ADMINISTRATION
# OF A SMALL ESTATE

Estate No. W77008

I certify that administration of the Estate of

**PAUL D. MANNINA**

was granted on the _31st_ day of _JULY, 2013_ ,

to VICTORIA M MANNINA

as personal representative(s) and the appointment is in effect

this _31st_ day of _JULY, 2013_

☐ Will probated _____
  (date)

☑ Intestate estate

☐ Unprobated Will - Probate Not Required

*Joseph M. Griffin*

JOSEPH M GRIFFIN

Register of Wills for

MONTGOMERY COUNTY

VALID ONLY IF SEALED WITH THE SEAL OF THE COURT OR THE REGISTER

RW1107

ROWNET
11/2009

IN THE ORPHANS' COURT FOR

*(OR)*

BEFORE THE REGISTER OF WILLS FOR

MONTGOMERY COUNTY , MARYLAND

IN THE ESTATE OF:
PAUL D. MANNINA _____     ESTATE NO. W77008 _____

# ORDER FOR SMALL ESTATE

Upon the foregoing Petition, it is this _31st_ day of _____ JULY _____ , _2013_ , by the Register of Wills ordered that:

1. The estate of _____ PAUL D. MANNINA _____ shall be administered as a small estate.

2. _____ VICTORIA M MANNINA _____
   shall serve as personal representative(s).

3. The personal representative shall pay fees due the register, expenses of administration, allowable funeral expenses, and statutory family allowances, and, if necessary, sell property of the decedent in order to pay them.

4. The will dated _____

   (including codicils, if any, dated _____ ) accompanying the petition is:

   ☐   admitted to probate; or

   ☐   retained on file only.

5. Publication is:

   ☐   not required; or

   ☑   required and Notice of Appointment shall be published once in a newspaper of general circulation in the county of appointment.

6. When publication is required, the personal representative shall, subject to the statutory order of priorities and the resolution of disputed claims by the parties or by the court: (a) pay all proper claims, expenses, and allowances not previously paid; (b) if necessary, sell property of the estate in order to do so; and (c) distribute the remaining property of the estate in accordance with the will or, if none, with the intestacy laws of this State.

*Joseph M. Griffin*
_____
JOSEPH M GRIFFIN
Register of Wills

## THIS ORDER DOES NOT CONSTITUTE LETTERS OF ADMINISTRATION
## AND DOES NOT AUTHORIZE THE TRANSFER OF ASSETS.

Certificate of Service

I hereby certify that on this _31st_ day of _____ JULY _____ , _2013_ , I delivered or mailed, postage

prepaid, a copy of the foregoing Order to _ VICTORIA M MANNINA _____

_____ Personal Representative.

VICTORIA M MANNINA
17717 POND RD.
ASHTON, MD 20861

*Joseph M. Griffin*
_____
JOSEPH M GRIFFIN
Register of Wills

# Exhibit 2

**Notice of Claim Pursuant to
Section 12-309 of the D.C. Code**



# JOSEPH, GREENWALD & LAAKE, P.A.

ATTORNEYS AT LAW

**Steven B. Vinick**
*Attorney at Law*

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Direct Dial: (240) 553-1221
Facsimile: (301) 220-1214
Email: svinick@jgllaw.com
www.jgllaw.com

August 1, 2013

**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
Office of Risk Management
ATTN: Claims
441 4th Street, NW, Suite 800 South
Washington, DC 20001

Mayor Vincent Gray
Executive Office of the Mayor
1350 Pennsylvania Avenue, NW, Suite 316
Washington, DC 20004

> **RE:** **Notice of Claim Pursuant to Section 12-309 of the D.C. Code**
> **Vicky Mannina, Individually and as the Personal Representativ̇e of the**
> **Estate of Paul Mannina**

Dear Mayor Gray:

Please be advised that this office has been retained to represent Vicky Mannira, individually and as Personal Representative of the Estate of Paul Mannina, for injuries, damages, and the wrongful death of Paul Mannina, which occurred on or about the late evening hours of June 17, 2013 and/or the early morning of hours of June 18, 2013 at the District of Columbia Central Detention Facility, which is located in the District of Columbia. Please accept this letter as Ms. Mannina's formal written notice of claim pursuant to §12-309 of the District of Columbia Code.

| | |
|---|---|
| Identity of Claimant: | Vicky Mannina<br>17717 Pond Road<br>Ashton, Maryland 20861<br>DOB: 3/1/1957<br>SSN: 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 |
| Identity of Decedent: | Paul Mannina<br>17717 Pond Road<br>Ashton, Maryland 20861<br>DOB: 5/29/1955<br>SSN: 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 |
| Date/Time of Incident: | Late evening hours of June 17, 2013/Early morning hours<br>of June 18, 2013 |



JOSEPH, GREENWALD & LAAKE, P.A.
ATTORNEYS AT LAW

Risk Management
Re: Vicky Mannina
August 1, 2013
Page 2 of 3

Location of Incident:      D.C. Central Detention Facility
1901 D Street SE
Washington, D.C. 20003

Cause of Damage or Injury:   Failure of the Detention Center to adequately assess, monitor, segregate and/or supervise Paul Mannina, resulting in his death

With respect to the circumstances under which the damages, injuries and death were sustained, and the reason for the District of Columbia's liability, it is the Claimant's contention that the City, and its agents, servants and employees, was negligent in assessing, monitoring, segregating and supervising Paul Mannina while he was incarcerated. Upon information and belief, the District of Columbia owns, operates, manages and/or maintains the premises known as the D.C. Central Detention Facility, 1901 D Street SE, Washington, D.C. 20003. In addition, the City employs the correctional officers and other officials and individuals who work in and for the D.C. Central Detention Facility.

On the late evening hours of June 17, 2013 and/or the early morning hours of June 18, 2013, Paul Mannina was a pretrial detainee. Prior to his incarceration, Paul Mannina had been a in-patient at the psychiatric ward of Montgomery General Hospital Mr. Mannina had been released only a few days before. He had gone to the psychiatric ward because of severe problems with depression. This information was known to the employees at the D.C. Central Detention Facility. Despite this knowledge, Mr. Mannina was never medically assessed, was not placed in a unit or a cell where he would be prevented from harming himself or from having other individuals harm him, and was not properly monitored or supervised. At some point during the late evening hours of June 17, 2013 and/or the early morning hours of June 18, 2013, Mr. Mannina died. Mr. Mannina was discovered on June 18, 2013 with his throat slashed. The District of Coumbia failed to properly assess Mr. Mannina's medical and psychiatric issues and failed to act accordingly. As a direct and proximate result of the negligence of the District of Columbia, the D.C. Central Detention Facility, and their agents, servants and employees, Paul Mannina was caused to suffer severe injuries and death.

Ms. Mannina is providing statutory notice of all claims, both individually and as the Personal Representative of the Estate of Paul Mannina, deceased. These claims include, but are not limited to, claims for wrongful death, survivorship, personal injury, conscious pain, mental anguish, emotional distress, physical suffering, loss of affection, loss of companionship, loss of consortium, loss of love, and all claims which can be made pursuant to D.C., Federal and common law. In addition, Ms. Mannina is providing notice of claims which include, but are not limited to, claims that the District of Columbia has engaged in a pattern and practice of failing to appropriately assess, monitor, segregate and supervise the inmates and detainees, including pretrial detainees, who present medical and mental health risks. The District of Columbia has failed to establish a system to protect inmates suffering from mental illness or who exhibit or report suicidal ideations or tendencies. Paul Mannina's death was the second death at the D.C. Central Detention Facility within the past year, and Ms. Mannina, both individually and as the



JOSEPH, GREENWALD & LAAKE, P.A.

ATTORNEYS AT LAW

Personal Representative of the Estate of Paul Mannina, reserves the right to pursue all claims against the District of Columbia for any and all governmental and institutional failures to prevent inmates and detainees, including pretrial detainees, from harming others, themselves and from killing themselves.

Ms. Mannina provides notice to the District of Columbia for negligence as described above. Please acknowledge receipt of this claim and the identity of the investigator assigned to the claim.

Thank you very much for your attention to this matter. Should you have any questions or concerns, please do not hesitate to contact me.

Yours very truly,

JOSEPH, GREENWALD & LAAKE, P.A.

By:    Steven B. Vinick

# Exhibit 3

**Transcript of Preventive Detention Hearing before
the Superior Court of the District of Columbia
(Selected Pages: June 17, 2013 Tr. 1-2, 8-10, 21-23, 40-43)**

| 1 | SUPERIOR COURT OF THE DISTRICT OF COLUMBIA |
|---|---|
| 2 | CRIMINAL DIVISION |

3  ------------------------------x
                                :
4  UNITED STATES OF AMERICA      :
                                :
5          V.                    : Criminal Action No.
                                : 2013 CF1 9990
6  PAUL MANNINA,                 :
                                :
7              Defendant.        :
                                :
8  ------------------------------x

9                          Washington, D.C.
                           Monday
10                         June 17, 2013

11        The above-entitled action came on for a
    preliminary hearing before the Honorable ROBERT RICHTER,
12  Associate Judge, in Courtroom Number 321, commencing at
    approximately 9:33 a.m.

13
            THIS TRANSCRIPT REPRESENTS THE
14          PRODUCT OF AN OFFICIAL
            REPORTER, ENGAGED BY THE COURT,
15          WHO HAS PERSONALLY CERTIFIED
            THAT IT REPRESENTS THE TESTIMONY
16          AND PROCEEDINGS OF THE CASE AS
            RECORDED.
17
            APPEARANCES:
18
            On behalf of the Government:
19
            ANDREA HERTZFELD, Esquire
20          Assistant United States Attorney

21
            On behalf of the Defendant:
22
            MICHAEL MCAULIFFE, Esquire
23          Washington, D.C.

24

25  Julie T. Richer, RPR
    (202) 879-1279

                                                        1

1                  I N D E X

2                                                     **Page**

3    GOVERNMENT WITNESS

4         ALEXANDER MacBEAN
              Direct examination by Ms. Hertzfeld          4
5             Cross-examination by Mr. McAuliffe         22
              Redirect examination by Hertzfeld         27

6

7    DEFENSE WITNESSES

8         DAVID HENRY ROOTS
              Direct examination by Mr. McAuliffe      32
9             Cross-examination by Ms. Hertzfeld      35

10        MELVIN JOSEPH MOSS
              Direct examination by Mr. McAuliffe      37

11

12

13                 E X H I B I T S
                                    **Page Admitted**

14   GOVERNMENT'S

15   1 through 8 - photos of complainant's injuries on 6/5/13   16

16   9 - photo of complainant's face on 6/6/13          18

17   10 - close-up photo of complainant's face a week later    18

18   11 - affidavit in support of arrest warrant         9

19

20

21

22

23

24

25

                                                     2

1  courtroom.

2      A      He's seated to the right of defense counsel

3  wearing an orange jumpsuit.

4      Q      Okay.  And you said that you prepared an arrest

5  warrant affidavit in this case.  If you have the opportunity

6  to adopt that arrest warrant affidavit as part of your

7  testimony today, would you do so?

8      A      Yes.

9      Q      I'm going to show you what I've marked here as

10  Government's Exhibit 11.

11              MR. McAULIFFE:  No objection.

12              MS. HERTZFELD:  Your Honor, may I approach?

13              THE COURT:  Yes.  You don't need permission to

14  approach.

15              MS. HERTZFELD:  Thank you.

16              BY MS. HERTZFELD:

17      Q      Detective MacBean, I'm showing you what's marked

18  as Government's Exhibit 11.  Do you recognize what that is?

19      A      Yes, ma'am, I do.

20      Q      And what is it?

21      A      It appears to be the affidavit in support of the

22  arrest warrant for Mr. Mannina.

23      Q      And is that the affidavit that you signed?

24      A      Yes.

25      Q      And that you prepared in this case?

8

```
 1        A    Yes, it is.

 2        Q    And would you adopt the arrest warrant today?

 3        A    Yes.

 4            MS. HERTZFELD:  Your Honor, I'd move to have

 5   Government's Exhibit 11 both admitted and permission to

 6   allow the witness to adopt it as part of his testimony

 7   today.

 8            MR. McAULIFFE:  I have no objection, Your Honor.

 9            THE COURT:  All right.  Very well.

10            (Government's Exhibit 11 was admitted in

11   evidence.)

12            BY MS. HERTZFELD:

13        Q    Now, Detective MacBean, in addition to the facts

14   that are set forth in that arrest warrant affidavit, have

15   you had an opportunity to continue your investigation in

16   this case?

17        A    Yes.

18        Q    And during the course of your continued

19   investigation in the case, did you learn any additional

20   information from the complainant in the case?

21        A    Yes.

22        Q    And with respect to the additional information you

23   learned, could you let us know what that is.

24        A    In post-interviews with the complainant, she

25   stated that -- some additional information with regard to
```

9

what she had recalled from the assault. And she had stated

that at one point the defendant during the assault, while he

was assaulting her, on top of her, said to her, "Show me

your tits, show me your tits." That was during the assault.

Q    Did she make any other additions in terms of

things that she recalled that the defendant said during the

assault?

A    In addition she stated something to the effect of,

"Everybody loves you" to the defendant.

And in response to that, he said, "Well, you

don't."

Q    Okay. And do you know -- did the complainant

represent to you at what point during the course of the

assault the defendant was making those statements?

A    I believe it was when he was on top of her.

Q    Okay. Is there anything else that she added in

terms of additional facts that she remembered as far as you

can recall at this point?

A    At one point the defendant, when he was -- at some

point when he was leaving the premises, he said something to

the effect of, "I guess I'll just go shoot myself,"

something along those lines.

Q    Okay. Now, is there anything else?

A    Not that I can recall right now.

Q    Okay. Now, during the course the course of your

1    Q    And where was it that you learned that

2    information?

3    A    From a family member.

4    Q    And did you have an opportunity to speak to anyone

5    at the hospital with respect to the defendant's admission to

6    the hospital?

7    A    Yes.

8    Q    And who was it that you spoke to at the hospital?

9    A    I spoke with a nurse that was working on the unit

10   where he was a patient.

11   Q    Okay.  And did you learn from that nurse who was

12   working at that unit where he was a patient what the basis

13   for his admission was?

14   A    Yes.

15   Q    And what was the basis?

16        MR. McAULIFFE:  Objection.

17        THE COURT:  Overruled.

18        THE WITNESS:  She reported to me that they

19   classified it, for lack of a better word, as a change in

20   mental state, and that's why he was admitted to the

21   hospital.

22   Q    Okay.  And did you learn any other information in

23   terms of his condition at that point?

24   A    Yes.

25   Q    And what was it?

21

1          MR. McAULIFFE:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  He was -- the nurse had purported to

4     me that he had a .12 blood alcohol level in his system, in

5     addition to opiates as well as high levels of Tylenol, and

6     he was for the most part unresponsive, and that he had

7     been -- we found out later that he was released on Monday,

8     approximately three days after he was admitted.

9          Q    And when he was released, was that into custody?

10         A    Yes.

11         MS. HERTZFELD:  At this time, Your Honor, I have

12    no further questions.

13         THE COURT:  Mr. McAuliffe.

14                    **CROSS-EXAMINATION**

15         Q    Detective, were you on the scene June 5, the date

16    of all this?

17         A    Yes.

18         Q    Did you interview the complaining witness?

19         A    Yes.

20         Q    When you first interviewed her, she told you that

21    she did not know who did this, correct?

22         A    Correct.

23         Q    And when you first interviewed her, she told you

24    that this stranger sort of forced his way in the door and

25    attacked her and pushed her back right away; isn't that

correct?

2     A    Yes.

3     Q    And she later clanged that story, correct?

4     A    Yes.

5     Q    And she said, "Well, actually I really did know
6  who this person was," right?

7     A    Yes.

8     Q    And she later said that she'd known him for many
9  years, correct?

10    A    Yes.

11    Q    And had an ongoing relationship for many years;
12 isn't that how she described it?

13    A    A work relationship yes, sir.

14    Q    Okay.  Well, she said there was more than a work
15 relationship, didn't she?

16    A    Friends.

17    Q    She told you she had made reservations for them to
18 spend the day together, correct?

19    A    She stated that she had made plans to meet up with
20 him that day.

21    Q    And then she told you that -- it was about two
22 days later, correct?

23    A    Yes.

24    Q    Now, the first version that she gave you, she was
25 struck in the face immediately upon opening the door,

1    It's the fact that, you know, 10 days ago, 12 days ago, he
2    was capable of something like this reflecting -- I'll accept
3    that he's not this evil person.  There's no history.

4            I assume you have no history.

5            MS. HERTZFELD:  No, Your Honor.

6            THE COURT:  But that he's obviously experienced
7    some sort of imbalance at this point, and I have heard
8    nothing that would assure me that he wouldn't repeat the
9    kind of desperate thing reflected here.  I mean it's -- you
10   know, what would be convincing to me is some doctor that
11   says, "There was this gross chemical imbalance that caused
12   him to act this way; we've rectified it."  But people
13   telling me he's been a good neighbor and a good father
14   doesn't really help a whole lot.

15           MR. McAULIFFE:  I understand the issue that you
16   have, and obviously we scrambled in a few days to put this
17   together.  What I would suggest to Your Honor -- one of the
18   things I wanted to show, if Your Honor were to order -- and
19   a stay-away order is already in place -- whatever monitoring
20   would be required to maintain that stay-away order to assure
21   the Court about a lack of contact with the victim, that that
22   would -- obviously we have no objection to that.  I think
23   it's appropriate under the allegations.

24           But the -- to hold him in detention would seem to
25   ignore, sir, the idea that even if everything the government

                                                              40

| | |
|---|---|
| 1 | says is true -- we don't agree to it. If everything the |
| 2 | government says is true, then perhaps he's a danger to one |
| 3 | person. And that can be monitored, and that can be |
| 4 | protected, and that would not be a concern. |
| 5 | THE COURT: Well, how can it be protected? I mean |
| 6 | it can be monitored, I'll agree with you. |
| 7 | MR. McAULIFFE: Right. |
| 8 | THE COURT: And then after the fact we could |
| 9 | likely figure out where he's been. It's -- but I don't see |
| 10 | how that protects this person. |
| 11 | MR. McAULIFFE: Your Honor, even if he were to be |
| 12 | placed on home detention -- and I understand that nobody is |
| 13 | ever 100 percent; I do understand that. I don't -- I hope |
| 14 | I'm not just quibbling with the Court. But it's -- given |
| 15 | the seriousness of pretrial detention -- and I do understand |
| 16 | how these things work in terms of the nature of these |
| 17 | allegations and that we would be somewhat unusual in some |
| 18 | respects. I think this is the unusual case. This is the |
| 19 | guy who's never been in trouble before. This is the person, |
| 20 | when he gives you his word, you can trust him. |
| 21 | The is the person who, whatever monitoring the |
| 22 | Court wants to put him on, I want to get him into the type |
| 23 | of treatment that you've described. I can't really do that |
| 24 | where he is now. He does have options. You've heard he's a |
| 25 | long-time federal government employee. He does have options |

1    to get the kind of mental health care, but I can't do that
2    when he's in jail. I want to take advantage of those
3    things.

4         MS. HERTZFELD: Your Honor, may I just respond to
5    one point briefly? I just want -- nobody predicted that
6    Mr. Mannina would show up in a premeditated fashion with
7    weaponry with him in order to perpetrate this kind of a
8    violent assault on this woman either. And so the question
9    of whether or not we may be able to predict whether he would
10   do something further to her, a man that has access to
11   firearms in his home, or to someone else -- I think that
12   question of whether or not it's a limited danger to this
13   person, I think -- I do think he's a danger to the victim in
14   this case.

15        But I think the predictability of whether or not
16   he's a danger to other people, given what happened here, is
17   exactly the issue. And I just want to point out that that
18   is a factor that the Court should take into consideration in
19   fashioning the bond conditions here and, I think, militates
20   in favor of the fact that the defendant should be held, to
21   prevent exactly this kind of unpredictable, extremely
22   violent and premeditated attack either again on this victim
23   or on some other member of her family or the community or
24   anybody else.

25        THE COURT: I mean it's -- there's no question

42

```
 1   your client sounds like someone who had everything to lose
 2   and nonetheless was capable of something like this,
 3   Mr. McAuliffe.  So I don't think I can find that there are
 4   conditions that will protect the community.  If you can find
 5   some secure treatment center or there ultimately is some
 6   better explanation than what I've heard, that can be
 7   reconsidered.

 8        I mean I -- as I say, there's no criminal history
 9   here.  I'm sure Mr. Mannina's lived his life well.  But
10   there's obviously something that's gone wrong here, and I
11   have no assurances that he's not still a desperate man.  I
12   mean it's -- sitting in jail for a week doesn't generally
13   improve someone's mental health, so I don't see how a
14   monitor can provide sufficient protection, so I will grant
15   the government's request for detention under 1322(B)(1)(a).
16   And that can obviously always be revisited.  And I'll set
17   this in front of Judge Beck for a status in about three
18   weeks.

19             MS. HERTZFELD:  That's fine, Your Honor.
20             THE DEPUTY CLERK:  She has July 9th, 10th.
21             THE COURT:  How is July 9th or 10th?
22             MS. HERTZFELD:  Court's indulgence.
23             MR. McAULIFFE:  I turned this off, so it's going
24   to be a minute before it --
25             MS. HERTZFELD:  July 9th or 10th, either one is
```

43

# Exhibit 4

***Report on Suicide Prevention Practices within the District of Columbia, Department of Corrections' Central Detention Facility*** **by Lindsay M. Hayes**

# REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE DISTRICT OF COLUMBIA, DEPARTMENT OF CORRECTIONS' CENTRAL DETENTION FACILITY
## Washington, DC
## (NIC T.A. No. 13J1092)

by

# Lindsay M. Hayes

40 Lantern Lane
Mansfield, MA 02048
(508) 337-8806; e-mail: Lhayesta@msn.com

September 13, 2013

REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE DISTRICT OF
COLUMBIA, DEPARTMENT OF CORRECTIONS' CENTRAL DETENTION
FACILITY
Washington, DC
(NIC T.A. No. 13J1092)

A.      **INTRODUCTION**

The following is a summary of the observations, findings, and recommendations of Lindsay M. Hayes, Project Director of the National Center on Institutions and Alternatives, following the provision of short-term technical assistance to the District of Columbia, Department of Corrections' (DOC) Central Detention Facility (CDF).   As of August 2013, the CDF has experienced a much higher number (three) of inmate suicides than in previous years. Because of the higher incidence of suicide, the DOC and its health care provider (Unity Health Care) began to examine the deaths, as well as review various policy and procedural directives relating to suicide prevention. In order to independently assess current practices, as well as offer any appropriate recommendations to suicide prevention policies and procedures within the CDF, DOC Director Thomas Faust decided to seek the assistance of an outside consultant.  Through the technical and financial assistance of the National Institute of Corrections - Jails Division, this writer's consulting services were offered to, and selected by, Director Faust.

It should be noted that the determination for the need of this writer's assessment was not prompted by litigation or critical investigation of any of the recent inmate suicides.  Rather, these actions were taken through the pro-active initiative of Director Faust who was committed to determining what steps, if any, were necessary to improve suicide prevention practices within the Central Detention Facility.

In conducting the assessment, this writer met with and/or interviewed numerous correctional, medical, and mental health officials and staff from the DC Department of Corrections, Central Detention Facility, and Unity Health Care; reviewed numerous policies and procedures related to suicide prevention, and screening/assessment protocols; reviewed various health care charts and investigative reviews of three (3) inmate suicides between November 2012 and June 2013;[1] and toured the Central Detention Facility. The on-site assessment was conducted on August 27 thru August 29, 2013.

It should also be noted that, as a result of the recent inmate suicides, DOC Director Faust assembled a Suicide Prevention Task Force comprised of representatives from the DC Department of Corrections, Unity Health Care, DC Department of Mental Health, and Corrections Corporation of America (which administers the Correctional Treatment Facility under contract with the Department of Corrections). The Task Force initially met on July 22, 2013 to review current policies and procedures governing the custodial, medical, and mental health care of inmates as it related to suicide prevention. This writer had an opportunity to review a draft of the Task Force report, as well as converse by telephone with Elspeth Ritchie, MD, Chief Clinical Officer for the DC Department of Mental Health and Task Force member.

As of August 2013, the Central Detention Facility had an average daily population of 1,739 inmates, with more than 14,000 new intakes processed through the facility each year. As shown by Table 1, the CDF has experienced 5 inmate suicides during the 5-year period of 2009 through 2013, including three (3) deaths this year. Based upon the average daily population

---

[1] The investigative reviews of an inmate suicide occurring in August 2013 had not yet been completed at the time of this writer's assessment and, therefore, not available for review prior to development of this report.

during this same time period, the suicide rate in the CDF was <u>50.8</u> deaths per 100,000 inmates -- a rate that is slightly higher than that of county jails of varying size throughout the country.[2] However, the suicide rate at the facility during 2013 (i.e., <u>172.5</u> deaths per 100,000 inmates) was substantially higher than that of county jails of varying size throughout the country.

---

[2] According to Heron, M. (2012), "Deaths: Leading Cause for 2009," *National Vital Statistics Report*, 61 (7), Hyattsville, MD: National Center for Health Statistics, the suicide rate in the general population is approximately <u>12</u> deaths per 100,000 citizens. According to the most recent data on jail suicide, the suicide rate in county jails throughout the country is approximately <u>43</u> per 100,000 inmates, Noonan, M. and Ginder, S. (2013), *Mortality in Local Jails and State Prisons, 2000-2011 - Statistical Tables*, Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice, Office of Justice Programs.

**TABLE 1**
**AVERAGE DAILY POPULATION, SUICIDES, AND SUICIDE RATE**
**WITHIN THE CENTRAL DETENTION FACIITY**
**JANUARY 2009 THRU AUGUST 2013***

| Year | ADP | Suicides | Suicide Rate |
|------|------|----------|--------------|
| 2009 | 1,962 | 1 | 50.9 |
| 2010 | 2,092 | 0 | 0 |
| 2011 | 2,095 | 0 | 0 |
| 2012 | 1,945 | 1 | 51.4 |
| 2013 | 1,739 | 3 | 172.5 |
| 2009-2013 | 9,833 | 5 | 50.8 |

*Source: DC Department of Corrections

**B.    FINDINGS AND RECOMMENDATIONS**

Detailed below is this writer's assessment of jail suicide prevention practices within the DC Department of Corrections' Central Detention Facility.  It is formatted according to this writer's eight (8) critical components of a suicide prevention policy: staff training, identification/screening, communication, housing, levels of supervision/management, intervention, reporting, and follow-up/morbidity-mortality review.  This protocol was previously developed by this writer and is consistent with national correctional standards, including those of the American Correctional Association's *Performance-Based Standards for Adult Local Detention Facilities* (2004); Standard J-G-05 of the National Commission on Correctional Health Care's *Standards for Health Services in Jails* (2008); and the "Suicide Prevention and Intervention Standard" of the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* (2011).[3] Where indicated, recommendations are also provided.

*At the outset, it should be noted that both the DC Department of Corrections and Unity Health Care have very comprehensive suicide prevention policies.  Both the DC Department of Corrections'* <u>Suicide Prevention and Intervention Policy</u> *(No. 6080.2F) and Unity Health Care's* <u>Suicide Prevention Policy</u> *(No. CF705) more than adequately cover the required components to a suicide prevention program.  However, as detailed in the following report, this writer found suicide prevention* **practices** *for many of these required components to be lacking in varying degrees and in need of immediate corrective action.*

---

[3]American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition, Lanham, MD: Author; National Commission on Correctional Health Care (2008), *Standards for Health Services in Jails*, 8th Edition, Chicago, IL: Author; and U.S. Department of Homeland Security (2011), Immigration and Customs Enforcement, *Operations Manual ICE Performance-Based National Detention Standards*, Washington, DC: Author.

1)   <u>Staff Training</u>

> *All* **correctional, medical, and mental health staff should receive eight (8) hours of initial suicide prevention training, followed by two (2) hours of annual training. At a minimum, training should include avoiding negative attitudes to suicide prevention, inmate suicide research, why correctional environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, identifying suicidal inmates despite the denial of risk, components of the agency's suicide prevention policy, and liability issues associated with inmate suicide.**

The key to any suicide prevention program is properly trained correctional staff, who form the backbone of any correctional system. Very few suicides are actually prevented by mental health, medical or other professional staff. Because inmates attempt suicide in their housing units, often during late afternoon or evening, as well as on weekends, they are generally outside the purview of program staff. Therefore, these incidents must be thwarted by correctional staff who have been trained in suicide prevention and are able to demonstrate an intuitive sense regarding the inmates under their care. Simply stated, correctional officers are often the only staff available 24 hours a day; thus they form the front line of defense in suicide prevention.

Both the American Correctional Association (ACA) and National Commission on Correctional Health Care (NCCHC) standards stress the importance of training as a critical component to any suicide prevention program. ACA Standard 4-ALDF-7B-10 requires that all correctional staff receive both initial and annual training in the "signs of suicide risk" and "suicide precautions;" while Standard 4-ALDF-4C-32 requires that staff be trained in the implementation of the suicide prevention program. As stressed in NCCHC Standard J-G-05  --

"All staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least biennial training are provided, although annual training is highly recommended." Finally, the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* require that all staff receive both pre-service and annual training in the following areas: recognizing verbal and behavioral cues that indicate potential suicide; demographic, cultural, and precipitating factors of suicidal behavior; responding to suicidal and depressed detainees; effective communication between correctional and health care personnel; necessary referral procedures; constant observation and suicide-watch procedures; follow-up monitoring of detainees who have already attempted suicide; and reporting and written documentation procedures."

**FINDINGS:** According to the DC Department of Corrections' <u>Suicide Prevention and Intervention Policy</u> (No. 6080.2F), all employees who work within the Central Detention Facility are required to receive 40 hours of pre-service training upon employment, including a module on suicide prevention. Annual, in-service suicide prevention training is also required for these employees. In addition, "prior to assignment to a mental health unit or to the female housing unit (noting females with mental illness may also be housed there), each correctional officer shall receive forty (40) hours training in correctional management of inmates who have mental illness. Eight (8) hours of the training shall be dedicated to the suicide prevention program. Each correctional officer assigned to the mental health unit and/or female mental health tear/cells shall be provided an annual forty (40) hours training session which includes eight (8) hours dedicated to the suicide prevention program."

The Unity Health Care's *Suicide Prevention Policy (No. CF705)* has similar mental health and suicide prevention training requirements, and states that the eight (8) hour annual mental health training required of correctional staff that work in the mental health units "shall include instruction on suicide warning signs and symptoms, potential suicide risk pre-disposing factors, high-risk suicide periods, why jails and prisons are conducive to suicides, liability issues, and a discussion of the jail's suicide prevention policy and procedures."

Despite the policy requirements from the DC Department of Corrections and Unity Health Care, current practices reflect a different training schedule and focus. For example, this writer was informed that correctional officers that are assigned to the mental health unit (South 3) in the Central Detention Facility do *not* receive any specialized mental health and/or suicide prevention training  (either on a pre-service or annual basis). In practice, the totality of suicide prevention training to *all* employees (including CDF correctional and Unity Health Care staff) is a 39-slide PowerPoint presentation entitled "Suicide Prevention (Module 16)." This workshop, encompassing only one (1) hour of instruction, is offered by Unity Health Care clinicians on a pre-service basis to new civilian employees and then repeated annually to all employees.[4] The slides present accurate information regarding signs and symptoms of suicidal behavior, research on suicide in community (not in the jail environment), liability issues, and the CDF policy on suicide prevention. According to training records, 70% of all correctional officers have received this suicide prevention training workshop within the past 12 months.[5]

---

[4]Although Unity Health Care clinicians provide the training, the "Suicide Prevention (Module 16)" lesson plan was previously developed by the DC Department of Corrections.
[5]This writer was informed that, although the DOC's Training Department has an annual target of 95% completion for training, completion of suicide prevention training has been lower this year because of budget considerations.

In addition to the "Suicide Prevention (Module 16)" training, the CDF Mental Health Director (for Unity Health Care) provides a 44-slide PowerPoint presentation entitled "Suicide Prevention and Corrections" to all Unity Health Care providers and qualified mental health professionals on both a pre-service and annual basis.[6] This one (1) hour PowerPoint slide presentation contains much of the same information found in the DOC's "Suicide Prevention (Module 16)" training, but, given its intended audience, is not clinically-focused and does not provide guidance on the clinical assessment of suicide risk. According to training records, 88% of Unity Health Care clinicians have received this suicide prevention training workshop within the past 12 months.

In sum, it would be this writer's opinion that the number of hours devoted to both pre-service and annual suicide prevention training for correctional, medical, and mental health staff is inadequate, and the content of the training curricula is in need of improvement. In addition, although only reflected in policy and not practice, a commitment to additional hours of suicide prevention training for correctional officers that are assigned to the lone Mental Health Unit (South 3) is misplaced because most of the identification of potentially suicidal behavior normally takes place outside of South 3 and in other units of the facility. Therefore, such additional hours of training is necessary for *all* correctional staff that work in the CDF.

**RECOMMENDATIONS**:  Several recommendations are offered to strengthen both the length and content of jail suicide prevention training offered to both correctional and healthcare personnel who work within the Central Detention Facility. *First*, it is strongly recommended that either the DC Department of Corrections or Unity Health Care develop a pre-service suicide

---

[6]It was unclear to this writer if such training was also required of the Unity Health Care *nursing* staff.

prevention curriculum (of between 4 to 8 hours in length) and that <u>all</u> new correctional and health care staff be required to complete this initial program. It is strongly recommended that the curriculum include the following topics:

- avoiding obstacles (negative attitudes) to prevention
- inmate suicide research
- why facility environments are conducive to suicidal behavior
- identifying suicide risk despite the denial of risk
- potential predisposing factors to suicide
- high-risk suicide periods
- warning signs and symptoms
- components of the CDF's suicide prevention program
- liability issues

There are several nationally-recognized suicide prevention training curricula that can be utilized as guides to development of a recommended suicide prevention training curriculum.[7] Much of this information is available through the US Justice Department's National Institute of Corrections at the following website: http://nicic.gov/?q=suicide+prevention+training. In addition, the new curriculum should include more recent national data on inmate suicides. Data from this writer's *National Study of Jail Suicide: 20 Years Later* can be included in the revised curriculum.[8]

*Second*, it is strongly recommended that either the DC Department of Corrections or Unity Health Care develop an annual suicide prevention curriculum (of 2 hours in length) and

---

[7]See, for example, Hayes, L.M. and Rowan, J.R. (1995), *Training Curriculum on Suicide Detection and Prevention in Jails and Lock-ups*, Mansfield, MA: National Center on Institutions and Alternatives; New York State, Office of Mental Health, Commission of Correction (2003), *Suicide Prevention and Crisis Intervention in County Jails and Police Lockups – Basic Program Trainer's Manual*, Albany, NY: Authors.
[8]Hayes, L.M (2010), *National Study of Jail Suicides: 20 Years Later*, Washington, DC: National Institute of Corrections, U.S. Department of Justice, http://www.ncianet.org/services/suicide-prevention-in-custody/publications/; Hayes, L. (2012), "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

that *all* correctional and health care staff be required to complete the workshop each year. The annual training curriculum should be a consolidation of the pre-service curriculum, offer case studies of any suicides during the previous year, and any changes in the CDF suicide prevention policy during the previous year.

## 2) Intake Screening/Assessment

**Intake screening for suicide risk must take place immediately upon confinement and prior to housing assignment. This process may be contained within the medical screening form or as a separate form, and must include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; prior mental health treatment/hospitalization; recent significant loss (job, relationship, death of family member/ close friend, etc.); history of suicidal behavior by family member/close friend; suicide risk during prior confinement; transporting officer(s) believes inmate is currently at risk. The intake screening process should include procedures for referral to mental health and/or medical personnel. Any inmate assigned to a special housing unit should receive a written assessment for suicide risk by mental health staff upon admission.**

Intake screening/assessment is also critical to a correctional system's suicide prevention efforts. An inmate can attempt suicide at any point during incarceration -- beginning immediately following reception and continuing through a stressful aspect of confinement. Although there is disagreement within the psychiatric and medical communities as to which factors are most predictive of suicide in general, research in the area of jail and prison suicides has identified a number of characteristics that are strongly related to suicide, including: intoxication, emotional state, family history of suicide, recent significant loss, limited prior incarceration, lack of social support system, psychiatric history, and various "stressors of confinement."[9] Most importantly, prior research has consistently reported that at least two thirds of all suicide victims communicate their intent some time prior to death, and that any individual with a history of one or more suicide attempts is at a much greater risk for suicide than those

---

[9]Bonner, R. (1992), "Isolation, Seclusion, and Psychological Vulnerability as Risk Factors for Suicide Behind Bars," in R. Maris et. al. (Editors) *Assessment and Prediction of Suicide*, New York, NY: Guilford Press, 398-419.

who have never made an attempt.[10] In addition, according to the most recent research on inmate suicide, at least one-third of all inmate suicide victims had prior histories of both mental illness and suicidal behavior.[11] The key to identifying potentially suicidal behavior in inmates is through inquiry during both the intake screening/assessment phase, as well as other high-risk periods of incarceration. Finally, given the strong association between inmate suicide and special management (i.e., disciplinary and/or administrative segregation) housing unit placement, any inmate assigned to such a special housing unit should receive a written assessment for suicide risk by mental health staff upon admission to such placement.

Both the ACA and NCCHC standards address the issue of assessing inmates assigned to segregation. According to ACA Standard 4-ALDF-2A-45: "When an inmate is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocol as established by the health authority." NCCHC Standard J-E-09 states that "Upon notification that an inmate is placed in segregation, a qualified health care professional reviews the inmate's health record to determine whether existing medical, dental, or mental health needs contraindicate the placement or require accommodation."

**FINDINGS:** Both the DC Department of Corrections and Unity Health Care policies adequately address requirements for intake screening to identify potentially suicidal behavior. Upon admission, all new inmates are processed through the Reception and Discharge (R &D)

---

[10]Clark, D. and S.L. Horton-Deutsch (1992), "Assessment in Absentia: The Value of the Psychological Autopsy Method for Studying Antecedents of Suicide and Predicting Future Suicides," in R. Maris et. al. (Editors) *Assessment and Prediction of Suicide*, New York, NY: Guilford Press, 144-182.

[11]Hayes, L.M. (2010), *National Study of Jail Suicide: 20 Years Later*, Washington, DC: U.S. Department of Justice, National Institute of Corrections; "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

Unit. The DOC recently initiated a new protocol by which the R & D Shift Lieutenant administers a "Booking Questionnaire" to each inmate. This 17-item intake screening form is very good and was adapted from the "Suicide Prevention Screening Guidelines" form that was originally developed by the New York State Office of Mental Health and Commission of Correction during the 1980s. In addition, the Shift Lieutenant reviews the "alert screen" in the Jail and Community Corrections System (JACCS), the agency's jail management system, to determine if the inmate has been flagged as a potential risk for suicide based upon current or prior behavior known to the agency.[12] Following the screening process, each inmate is escorted to the Medical Unit or additional intake screening.

Each inmate admitted into the Central Detention Facility receives intake screening administered by a health care provider from Unity Health Care, either a physician, physician's assistant, or nurse practitioner.[13] Mental health/suicide risk inquiry during the intake screening process is found on the "Psych Screen" section of the electronic medical record (EMR), entitled "Centricity." Following questions are on the screen:

- Currently receiving MH services in community?
- Received MH services in the past?
- Experienced a significant loss within six months?
- Very worried about 'major' problems other than legal?
- Family or significant other attempted suicide?
- Holds position of respect in community and/or charged with crime of notoriety?
- Thinking about killing him/her self?
- History of suicide(s), self injury, or suicidal ideation?
- Lacks close family or friends in the community?
- First DC incarceration?
- Referred for court-ordered forensic evaluation?

[12] This process was initiated a few months ago following the recent inmate suicides.
[13] This practice far exceeds the standard of care in similar sized jail facilities throughout the country in which intake screening is completed by nursing staff (preferably a registered nurse).

- Have you ever been a victim of a physical or sexual assault?
- History of special education placement?
- History of sex offenses?
- Apparently under influence of alcohol or drugs?
- Is inmate a juvenile?
- Referred to comprehensive assessment because of a positive response to screening questions?

These are all good questions for an adequate suicide risk inquiry. In addition, and perhaps most importantly, the screening process is conducted within the privacy of the medical provider's office. This better ensures the likelihood of an inmate feeling comfortable in self-reporting sensitive medical and mental health information. This writer had the opportunity to observe the intake screening process within the Medical Unit. Unfortunately, due to scheduling problems, only one new intake could be observed. However, this writer's observation of that one case was not very favorable. Despite a "Psych. Screen" that listed over 15 lines of inquiry, this writer observed the provider only making the following inquiries to the inmate:

- Ever seen a psychiatrist?
- Are you thinking of hurting yourself?
- Suffered any significant loss?

Although the observed inmate answered "no" to each of these three questions, because it was his first CDF incarceration, pursuant to policy, the inmate was referred to a mental health clinician for further assessment. This writer followed the inmate and subsequently observed this mental health assessment (in another private office). The mental health clinician asked the following questions to the inmate:

- Any MH treatment in community?
- Ever tried to harm yourself?
- Any drug use?
- Do you have any significant relationships?
- Schooling?
- Employment?

- Need any mental health services? (Informed how to access mental health services through sick call slips.)

Ironically, there was no inquiry from this clinician regarding *current* suicide risk. Although disappointing to observe, based upon a sample of only one case, this writer will not offer any conclusions as to the quality of intake screening administered by either Unity Health Care providers or mental health clinicians.

Further, one of the indicators of current suicide risk during confinement is suicide risk during prior confinement. Although the "alert screen" in the JACCS has the ability to capture information about an inmate's placement on suicide precautions during a prior CDF confinement, such critically important information is not currently contained within JACCS (despite CDF staff assurances that it was).[14] In addition, this writer was informed that the Centricity EMR will be upgraded in the next several weeks, with one new feature being the ability to flag and inmate's placement on suicide precautions during a prior confinement through an alert screen.

Finally, as previously offered, there is a strong association between inmate suicide and special management (i.e., disciplinary and/or administrative segregation) housing unit placement. Therefore, any inmate assigned to a segregation unit should receive a written assessment for suicide risk by mental health staff upon admission to such placement. This writer was informed by Unity Health Care officials that each inmate assigned to segregation must be seen face-to-face by a medical provider and given "pre-segregation clearance." In addition, an inmate assigned to

---

[14]For example, this writer reviewed the JACCS and found that none of the inmates on suicide precautions for August 27 were listed on the alert screen.

segregation with a history of mental illness must be seen by, and cleared for, such housing by a mental health clinician. However, documentation of such assessment appears only as a "cleared for segregation" entry in the chart." Finally, this writer was informed that nursing staff are required to make daily rounds of segregation, whereas a mental health clinician conducts rounds once or twice a week in segregation. These are good practices.

In sum, the intake screening process for identifying potentially suicidal behavior is more than adequate, with medical providers responsible for administering the screening form in the privacy of their offices. However, the suicide risk inquiry is not as robust as it could be, and an alert system should be activated within both the JACCS and Centricity EMR to flag an inmate's placement on suicide precautions during a prior CDF confinement.

**RECOMMENDATIONS:** A few recommendations are offered to improve the intake screening/assessment process within the Central Detention Facility. *First*, it is strongly recommended that the current suicide risk inquiry contained on the current "Psych. Screen" in the centricity EMR be replaced by the "Mental Health/Suicide Risk Intake Screening Form" contained in Appendix A. This form was previously forwarded to both DC Department of Corrections and Unity Health Care officials for consideration.

*Second*, it is strongly recommended that the DC Department of Corrections initiate a continuous quality assurance audit of the intake screening process to ensure that all suicide risk questions are asked to new inmates and responses appropriately documented within the EMR.

*Third*, regardless of the inmate's behavior or answers given during intake screening, an immediate referral to mental health staff should always be initiated based on documentation reflecting possible mental illness and/or suicidal behavior during an inmate's prior confinement within the Central Detention Facility.  As such, the "alert screen" should be activated within both the JACCS and Centricity EMR according to the following procedures:

- Any inmate placed on suicide precautions in the CDF should be tagged on the "alert screen" of both the JACCS and Centricity EMR by Unity Health Care staff;

- Medical providers conducting intake screening should always review the inmate's alert screen to verify whether they were previously confined in the CDF and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and

- Regardless of the inmate's behavior or answers given during intake screening, an immediate referral to mental health staff should always be initiated based on documentation reflecting possible mental illness and/or suicidal behavior during an inmate's prior confinement within the CDF.

*Fourth*, it would also be strongly recommended that, rather than simply entering "cleared for segregation" in the EMR, a better practice to document a "pre-clearance for segregation" assessment by mental health staff would be to enter a progress note into the chart that details the inmate's current mental health status.

### 3) Communication

**Procedures that enhance communication at three levels: 1) between the sending institution/arresting-transporting officer(s) and correctional staff; 2) between and among staff (including medical and mental health personnel); and 3) between staff and the suicidal inmate.**

Certain signs exhibited by the inmate can often foretell a possible suicide and, if detected and communicated to others, can prevent such an incident. There are essentially three levels of communication in preventing inmate suicides: 1) between the sending institution/arresting-transporting officer and correctional staff; 2) between and among staff (including mental health and medical personnel); and 3) between staff and the suicidal inmate. Further, because inmates can become suicidal at any point in their incarceration, correctional staff must maintain awareness, share information and make appropriate referrals to mental health and medical staff.

**FINDINGS:** Effective communication between correctional, medical, and mental health staff is not an issue that can be easily written as a policy directive, and is often dealt with more effectively through examples of multidisciplinary problem-solving. Although on-site for only a few several days, this writer sensed that correctional, medical, and mental health personnel had a good working relationship, although there appeared to be some tension between DOC and Unity Health Care officials regarding the recent inmate suicides, as well as appropriate management of suicidal inmates. In addition, the Centricity EMR is integrated and contains both medical and mental health records that better ensures the continuity of care and enhancing communication. Further, there are regularly scheduled management meetings between DOC and Unity Health Care supervisory personnel. These are all good practices.

**RECOMMENDATION**: As previously stated, a multi-agency Suicide Prevention Task Force was initiated by DOC Director Faust in July 2013 following two recent inmate suicides. One of the Task Force recommendations was to develop better tools for outside agencies (including the DC court system, DC Pre-Trial Services, etc.) to communicate with CDF and Unity Health Care staff regarding potentially suicidal inmates. This writer was informed that the JACCS was available to these outside agencies, but rarely utilized by them. It would be this writer's opinion that the JACCS would be an ideal tool to communicate such information and would strongly encourage its expanded use by both internal and external agencies.

4)   **Housing**

> **Isolation should be avoided. Whenever possible, house in general population, mental health unit, or medical infirmary, located in close proximity to staff. Inmates should be housed in suicide-resistant, protrusion-free cells. Removal of an inmate's clothing (excluding belts and shoelaces), as well as use of physical restraints (e.g. restraint chairs/boards, straitjackets, leather straps, etc.) and cancellation of routine privileges (showers, visits, telephone calls, recreation, etc.), should be avoided whenever possible, and only utilized as a last resort for periods in which the inmate is physically engaging in self-destructive behavior.**

In determining the most appropriate location to house a suicidal inmate, there is often the tendency for correctional officials in general to physically isolate the individual. This response may be more convenient for staff, but it is detrimental to the inmate. The use of isolation not only escalates the inmate's sense of alienation, but also further serves to remove the individual from proper staff supervision. National correctional standards stress that, to every extent possible, suicidal inmates should be housed in the general population, mental health unit, or medical infirmary, located in close proximity to staff.

Of course, housing a suicidal inmate in a general population unit when their security level prohibits such assignment raises a difficult issue. The result, of course, will be the assignment of the suicidal inmate to a housing unit commensurate with their security level. Within a correctional system, this assignment might be a "special housing" unit, e.g., restrictive housing, disciplinary confinement, administrative segregation, etc., However, to every extent possible, such inmates should be housed in suicide-resistant, protrusion-free cells. Further, cancellation of routine privileges (showers, visits, telephone calls, recreation, etc.), removal of clothing (excluding belts and shoelaces), as well as the use of physical restraints (e.g., restraint

chairs/boards, straitjackets, leather straps, etc.) should be avoided whenever possible, and only utilized as a last resort for periods in which the inmate is physically engaging in self-destructive behavior. Housing assignments should not be based on decisions that heighten depersonalizing aspects of incarceration, but on the ability to maximize staff interaction with inmates.

**FINDINGS:** Pursuant to policy, inmates identified as suicidal are permitted to be housed in three locations within the Central Detention Facility: three (3) cells in the Medical Unit, three (3) cells in the Special Management Unit (South 1), and three (3) cells within the Mental Health Unit (South 3). This writer examined each of these cell locations and found that, for the most part, they were "suicide-resistant" and did not contain any obvious protrusions that could act as an anchoring device from which an inmate could attach a ligature in a suicide attempt by hanging. However, with only nine (9) designated safe cells in the CDF, this writer observed that there were more than nine (9) inmates on observation status each day during this on-site assessment that resulted in several inmates being housed in non-suicide resistant cells on the mental health unit. Several of these South 3 cells contained several dangerous anchoring devices, including a towel rack on the desk, a towel rack on the sink, ventilation holes in bunks, large holes in ventilation grates, and clothing hooks.[15]

There were several other concerns regarding the management of inmates on suicide precautions or "Behavioral observation" (a practice that will be discussed in detail in the next section) in the Central Detention Facility. First, *all* inmates are stripped of all clothing and possessions, and given only a paper gown without undergarments. Contrary to DOC policy, no

---

[15]These anchoring devices were utilized in several of the recent inmate suicides. In fact, during this writer's on-site assessment, an inmate was found hanging (without subsequent serious injury) from a ventilation grate in his South 3 cell on August 29.

other possessions, including safety blanket, mattress, or footwear, are provided. In addition, these inmates are only allowed out of their cells for a shower (at the officer's discretion and/availability) and legal visits. Access to the telephone and family visitation is prohibited. Clinical judgment to determine possessions/privileges offered and removed based upon suicide risk level and lethality are *not* practiced at the CDF.

It would be this writer's opinion that current management of placed on suicide precautions and Behavioral Observation within the Central Detention Facility is overly restrictive and seemingly punitive. Confining a suicidal inmate to their cell for 24 hours a day only enhances isolation and is anti-therapeutic. Under these conditions, it is also difficult, if not impossible, to accurately gauge the source of an inmate's suicidal ideation. Take, for example, the daily scenario of a clinician interviewing an inmate on suicide precautions or Behavioral Observation. The inmate has been in the cell for a few days, clothed only in a paper gown. The inmate has not been out of the cell and has an incredibly foul odor because he has not showered (even if it had been offered). The clinician then asks the inmate: "Are you suicidal?" Given the circumstances he finds himself in, the likelihood of an inmate answering affirmatively to that question, the result of which will be his continued placement under these conditions, is highly questionable.

Therefore, it would be this writer's opinion that the overly restrictive and seemingly punitive environment of suicide precautions and Behavioral Observation within the Central Detention Facility influences an inmate's suicide risk assessment by mental health staff, as well as the suicidal inmate's willingness to self-report suicidal ideation. Several Unity Health Care

staff informed this writer that the conditions of suicide precautions and Behavioral Observation are not intentionally punitive, but driven by concern for the safety of the inmate and staff assigned to the housing units.[16] The commitment to safety is not being challenged here. Safety of the inmate is, of course, of utmost concern when developing a suicide prevention policy. But the number and types of restrictions imposed in the name of safety must be reasonable and commensurate with the inmate's level of suicide risk.

Officials might also argue (although they did not to this writer) that the rationale for these restrictions is that suicidal inmates are unpredictable and bad news received during a family visit or telephone call might trigger suicidal ideation and result in an increased risk for suicide. This rationale, however, ignores the obvious -- what better opportunity is there to observe an inmate's reaction to potentially negative news then when they are on suicide precautions, as well as the fact that interaction with the outside world can be therapeutic and reduce isolation -- a leading cause for suicidal behavior. Staff might also argue that most inmates who are mentally ill and on suicide precautions are so debilitated by their illness that "they do not care" how they are treated (i.e., the withholding of basic privileges). Of course, this assumption is not only unsupported but ignores the real possibility that these measures are contributing to an inmate's debilitating mental illness.

Finally, mental health clinicians from Unity Health Care told this writer that these highly restrictive measures are effective in managing those inmates suspected as being manipulative or malingering. As should be discussed during suicide prevention training workshops, although

---

[16]As will be explained in the next section, it was somewhat ironic that clinicians stressed to this writer that they were concerned about an inmate's safety while at the same time ordering observation at 30-minute or 60-minute intervals, a frequency of observation that was obviously contrary to a concern for self-harm.

distinguishable, manipulative behavior and suicidal behavior are not mutually exclusive. Both types of behavior can occur (or overlap) in the same individual and cause serious injury and death. Several studies of self-harm and suicide in the correctional environment have found "substantial co-existence of manipulative motive with both suicidal intent and potentially high lethality of self-harming behavior."[17] As one observer has stated, "There are no reliable bases upon which we can differentiate 'manipulative' suicide attempts posing no threat to the inmate's life from those 'true, non-manipulative' attempts which may end in death. The term 'manipulative' is simply useless in understanding, and destructive in attempting to manage, the suicidal behavior of inmates (or of anybody else).[18] Self-harm is often a complex, multifaceted behavior, rather than simply manipulative behavior motivated by secondary gain. At a minimum, any inmate who would go to the extreme of threatening suicide or engaging in self-harming behavior is suffering from at least an emotional imbalance that requires special attention. They may also be mentally ill. Simply stated, inmates labeled as manipulative still commit suicide.

**RECOMMENDATIONS:** The following recommendations are offered to improve the housing of inmates on suicide precautions within the Central Detention Facility. *First*, it is strongly recommended that DOC officials embark upon an inspection program to ensure that inmates on suicide precautions are housed in "suicide-resistant" cells, i.e., without any obvious protrusions that would easily enable an inmate to hang themselves. For example, bunk holes should be covered and/or bunk replaced, dangerous ventilation grates be replaced with grates that

---

[17]Dear G, Thomson D, Hills A. (2000), "Self-Harm in Prison: Manipulators Can Also Be Suicide Attempters," *Criminal Justice and Behavior*, 27: 160-175.
[18]Haycock J. (1992), "Listening to 'Attention Seekers:' The Clinical Management of People Threatening Suicide," *Jail Suicide Update* 4 (4): 8-11.

have holes that are ideally 1/8 inches in diameter and no more than 3/16 inches diameter (or 16-mesh per square inch), and clothing hooks and towel racks removed from all cells designated to house suicidal inmates. Specific recommendations regarding the removal of obvious protrusions in cells can be found in the "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," which is contained in Appendix B of this report.

*Second*, it is strongly recommended that the overly restrictive and seemingly punitive environment of suicide precautions be reduced by revision of both DOC and Unity Health Care suicide prevention policies that would include the following requirements:

- All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk *as determined on a case-by-case basis by mental health staff*;

- If mental health staff determine that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock *and safety blanket*;[19]

- A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended, i.e., attempting to tamper with/destroy, utilizes to obstruct visibility into the cell, etc.);

- All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction; and

- Inmates on suicide precautions shall not automatically be locked down. They should be allowed dayroom access commensurate with their security level and clinical judgment of mental health staff.

---

[19]Paper gowns should not be utilized in the Central Detention Facility. Their use is antiquated and the explanation given to this writer that safety smocks were previously utilized but "disappeared from the facility by staff" is more of an issue of security and inventory and not the appropriate response for properly clothing a suicidal inmate.

*Third*, this writer would strongly support a Suicide Prevention Task Force recommendation relating to better utilization of the existing Mental Health Unit (South 3) and re-introduction of a step-down mental health unit. Although this writer did not have sufficient time to conduct a thorough analysis of the existing Mental Health Unit, it would appear that it is currently being utilized simply as a regular housing unit to house inmates with serious mental illness, rather than a fully functioning mental health unit. This writer observed very few mental health staff assigned to the unit, no group therapy or other program activities, and very few inmates permitted out of their cells in the dayroom area. As offered in the next section, the standard of care (as well as reflected in Unity Health Care's suicide prevention policy) requires treatment planning for inmates on suicide precautions. Given the lack of mental health staffing and programmatic resources currently available in the existing Mental Health Unit, few treatment planning options beyond medication management are available.

**5)** <u>**Levels of Supervision/Management**</u>

> **Two levels of supervision are generally recommended for
> suicidal inmates -- *close observation* and *constant observation.*
> *Close Observation* is reserved for the inmate who is not actively
> suicidal, but expresses suicidal ideation and/or has a recent
> prior history of self-destructive behavior. In addition, an
> inmate who denies suicidal ideation or does not threaten
> suicide, but demonstrates other concerning behavior (through
> actions, current circumstances, or recent history) indicating
> the potential for self-injury, should be placed under close
> observation. This inmate should be observed by staff at
> staggered intervals not to exceed every 10 minutes. *Constant
> Observation* is reserved for the inmate who is actively suicidal,
> either by threatening or engaging in self-injury. This inmate
> should be observed by a staff member on a continuous,
> uninterrupted basis. Other supervision aids (e.g., closed
> circuit television, inmate companions/watchers, etc.) can be
> utilized as a supplement to, but never as a substitute for, these
> observation levels. Inmates on suicide precautions should be
> reassessed on a daily basis.**

Experience has shown that prompt, effective emergency medical service can save lives. Research indicates that the overwhelming majority of suicide attempts in custody is by hanging.[20] Medical experts warn that brain damage from asphyxiation can occur within four minutes, with death often resulting within five to six minutes. In inmate suicide attempts, the promptness of the response is often driven by the level of supervision afforded the inmate. Both the ACA and NCCHC standards address *levels of supervision*, although the degree of specificity varies. ACA Standard 4-ALDF-2A-52 vaguely requires that "suicidal inmates are under continuous observation," while NCCHC Standard J-G-05 requires physical observation ranging from "constant supervision" to "every 15 minutes or more frequently if necessary." According to the Suicide Prevention and Intervention Standard from the U.S. Department of Homeland

---

[20]Hayes, L.M. (2010), *National Study of Jail Suicide: 20 Years Later*, Washington, DC: U.S. Department of Justice, National Institute of Corrections; "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

Security's *Operations Manual ICE Performance-Based National Detention Standards*, "Suicidal detainees will be monitored by the assigned security officers who maintain constant one-on-one visual observation, 24 hours a day, until the detainee is released from suicide watch. The assigned security officer makes notations every 15 minutes on the behavioral observation checklist."

In addition, the component of "Levels of Supervision" encompasses the overall management of the inmate on suicide precautions and includes the appropriate level of observation, timely and comprehensive suicide risk assessments, downgrading the level of observation following a period of stability, and providing periodic follow-up assessments following discharge from suicide precautions.

**FINDINGS:** Both the DC Department of Corrections and Unity Health Care policies adequately address the two authorized levels of observation required for suicidal inmates:

> **Suicide Precaution**: A measure utilized for the inmate who, though suicidal, is not thought to require continuous observation. Inmates on close observation may be housed in an observation bed/cell and are observed at staggered intervals that do not exceed 15 minutes;

> **Suicide Watch**: A measure utilized for the inmate who is actively suicidal. Inmates on constant observation are housed in an observation bed/cell that allows continuous observation without interruption with documentation every 15 minutes.

## Behavioral Observation

Despite the above policy language, current practices of Unity Health Care clinicians within the Central Detention Facility are to place inmates identified as either suicidal and/or those threatening/engaging in self-injurious behavior on a status commonly referred to as

"B**ehavioral Observation**."[21] In fact, *Suicide Watch and Suicide Precautions are rarely utilized in the facility, and incredibly there were not any inmates on either Suicide Watch or Suicide Precaution status during this writer's three-day on-site assessment. Instead, there were numerous inmates on Behavior Observation status.* This writer conversed with several Unity Health Care clinicians and they offered varying interpretations as to the types of inmates and behavior warranting Behavioral Observation. For example, one clinician offered that Behavioral Observation was utilized for inmates who were threatening suicide, but thought to be manipulative and/or malingering, as well as for inmates being aggressive/assaultive toward other inmates or staff. Another clinician was more specific and offered that Behavioral Observation was utilized for inmates who *expressed* suicidal ideation or *threatened* suicide, as well as inmates who engaged in *non-lethal* self-injurious behavior; whereas Suicide Watch and Suicide Precaution was utilized for inmates who actually engaged in serious suicidal behavior (i.e., a lethal suicide attempt).

This writer was also informed by Unity Health Care clinicians that whereas a psychiatrist is the only clinician permitted to remove an inmate from Suicide Watch and Suicide Precaution, any mental health clinician can discharge an inmate from Behavioral Observation. According to Unity Health Care clinicians, inmates on Behavioral Observation status are housed in the Mental Health (South 3) and Special Management (South 1) units, whereas inmates on Suicide Watch and Suicide Precautions are housed in the Medical Unit. (During this on-site assessment, however, this writer observed two inmates on Behavioral Observation status in the Medical Unit.)

---

[21]It should be noted that Unity Health Care officials informed this writer that the practice of utilizing Behavioral Observation in the Central Detention Facility pre-dated their agency's initiation of health care services in 2006.

Of particular interest, this writer was informed by Unity Health Care officials that inmates on Behavioral Observation status are observed at varying intervals contingent upon their housing location. For example, inmates on Behavioral Observation status in the Medical Unit are observed at 60-minute intervals by nursing staff;[22] inmates on Behavioral Observation status in the Mental Health Unit (South 3) are observed at 30-minute intervals by nursing staff (although staff on that unit offered contradictory information and claimed the observations occurred at 60-minute intervals); and inmates on Behavioral Observation status in the Special Management Unit (South 1) are observed at 15-minute intervals by correctional officers (based upon a recent directive from the DOC Director mandating 15-minute observation of all inmates in Special Management and Intake [South 2] units). *Of course, none of the above described practices are in writing because the use of Behavioral Observation is not even addressed in either the DC Department of Corrections' Suicide Prevention and Intervention Policy (No. 6080.2F) or Unity Health Care's Suicide Prevention Policy (No. CF705). Such unauthorized practices should be very concerning to legal counsel for each agency.*

In conclusion, there are numerous problems associated with the use of Behavioral Observation status within the Central Detention Facility. *First*, beyond the fact that it is not even authorized in any DOC or Unity Health Care policy or directive, it appears to be predicated upon the belief that clinical staff can easily distinguish "genuinely suicidal behavior" from "manipulative behavior." As offered earlier in this report, manipulative behavior and suicidal

---

[22]In addition, although informed that inmates housed in the Medical Unit on Behavioral Observation were also continuously observed via closed-circuit television (CCTV) monitoring, this writer spent considerable time in the Medical Unit and *never* observed any nursing and or correctional staff monitoring the CCTV.

behavior are not mutually exclusive; both types of behavior can occur (or overlap) in the same individual and cause serious injury and death. In fact, as aptly stated on a PowerPoint slide utilized in suicide prevention training by mental health clinicians from Unity Health Care: "Most researchers suggest the better and safer approach may be to manage a non-suicidal (manipulative behavior) prisoner as if he was suicidal."

*Second*, inmates on Behavior Observation status are stripped of their uniform and all other possessions, and issued only a paper gown. They are confined to their cell 24 hours a day with no privileges. These highly restrictive measures are said to be taken for the inmate's safety and concern for the potential of self-injurious behavior. However, in demonstration of complete unconcern for inmate safety, clinicians then order the inmate to be observed at 60-minute intervals. In addition, these inmates are sometimes housed in cells that are not suicide-resistant.

It was obvious to this writer that the use of Behavioral Observation in the Central Detention Facility is predicated upon two factors: 1) a misguided belief that most inmates who threaten suicide and/or engage in self-injurious behavior are simply manipulative and the overtly restrictive and punitive aspects of Behavioral Observation is meant to deter such behavior; and 2) a mechanism to by-pass requirements of either continuous or 15-minute observation on Suicide Watch/Suicide Observation by utilizing an observation status that only requires nursing staff to monitor an inmate at 30 or 60-minute intervals.

An additional concern involves the quality of documentation found in progress notes as they relate to the assessment and treatment of suicide risk. Pursuant the DOC and Unity Health

Care suicide prevention policies, inmates on suicide precautions are required to be seen daily by either a psychiatrist or nurse practitioner to determine continuation of, or discharge from, suicide precautions. This writer reviewed several charts of inmates on Behavioral Observation status. The following case exemplifies concerns regarding the quality of documentation. The inmate had multiple diagnoses, including Bi-Polar Disorder. He had been placed on, and discharged from, Behavioral Observation status on several occasions since his confinement in the Central Detention Facility beginning in February 2013. The rationale for initiation of Behavioral Observation varied from having physical altercations with other inmates in the Mental Health Unit, throwing urine on staff, and threatening suicide and/or engaging in self-injurious behavior. In July 2013, the inmate tied a paper gown around his neck and attempted to flush it down the toilet, as well as later attaching his paper gown to a ventilation grate in his cell. The paper gown was subsequently removed and he was housed completely naked in his cell for over a week. The inmates was discharged from Behavior Observation status on July 23, and continued on and off this observation status on several more occasions, most recently on August 13 when he was observed with a sheet tied around his neck and threatening suicide. He had also thrown feces at another inmate, as well as accused correctional staff of sexual abuse. The following are examples of the "assessments" by psychiatric staff in this case, provided in their *entirety*:

> August 20: "The patient continues to be loud and asking to be removed from the safe cell. He claims he wants to see the sister, he has no visitors, safe cell order continues."
>
> August 22: "The patient has reached maximum benefit in the safe cell. He was counseled about his behavior, he will be released from the safe cell and seen within 24 hours."
>
> August 23: "The patient was removed from the safe cell yesterday. He is stable and not in any distress."

Several days later on August 29 (while this writer was on-site), the following nursing note was found in the chart:

> At about 8:15am, Cpl. _____ entered the nurses' station and reported that _____ had something tied around his neck and attached to the ceiling. His feet barely touch the floor, his eyes were bulging, saliva was coming from his mouth, and he urinated on himself. Writer immediately proceeded to untie the knots and asked the officer to call MERT and get the wonder knife. Mr. _____ raised his hand to assist writer to untie the second knot. With assistance from the officer, the sheet was untied and he was lowered to the floor. When the MERT arrived he was lying on the floor and was assisted to sit on his bunk. He ambulated to the stretcher and was transported to urgent care."

Despite the seriousness of the incident, the inmate was later placed on Behavioral Observation status, *not* Suicide Watch or Suicide Observation.

Further, the "Comprehensive Mental Health Assessment" template form currently in the Centricity EMR does *not* provide an adequate documentation of an adequate suicide risk assessment. The template is limited to the following fields: "Suicide History (attempts and methods) and Potential for Harm (self injurious and suicidal ideation)." The standard of care requires that documentation of a comprehensive assessment of suicide risk include sufficient description of the current behavior and justification for either, placement on, or discharge from, suicide precautions. For example, the assessment should include a brief mental status examination, listing of chronic and acute risk factors, listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and a treatment plan.[23]

---

[23]See American Psychiatric Association (2003), "Practice Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors," *American Journal of Psychiatry*, (160) 11: 1-60 (Supplement).

Finally, there were additional concerns regarding the continuity of care for inmates identified as suicidal and/or engaging in self-injurious behavior. For example, there is <u>no</u> step-down or transitioning process from suicide precautions. An inmate is simply placed on observation status, stripped of all clothing and possessions and issued a paper gown, prohibited from most privileges, and then discharged from the status and returned to their housing unit. In addition, there is very limited treatment planning for inmates identified as suicidal and/or engaging in self-injurious behavior.[24] NCCHC standards (J-G-02), as well as other national correctional standards, require that a treatment plan "should describe signs, symptoms, and the circumstances in which risk for suicide is likely to recur; how recurrence of suicidal thoughts can be avoided, and the actions the patient or staff can take if suicidal thoughts do occur." As found in the Centricity EMR, a typical treatment plan for an inmate released from observation status would be: "1) Continue taking medication, 2) Place sick call slip as needed, 3) MH to follow-up within 24 hours." Similar to treatment planning, follow-up assessments of inmates recently discharged from observation status is limited to one 24-hour "check-in."

**RECOMMENDATIONS:** This writer would offer several recommendations to strengthen the observation and management of inmates identified as suicidal and/or exhibiting self-injurious behavior within the Central Detention Facility. *First*, and perhaps most importantly, the DC Department of Corrections should immediately prohibit the practice of utilizing Behavioral Observation status for inmates expressing suicidal ideation, threatening suicide, engaging in suicidal and/or other forms of self-injurious behavior, *but* perceived to be

---

[24]This writer reviewed several monthly Treatment Plan Reviews that were developed for the inmate described above. Even though the inmate was on Behavior Observation status on numerous occasions from February 2013 through August 2013, these treatment plans failed to address any problem areas relevant to suicidal behavior, self-injurious behavior, or even perceived manipulative and/or malingering behavior.

manipulative and/or malingering.[25] Regardless of any perceived intent, any inmate expressing suicidal ideation, threatening suicide, engaging in suicidal and/or other forms of self-injurious behavior should immediately be placed on suicide precautions until assessed by a qualified mental health professional.

*Second*, both the DOC and Unity Health Care suicide prevention policies should be revised to include specific reference to the observation of inmates threatening/displaying self-injurious behavior. A proposed revision is offered as follows:

> **Close Observation** (or **Suicide Precaution**) is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10 minutes, and should be documented as it occurs.
>
> **Constant Observation** (or **Suicide Watch**) is reserved for the inmate who is actively suicidal, either by threatening or engaging in self-injury and would be considered a high risk for suicide. This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 10-minute intervals.

*Third*, the recommended prohibition of utilizing Behavior Observation status for inmates who threaten suicide and/or engage in self-injurious behavior will result in a dramatic increase of inmates placed on suicide precautions and requiring observation of at least 15-minute intervals.

---

[25]Although the terms "mental health observation" or "medical observation" are often utilized in correctional facilities around the country to provide increased supervision of inmates based upon a medical and/or mental health issue, e.g., detoxification, monitoring food/fluid intake, stabilization on psychotropic medication, etc., these levels of observation are *never* associated with suicidal and/or self-injurious behaviors.

Given the fact that current practices within the Central Detention Facility require nursing staff to conduct observation of these inmates in both the Medical and Mental Health units, unless the DOC assumes responsibility for this observation with the assignment of the appropriate number of correctional staff, it would appear that Unity Health Care will need to receive additional funding to provide the appropriate number of nursing staff.

*Fourth*, it is strongly recommended that the current "Comprehensive Mental Health Assessment" template form in Centricity EMR be replaced with a form that allows for adequate documentation of a suicide risk assessment. As previously offered, such documentation should include a sufficient description of the current behavior and justification for either, placement on, or discharge from, suicide precautions, as well as a brief mental status examination, listing of chronic and acute risk factors, listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and a treatment plan.  A sample "Suicide Risk Assessment" form is contained in Appendix C and was previously forwarded to both DC Department of Corrections and Unity Health Care officials for consideration.

*Fifth*, in addition to completion of a Suicide Risk Assessment form *only* when an inmate is placed on, or discharge from, suicide precautions, when an inmate is continued on suicide precautions following a daily assessment, mental health clinicians should be required to document justification for continued suicide precautions as a progress note that provides sufficient description of the current behavior and justification for a particular level of observation.

*Sixth*, it is strongly recommended that, consistent with national correctional standards,[26] mental health clinician(s) develop treatment plans for inmates on suicide precautions that "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur" (see NCCHC, 2008).

*Seventh*, it is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on mental health caseloads and receive regularly scheduled follow-up assessments by mental health staff until their release from custody. As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that the reassessment schedule following discharge from suicide precautions be as follows: within 24 hours, again within 72 hours, again within 1 week, and then periodically until release from custody.

---

[26]For example, the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* state that "Based on the evaluation, the appropriately trained qualified medical personnel will develop a treatment plan placed and documented in the patient's medical record. This treatment plan will address the environmental, historical, and psychological factors that contribute to the detainee's suicidal ideation. The plan should include: strategies and interventions to be followed by the staff and detainee if suicidal ideation reoccurs, strategies for improving for improved functioning, and regular follow-up appointments based on level of acuity."

**6)**     <u>Intervention</u>

> **A facility's policy regarding intervention should be threefold: 1) all staff who come into contact with inmates should be trained in standard first aid and cardiopulmonary resuscitation (CPR); 2) any staff member who discovers an inmate attempting suicide should immediately respond, survey the scene to ensure the emergency is genuine, alert other staff to call for medical personnel, and begin standard first aid and/or CPR; and 3) staff should never presume that the inmate is dead, but rather initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. In addition, all housing units should contain a first aid kit, pocket mask or mouth shield, Ambu bag, and rescue tool (to quickly cut through fibrous material). All staff should be trained in the use of the emergency equipment. Finally, in an effort to ensure an efficient emergency response to suicide attempts, "mock drills" should be incorporated into both initial and refresher training for all staff.**

Following a suicide attempt, the degree and promptness of intervention provided by staff often foretells whether the victim will survive. Although both ACA and NCCHC standards address the issue of intervention, neither are elaborative in offering specific protocols. For example, ACA Standard 4-ALDF-4D-08 requires that -- "Correctional and health care personnel are trained to respond to health-related situations within a four-minute response time. The training program...includes the following: recognition of signs and symptoms, and knowledge of action required in potential emergency situations; administration of basic first aid and certification in cardiopulmonary resuscitation (CPR)..." NCCHC Standard J-G-05 states -- "Intervention: There are procedures addressing how to handle a suicide attempt in progress, including appropriate first-aid measures."

**FINDINGS:** Both the DOC and Unity Health Care suicide prevention policies provide very good descriptions of the proper emergency response to a suicide attempt. In addition, first

aid kits were located in each housing unit that was toured by this writer. Each kit contained a microshield or CPR mask. In addition, emergency rescue tools (utilized to quickly cut through fibrous material), were also found in each toured unit. Further, Automated External Defibrillators (AEDs) were located in most toured housing units. With regard to training, this writer was informed that 100% of Unity Health Care's medical staff are currently up-to-date with their training and/or certification in CPR/AED; whereas only 73% of correctional staff are up-to-date with their training and/or certification in CPR/AED.[27] In addition, the DOC suicide prevention policy requires that "mock drill" exercises to simulate an emergency response to a suicide attempt be conducted twice each year. This writer was informed that such drills have been conducted as scheduled. This is an excellent practice.

This writer reviewed the investigative reports and mortality reviews of several of the recent inmate suicide cases and would support the recent Suicide Prevention Task Force recommendations for improving emergency medical responses, including updating AED equipment, reinforcing correctional staff's ability to contact Emergency Medical Services via Central Control without first waiting for medical staff to arrive at the scene of the emergency, and creating better ways to expedite the MERT response.

**RECOMMENDATIONS:** Apart from a recommendation to increase the compliance rate of CPR/AED training for correctional staff, this writer would support the recommendations previously offered by the Suicide Prevention Task Force.

---

[27]As previously stated, this writer was informed that, although the DOC's Training Department has an annual target of 95% completion for training, completion of CPR/AED training has been lower this year because of budget considerations.

**7)** **Reporting**

**In the event of a suicide attempt or suicide, all appropriate
correctional officials should be notified through the chain of
command. Following the incident, the victim's family should
be immediately notified, as well as appropriate outside
authorities. All staff who came into contact with the victim
prior to the incident should be required to submit a statement
as to their full knowledge of the inmate and incident.**

**FINDINGS**: With the exception of one reviewed case that involved falsification of
observation logs by a correctional officer, this writer's review of the investigative reports
concerning the recent inmate suicides found that all reporting requirements appeared to have
been appropriately followed.

**RECOMMENDATION**: None

**8)** **Follow-up/Morbidity-Mortality Review**

> **Every completed suicide, as well as serious suicide attempt (i.e., requiring hospitalization), should be examined by a morbidity-mortality review. (If resources permit, clinical review through a psychological autopsy is also recommended.) The review, separate and apart from other formal investigations that may be required to determine the cause of death, should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. Further, all staff involved in the incident should be offered critical incident stress debriefing.**

Experience has demonstrated that many correctional systems have reduced the likelihood of future suicides by critically reviewing the circumstances surrounding incidents as they occur. While all deaths are investigated either internally or by outside agencies to ensure impartiality, these investigations are normally limited to determining the cause of death and whether there was any criminal wrongdoing. *The primary focus of a morbidity-mortality review should be two-fold: What happened in the case under review and what can be learned to help prevent future incidents?* To be successful, the morbidity-mortality review team must be multidisciplinary and include representatives of both line and management level staff from the corrections, medical and mental health divisions.

**FINDINGS:** Both the DOC and Unity Health Care suicide prevention policies provide very good descriptions of the morbidity and mortality review process following an inmate suicide or serious suicide attempt. Each suicide (and any other death in the jail system) results in

an investigation by the DC Department of Corrections' Office of Investigative Services.  This writer reviewed most of the investigative reports for each of the recent inmate suicides and found them to be quite thorough.

In addition, each suicide results in a "psychological autopsy" conducted by Unity Health Care clinicians. Review of several of these documents found them also to be quite thorough, and included possible precipitating factors to each incident. Finally, multidisciplinary mortality reviews were conducted following each of the recent suicides. The initial review was conducted by Unity Health Care clinicians, with a secondary review conducted with the DOC's Health Systems Administrator, DOC Medical Director, and Unity Health Care administrative and clinician personnel comprising a Morbidity and Mortality Review Committee. Review of several of these documents found them also to be quite thorough. The only noted concern was that documentation of recommendations offered by the Committee did not contain any indication as to whether such recommendations were accepted or rejected, as well as a corrective action plan with responsible parties and timetables for completion noted for those recommendations accepted by the Committee and/or DOC and Unity Health Care officials.

**RECOMMENDATIONS:** Only one recommendation is offered. It is strongly recommended that documentation of a mortality review that includes recommendations should contain an indication as to whether or not each recommendation was accepted or rejected, as well as a corrective action plan with responsible parties and timetables for completion noted for any recommendation accepted by the Committee and/or DOC and Unity Health Care officials.

## C.     SUMMARY OF RECOMMENDATIONS

### Staff Training

1) It is strongly recommended that either the DC Department of Corrections or Unity Health Care develop a pre-service suicide prevention curriculum (of between 4 to 8 hours in length) and that all new correctional and health care staff be required to complete this initial program. It is strongly recommended that the curriculum include the following topics:

- avoiding obstacles (negative attitudes) to prevention
- inmate suicide research
- why facility environments are conducive to suicidal behavior
- identifying suicide risk despite the denial of risk
- potential predisposing factors to suicide
- high-risk suicide periods
- warning signs and symptoms
- components of the CDF's suicide prevention program
- liability issues

There are several nationally-recognized suicide prevention training curricula that can be utilized as guides to development of a recommended suicide prevention training curriculum. Much of this information is available through the US Justice Department's National Institute of Corrections at the following website: http://nicic.gov/?q=suicide+prevention+training. In addition, the new curriculum should include more recent national data on inmate suicides. Data from this writer's *National Study of Jail Suicide: 20 Years Later* can be included in the revised curriculum.

2) It is strongly recommended that either the DC Department of Corrections or Unity Health Care develop an annual suicide prevention curriculum (of 2 hours in length) and that *all* correctional and health care staff be required to complete the workshop each year. The annual training curriculum should be a consolidation of the pre-service curriculum, offer case studies of any suicides during the previous year, and any changes in the CDF suicide prevention policy during the previous year.

### Intake Screening/Assessment

3) It is strongly recommended that the current suicide risk inquiry contained on the current "Psych. Screen" in the centricity EMR be replaced by the "Mental Health/Suicide Risk Intake Screening Form" contained in Appendix A. This form was previously forwarded to both DC Department of Corrections and Unity Health Care officials for consideration.

4) It is strongly recommended that the DC Department of Corrections initiate a continuous quality assurance audit of the intake screening process to ensure that all suicide risk questions are asked to new inmates and responses appropriately documented within the EMR.

5) Regardless of the inmate's behavior or answers given during intake screening, an immediate referral to mental health staff should always be initiated based on documentation reflecting possible mental illness and/or suicidal behavior during an inmate's prior confinement within the Central Detention Facility.  As such, the "alert screen" should be activated within both the JACCS and Centricity EMR according to the following procedures:

- Any inmate placed on suicide precautions in the CDF should be tagged on the "alert screen" of both the JACCS and Centricity EMR by Unity Health Care staff;

- Medical providers conducting intake screening should always review the inmate's alert screen to verify whether they were previously confined in the CDF and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and

- Regardless of the inmate's behavior or answers given during intake screening, an immediate referral to mental health staff should always be initiated based on documentation reflecting possible mental illness and/or suicidal behavior during an inmate's prior confinement within the CDF.

6) It would also be strongly recommended that, rather than simply entering "cleared for segregation" in the EMR, a better practice to document a "pre-clearance for segregation" assessment by mental health staff would be to enter a progress note into the chart that details the inmate's current mental health status.

**Communication**

7) One of the Task Force recommendations was to develop better tools for outside agencies (including the DC court system, DC Pre-Trial Services, etc.) to communicate with CDF and Unity Health Care staff regarding potentially suicidal inmates. This writer was informed that the JACCS was available to these outside agencies, but rarely utilized by them. It would be this writer's opinion that the JACCS would be an ideal tool to communicate such information and would strongly encourage its expanded use by both internal and external agencies.

**Housing**

8) It is strongly recommended that DOC officials embark upon an inspection program to ensure that inmates on suicide precautions are housed in "suicide-resistant" cells, i.e., without any obvious protrusions that would easily enable an inmate to hang themselves. For example, bunk holes should be covered and/or bunk replaced, dangerous ventilation grates be replaced with grates that have holes that are ideally 1/8 inches in diameter and no more than 3/16 inches diameter (or 16-mesh per square inch), and clothing hooks and towel racks removed from all cells designated to house suicidal inmates. Specific recommendations regarding the removal of obvious protrusions in cells can be found in the "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," which is contained in Appendix B of this report.

9) It is strongly recommended that the overly restrictive and seemingly punitive environment of suicide precautions be reduced by revision of both DOC and Unity Health Care suicide prevention policies that would include the following requirements:

- All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk *as determined on a case-by-case basis by mental health staff*;

- If mental health staff determine that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock *and safety blanket*;

- A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended, i.e., attempting to tamper with/destroy, utilizes to obstruct visibility into the cell, etc.);

- All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction; and

- Inmates on suicide precautions shall not automatically be locked down. They should be allowed dayroom access commensurate with their security level and clinical judgment of mental health staff.

10) This writer would strongly support a Suicide Prevention Task Force recommendation relating to better utilization of the existing Mental Health Unit (South 3) and re-introduction of a step-down mental health unit.

**Levels of Supervision/Management**

11) The DC Department of Corrections should immediately prohibit the practice of utilizing Behavioral Observation status for inmates expressing suicidal ideation, threatening suicide, engaging in suicidal and/or other forms of self-injurious behavior, *but* perceived to be manipulative and/or malingering. Regardless of any perceived intent, any inmate expressing suicidal ideation, threatening suicide, engaging in suicidal and/or other forms of self-injurious behavior should immediately be placed on suicide precautions until assessed by a qualified mental health professional.

12) Both the DOC and Unity Health Care suicide prevention policies should be revised to include specific reference to the observation of inmates threatening/displaying self-injurious behavior. A proposed revision is offered as follows:

> ***Close Observation*** (or ***Suicide Precaution***) is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10 minutes, and should be documented as it occurs.

> ***Constant Observation*** (or ***Suicide Watch***) is reserved for the inmate who is actively suicidal, either by threatening or engaging in self-injury and would be considered a high risk for suicide. This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 10-minute intervals.

13) The recommended prohibition of utilizing Behavior Observation status for inmates who threaten suicide and/or engage in self-injurious behavior will result in a dramatic increase of inmates placed on suicide precautions and requiring observation of at least 15-minute intervals. Given the fact that current practices within the Central Detention Facility require nursing staff to conduct observation of these inmates in both the Medical and Mental Health units, unless the DOC assumes responsibility for this observation with the assignment of the appropriate

number of correctional staff, it would appear that Unity Health Care will need to receive additional funding to provide the appropriate number of nursing staff.

14) It is strongly recommended that the current "Comprehensive Mental Health Assessment" template form in Centricity EMR be replaced with a form that allows for adequate documentation of a suicide risk assessment. As previously offered, such documentation should include a sufficient description of the current behavior and justification for either, placement on, or discharge from, suicide precautions, as well as a brief mental status examination, listing of chronic and acute risk factors, listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and a treatment plan. A sample "Suicide Risk Assessment" form is contained in Appendix C and was previously forwarded to both DC Department of Corrections and Unity Health Care officials for consideration.

15) In addition to completion of a Suicide Risk Assessment form *only* when an inmate is placed on, or discharge from, suicide precautions, when an inmate is continued on suicide precautions following a daily assessment, mental health clinicians should be required to document justification for continued suicide precautions as a progress note that provides sufficient description of the current behavior and justification for a particular level of observation.

16) It is strongly recommended that, consistent with national correctional standards, mental health clinician(s) develop treatment plans for inmates on suicide precautions that "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur" (see NCCHC, 2008).

17) It is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on mental health caseloads and receive regularly scheduled follow-up assessments by mental health staff until their release from custody. As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that the reassessment schedule following discharge from suicide precautions be as follows: within 24 hours, again within 72 hours, again within 1 week, and then periodically until release from custody.

**Intervention**

18) Apart from a recommendation to increase the compliance rate of CPR/AED training for correctional staff, this writer would support the recommendations previously offered by the Suicide Prevention Task Force.

**Reporting**

None

**Follow-Up/Morbidity-Mortality Review**

19) It is strongly recommended that documentation of a mortality review that includes recommendations should contain an indication as to whether or not each recommendation was accepted or rejected, as well as a corrective action plan with responsible parties and timetables for completion noted for any recommendation accepted by the Committee and/or DOC and Unity Health Care officials.

**D.** **CONCLUSION**

It is hoped that the suicide prevention assessment provided by this writer, as well as the recommendations contained within this report, will be of assistance to both the DC Department of Corrections and Unity Health Care. As stated in the preface of this report, both agencies have very comprehensive suicide prevention policies. It is the current suicide prevention *practices* that are of concern. However, this writer met numerous DOC and Unity Health Care officials and supervisors, as well as officers and mental health clinicians, who appeared genuinely concerned about inmate suicide and committed to taking whatever actions were necessary to reduce the opportunity for such tragedy in the future. And based upon a pro-active approach and high caliber management and line staff, this writer is confident that full implementation of the numerous recommendations contained within this report will result in successful efforts to reduce the likelihood of future inmate suicides within the Central Detention Facility.

In conclusion, this writer would be remiss by not extending sincere appreciation to DOC Director Thomas Faust, Diana Lapp, MD, Medical Director for Unity Health Care, and Bruce Reid, CDF Mental Health Director for Unity Health Care. Special thanks is extended to Forrest Daniels, DOC Health Systems Administrator, Beth Mynett, MD, DOC Medical Director, and CDF Major Walter Coley. Without the total candor, cooperation and assistance these individuals, as well as from all correctional, medical, and mental health personnel that were interviewed, this writer would not have been able to complete this technical assistance assignment.

Respectfully Submitted By:


Lindsay M. Hayes
40 Lantern Lane
Mansfield, MA 02048
(508) 337-8806
lhayesta@msn.com


September 13, 2013

**APPENDIX  A**

## MENTAL HEALTH/SUICIDE RISK INTAKE SCREENING FORM

1) Does the arresting and/or transporting officer have any information (e.g., from observed behavior, documentation from sending agency/facility, family member/guardian, etc.) that indicates detainee is a medical, mental health or suicide risk now (requires verification from arresting and/or transporting officer)?

2) Was detainee a medical, mental health or suicide risk during any prior contact and/or confinement within this facility (requires verification on ALERT screen of EMR)?

3) Are you now or have you received counseling for mental health or emotional issues?

4) Have you ever been hospitalized for a mental health issue?

5) Have you ever received medication for a mental health issue?

6) Are you currently taking any medication for a mental health issue?

7) Have you ever received treatment for abuse of alcohol and/or legal or illegal substances?

8) Have you ever heard or seen things that other people could not hear or see?

9) Do you have any mental health issues that you would like to talk to mental health staff about?

10) Are you now or have you ever been accused of committing a violent and/or sexual act?

11) Have you ever been a victim of a violent and/or sexual act?

12) Is this your first incarceration?

13) Do you feel you will have difficulty adjusting to jail?

14) Have you ever attempted suicide?

15) Have you ever considered suicide?

16) Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?

17) Has a family member/close friend ever attempted or committed suicide?

18) Do you feel there is nothing to look forward to in the immediate future (expressing helplessness and/or hopelessness)?

19) Are you thinking of hurting and/or killing yourself?

# Observation of Mental Status

**Appearance**: __ Appropriate __Sweating __Tremors __Disheveled __Bizarre __Intoxicated

**Mood**: __Appropriate __Depressed __Euphoric __Anxious __Angry __Irritable __ Fearful

**Affect**: __Appropriate __Tearful __Blunted __Flat __Labile __Hostile

**Speech**: __Appropriate __Expressive __Loud __Slowed __Pressured __ Slurred__ Disorganized

**Thought Content/Process**: __Appropriate __ Delusional/Paranoid Thoughts __ Remorseful __Shameful __Hopelessness __Other

**Orientation**: __Person __Place __Time __Situation

**Insight**: __Good __Fair __Poor

**Perceptions**: __Auditory/Visual Hallucinations

## APPENDIX B
# CHECKLIST FOR THE "SUICIDE-RESISTANT" DESIGN OF CORRECTIONAL FACILITIES

The safe housing of suicidal inmates is an important component to a correctional facility's comprehensive suicide prevention policy. Although impossible to create a "suicide-proof" cell environment within any correctional facility, given the fact that almost all inmate suicides occur by hanging, it is certainly reasonable to ensure that all cells utilized to house potentially suicidal inmates are free of all obvious protrusions. And while it is more common for ligatures to be affixed to air vents and window bars (or grates), *all* cell fixtures should be scrutinized, since bed frames/holes, shelves with clothing hooks, sprinkler heads, door hinge/knobs, towel racks, water faucet lips, and light fixtures have been used as anchoring devices in hanging attempts. As such, to ensure that inmates placed on suicide precautions are housed in "suicide-resistant" cells, facility officials are strongly encouraged to address the following architectural and environmental issues:

1) Cell doors should have large-vision panels of Lexan (or low-abrasion polycarbonate) to allow for unobstructed view of the entire cell interior at all times. These windows should _never_ be covered (even for reasons of privacy, discipline, etc.) If door sliders are not used, door interiors should not have handles/knobs; rather they should have recessed door pulls. Any door containing a food pass should be closed and locked.

Interior door hinges should bevel down so as not to permit being used as an anchoring device. Door frames should be rounded and smooth on the top edges. The frame should be grouted into the wall with as little edge exposed as possible.

In older, antiquated facilities with cell fronts, walls and/or cell doors made of steel bars, Lexan paneling (or low-abrasion polycarbonate) or security screening (that has holes that are ideally 1/8 inches wide and no more than 3/16 inches wide or 16-mesh per square inch) should be installed from the _interior_ of the cell.

Solid cell fronts must be modified to include large-vision Lexan panels or security screens with small mesh;

2) Vents, ducts, grilles, and light fixtures should be protrusion-free and covered with screening that has holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch;

3) Wall-mounted corded telephones should _not_ be placed inside cells. Telephone cords of varying length have been utilized in hanging attempts;

4) Cells should _not_ contain any clothing hooks. The traditional, pull-down or collapsible hook can be easily jammed and/or its side supports utilized as an anchor;

5) A stainless steel combo toilet-sink (with concealed plumbing and outside control valve) should be used. The fixture should *not* contain an anti-squirt slit, toothbrush holder, toilet paper rod, and/or towel bar;

6) Beds should ideally be either heavy molded plastic or solid concrete slab with rounded edges, totally enclosed underneath.

If metal bunks are utilized, they should be bolted flush to the wall with the frame constructed to prevent its use as an anchoring device. Bunk holes should be covered; ladders should be removed. (Traditional metal beds with holes in the bottom, not built flush to the wall and open underneath, have often been used to attach suicide nooses. Lying flat on the floor, the inmate attaches the noose from above, runs it under his neck, turns over on his stomach and asphyxiates himself within minutes.);

7) Electricity should be turned off from wall outlets outside of the cell;

8) Light fixtures should be recessed into the ceiling and tamper-proof. Some fixtures can be securely anchored into ceiling or wall corners when remodeling prohibits recessed lighting. All fixtures should be caulked or grouted with tamper-resistant security grade caulking or grout.

Ample light for reading (at least 20 foot-candles at desk level) should be provided. Low-wattage night light bulbs should be used (except in special, high-risk housing units where sufficient lighting 24 hours per day should be provided to allow closed-circuit television (CCTV) cameras to identify movements and forms).

An alternative is to install an infrared filter over the ceiling light to produce total darkness, allowing inmates to sleep at night. Various cameras are then able to have total observation as if it were daylight. This filter should be used only at night because sensitivity can otherwise develop and produce aftereffects;

9) CCTV monitoring does *not* prevent a suicide, it only identifies a suicide attempt in progress. If utilized, CCTV monitoring should *only* supplement the physical observation by staff. The camera should obviously be enclosed in a box that is tamper-proof and does not contain anchoring points. It should be placed in a high corner location of the cell and all edges around the housing should be caulked or grouted.

Cells containing CCTV monitoring should be painted in pastel colors to allow for better visibility. To reduce camera glare and provide a contrast in monitoring, the headers above cell doors should be painted black or some other dark color.

CCTV cameras should provide a clear and unobstructed view of the entire cell interior, including *all* four corners of the room. Camera lens should have the capacity for both night or low light level vision;

10) Cells should have a smoke detector mounted flush in the ceiling, with an audible alarm at the control desk. Some cells have a security screening mesh to protect the smoke detector from

vandalism. The protective coverings should be high enough to be outside the reach of an inmate and far enough away from the toilet so that the fixture could not be used as a ladder to access the smoke detector and screen. Ceiling height for new construction should be 10 feet to make such a reasonable accommodation. Existing facilities with lower ceilings should carefully select the protective device to make sure it cannot be tampered with, or have mesh openings large enough to thread a noose through.

Water sprinkler heads should not be exposed. Some have protective cones; others are flush with the ceiling and drop down when set off; some are the breakaway type;

11) Cells should have an audio monitoring intercom for listening to calls of distress (*only* as a supplement to physical observation by staff). While the inmate is on suicide precautions, intercoms should be turned up high (as hanging victims can often be heard to be gurgling, gasping for air, their body hitting the wall/floor, etc.);

12) Cells utilized for suicide precautions should be located as close as possible to a control desk to allow for additional audio and visual monitoring;

13) If modesty walls or shields are utilized, they should have triangular, rounded or sloping tops to prevent anchoring. The walls should allow visibility of both the head and feet;

14) Some inmates hang themselves under desks, benches, tables or stools/pull-out seats. Potential suicide-resistant remedies are: (a) Extending the bed slab for use as a seat; (b) Cylinder-shaped concrete seat anchored to floor, with rounded edges; (c) Triangular corner desk top anchored to the two walls; and (d) Rectangular desk top, with triangular end plates, anchored to the wall. Towel racks should also be removed from any desk area;

15) All shelf tops and exposed hinges should have solid, triangular end-plates which preclude a ligature being applied;

16) Cells should have security windows with an outside view. The ability to identify time of day via sunlight helps re-establish perception and natural thinking, while minimizing disorientation.

If cell windows contain security bars that are not completely flush with window panel (thus allowing a gap between the glass and bar for use as an anchoring device), they should be covered with Lexan (or low-abrasion polycarbonate) paneling to prevent access to the bars, or the gap, should be closed with caulking, glazing tape, etc.

If window screening or grating is used, covering should have holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch;

17) The mattress should be fire retardant and not produce toxic smoke. The seam should be tear-resistant so that it cannot be used as a ligature;

18) Given the fact that the risk of self-harm utilizing a laundry bag string outweighs its usefulness for holding dirty clothes off the floor, laundry bag strings should be removed from the cell;

19) Mirrors should be of brushed, polished metal, attached with tamper-proof screws;

20) Padding of cell walls is prohibited in many states. Check with your fire marshal. If permitted, padded walls must be of fire-retardant materials that are not combustible and do not produce toxic gasses; and

21) Ceiling and wall joints should be sealed with neoprene rubber gasket or sealed with tamper-resistant security grade caulking or grout for preventing the attachment of an anchoring device through the joints.

NOTE: A portion of this checklist was originally derived from R. Atlas (1989), "Reducing the Opportunity for Inmate Suicide: A Design Guide," *Psychiatric Quarterly*, 60 (2): 161-171. Additions and modifications were made by Lindsay M. Hayes, and updated by Randall Atlas, Ph.D., a registered architect. See also Hayes, L.M. (2003), "Suicide Prevention and "Protrusion-Free Design of Correctional Facilities," *Jail Suicide/Mental Health Update*, 12 (3): 1-5. Last revised in January 2004.

## APPENDIX  C
## SUICIDE RISK ASSESSMENT

**INMATE'S NAME:**_____**I.D. NUMBER:**_____
         (Last)                        (First)        (M.I.)

**DOB:**_____ **AGE:**___ **SEX:**___ **INITIAL ASSESSMENT:**___ **REASSESSMENT:**_____ **DATE:**_____

**SUICIDE PRECAUTIONS DURING PRIOR CONFINEMENT: YES**___ **(When:**_____**) NO**_____

**REASON FOR REFERRAL:**_____
_____
_____
_____
_____
_____
_____

**SUICIDE RISK INDICATORS (Check all that apply):**

| | | |
|---|---|---|
| Suicide Attempt____ | Suicide Ideation/Gesture____ | Self-Mutilation____ |
| Depressed_____ | Agitated_____ | Mood Change_____ |
| Hostile/Aggressive____ | Sleep Problems_____ | Recent Loss_____ |
| Lethargy_____ | Excessive Weight Gain/Loss____ | Isolation/Withdrawal_____ |
| Giving Away Possessions_____ | Intoxicated____ | Hopeless/Helpless_____ |
| Afraid/Fearful____ | Bizarre Behavior (Explain Above)___ | Other (Explain Above)___ |

**TYPE OF THREAT/ATTEMPT:** Hanging_____Cutting____Jumping____Ingestion___Overdose___Other____

**PROTECTIVE FACTORS (Check all that apply):**

Identifies reason to live/not commit suicide_____      Future orientation/plans for future_____
Family Support_____      Children at home_____
Religious/spiritual/cultural beliefs_____      Spousal support_____
Interpersonal social support_____      Insight into problems_____
Exercises regularly_____      Job or school assignment_____
Positive coping skills/conflict resolution skills_____      Active and motivated in mental health treatment_____

**PREVIOUS PSYCHIATRIC/SUICIDE HISTORY:**_____
_____
_____
_____
_____
_____
_____
_____
_____

**CURRENT MEDICATIONS:**_____
_____
_____

**ASSESSMENT OF LETHALITY:** Low (1)_____ Medium (2)_____ High (3)_____

**DIAGNOSIS:**
_____
_____
_____
_____
_____

**FINDINGS/RECOMMENDATIONS:**_____

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**TREATMENT PLAN (**Describe circumstances in which risk for suicide is likely to recur; specific strategies/actions patient and clinician will take if suicidal thoughts do occur; include frequency of continued contact, referrals, etc.)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**ACTIONS:**     **Suicide Precautions Authorized:**     Yes_____     No_____

**Level: CLOSE** (Physical checks at staggered intervals not to exceed every 10 minutes)____
     **CONSTANT** (1:1 Continuous, uninterrupted observation)_____
     **OTHER** (Specify)_____

**Medical Restraints:** Yes_____          No_____
**Safety Smock:** Yes_____          No_____
**Items Allowed (Check):** Clothing___Undergarments___Blankets___Mattress___Pillow____
          Reading Materials____Toiletries___Other_____
**Shower:** Yes_____          No_____
**Visits:** Yes_____          No_____
**Telephone Cells:** Yes_____          No_____
**Housing Assignment:**_____
**Transfer Recommendation:**_____
**Other Referrals/Recommendations:**_____

**SIGNATURE/TITLE:** _____**TIME:**_____
                         **(Qualified Mental Health Professional)**

Developed by the NATIONAL CENTER ON INSTITUTIONS AND ALTERNATIVES

IN THE UNITED STATES ~~DISCTRICT~~DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VICTORIA MANNINA,~~————————~~ )               )
~~PLAINTIFF,~~ )
                                        )
_____                                    )    ~~v.~~
~~)~~

                                        )
~~HON. MURIEL BOWSER,~~ )
                                        )    ~~Civil~~ Case No~~.~~.: 1:15-~~931~~cv-0931
(KBJ)
~~Mayor of the District of~~ )
~~Columbia, in her~~ )
~~Official capacity,~~ )
~~DEFENDANT~~ )
                                        )
~~CARL A. RACINE,~~ )
                                        )
~~Attorney General of~~ )
~~The District of Columbia, in his~~ )
~~Official Capacity,~~ )
~~DEFENDANT,~~ )
                                        )
~~and~~ )
                                        )
~~THOMAS FAUST,~~ )
~~Director of the District of~~ )
~~Columbia Department of~~ )
~~Corrections, in his Individual~~ )
~~and Official Capacity,~~ )
~~DEFENDANT.~~ )
                                        )


                    Plaintiff,          )
                                        )
    v.                                  )
                                        )
DISTRICT OF COLUMBIA, ET AL.            )
                                        )
                    Defendants.         )
                                        )

**SECOND AMENDED COMPLAINT**

**~~Summary~~**

~~This is an action filed on behalf of the~~ Plaintiff Victoria Mannina, individually and as

personal representative for the Estate of Paul Mannina ~~and his~~, by counsel, pursuant to Fed. R.

Civ. P. 15(a)(2), files this Second Amended Complaint against Defendants, the District of

Columbia, et al., alleging as follows:

**Nature of the Action**

1.      Plaintiff brings this action individually, as a widow, ~~Victoria~~and as personal

representative of the Estate of Paul Mannina. ~~Mr.~~Paul Mannina died while in the custody of the

~~Department of Corrections of the~~ District of Columbia (~~"DoC~~Department of Corrections

("DCDOC") at its Central Detention Facility ("D.C. Jail") after ample notice of his deteriorating

mental condition when his jailors at the D.C. Jail gave him a razor that he used to slit his throat

hours after returning from a ~~preventive detention~~court hearing in which he was denied his

pretrial release.

~~1.      Acting under the Color of Authority and in violation of the Fifth Amendment of~~

~~the Constitution of the United States guarantee of due process, Defendant Faust acted with~~

~~deliberate indifference to the safety of Mr. Mannina, despite having knowledge of the risks faced~~

~~by Mr. Mannina.   Notwithstanding the epidemic of attempted suicides in the D.C. Jail,~~

~~Defendant Faust, failed to train guards not to give Mr. Mannina, the razor blade that he used to~~

~~kill himself despite knowing of his suicidal tendencies or allowed such a policy to exist.  In~~

~~doing so, defendant Defendant Faust violated Mr. Mannina's civil rights under federal law as~~
~~codified at 42 U.S.C. § 1983.~~

~~2.     The DoC failed to exercise the requisite duty of care to ensure plaintiff's safety~~
~~and their failure was a proximate cause of his wrongful death under the laws of the District of~~
~~Columbia and entitles his widow to survival benefits.~~

2.     The District of Columbia acted with negligence and deliberate indifference to the
safety of Mr. Mannina despite knowledge it had or should have had of the serious risks he faced
to harm himself, or general risk of self-harm that all inmates in Mr. Mannina's particular
situation face. The District's actions fell below the applicable standard of care and were in
violation of the Fifth Amendment guarantee of due process under the United States Constitution
because the District (a) failed to provide adequate medical care to persons in the custody of the
DCDOC, (b) failed to provide adequate mental health care to persons in the custody of the
DCDOC, (c) failed to protect detainees from unsafe conditions leading to suicide by
indiscriminately distributing razor blades to all detainees upon admission to D.C. Jail, (d) failed
to protect persons in the custody of the DCDOC from self-destruction by placing detainees in
conditions known to be inadequate for suicidal persons, (e) failed to have adequate systems for
the collection or sharing of information from other departments or agencies that have relevant
mental health information about MPD arrestees or D.C. Jail detainees in order to protect persons
in the custody of the DCDOC from self-injury, and (f) failed to ensure that D.C. Jail personnel
have adequate and relevant suicide prevention and mental health training to prevent self-harm.

3.     These failures, well known to the District, amounted to a de facto policy of
deliberate indifference to detainees in its custody, and this indifference resulted in the denial of

care and tragic death of inmates, like Mr. Mannina, and a suicide rate that was three times the national average at jails between November 2012 and August 2013.

4. Plaintiff therefore seeks monetary damages, punitive damages, costs of suit, including reasonable attorneys' fees, and such other relief as equity and law require as a result of the District's negligence, unsafe conditions, harmful policies and practices, and exhibited deliberate indifference which caused the instant tort, statutory, and constitutional injuries.

## Jurisdiction and Venue

2.5. The Plaintiff's claims of the plaintiff arise under the Fifth Amendment of the United States Constitution and federal law, 42 U.S.C. § 1983. Consequently, jurisdiction is proper under 42 U.S.C. § 1331 and 28 U.S.C. —————§ 1343(a)(3),) to adjudicate a federal question and redress the deprivation of federal law involving a violation of a person's civil rights. right secured by the Constitution. Because the wrongful death and survival claims are derived from the same common nucleus of operative facts as the federal claim, thethis Court has pendent jurisdiction to hear and decide the remaining state law wrongful death and survival claims.

3.6. Venue in this Court is proper because the acts Plaintiff complains of defendant Faust were committedoccurred in the District of Columbia and the plaintiff'sMr. Mannina's death occurred in the jail ofD.C. Jail located in the District of Columbia.

## Parties

4.7. Paul Mannina, deceased, was a resident of the State of Maryland, having resided at 1171717717 Pond Road, Ashton, Maryland. 20861. He died at D.C. Jail while in the custody of the District.

3.      Plaintiff Victoria Mannina is the widow of the Decedent, Paul Mannina, and is a resident of the State of Maryland, residing at 17717 Pond Road, Ashton, Maryland.

4.      Defendant Thomas Faust is the Director of the DoC and is singularly and ultimately responsible for the management of the D.C. Jail and the supervision of its employees and contractors where Mr. Mannina took his life.  Acting under the Color of Authority for the District of Columbia, he is the person responsible for establishing policies for the D.C. Jail and for the training and supervision of its personnel.  He is charged with ensuring that policies are properly implemented, including but not limited to, the provision of razors to prisoners and the procedures for ensuring that unnecessary and avoidable harm is not visited on prisoners that are under the custody and control of the DoC.  Defendant Faust's deliberate indifference and reckless behavior to establish and carry out such procedures for maintaining the safety of the plaintiff led directly to Mr. Mannina's death.

5.      Defendant Hon. Muriel Bowser is the Mayor of the District of Columbia and has management responsibility for the DoC, the Metropolitan Police Force of the District of Columbia and all other District of Columbia personnel that were responsible for the care and custody of the Decedent Paul Mannina.  She is named in her official capacity as the chief executive for the District of Columbia.

5.8.    20861. On July 31, 2013, the Montgomery County Register of Wills appointed Ms.Victoria Mannina as the Personal Representativepersonal representative of the Estate of Paul Mannina. (A, a true and correct copy of the appointment order issuch Appointment Order being attached hereto as Exhibit 1.).

9.      Ms.Defendants are the District of Columbia and all of its agencies, instrumentalities, and municipal employees and officers who acted under color of authority and

came in contact with Mr. Mannina, including, but not limited to, the Department of Corrections, D.C. Jail, and the Metropolitan Police Department ("MPD") and their respective personnel, as well as agents, and contractors of the District of Columbia.

6.10.   Victoria Mannina, as ~~Personal Representative~~personal representative of ~~the~~said Estate and for herself, timely gave written notice of her claims pursuant to D.C. Code § 12-309, describing the time, place, and circumstances of the injury to Mr. Mannina. ~~(A,~~ a true ~~and~~ ~~correct~~ copy of ~~the~~such Notice ~~is~~being attached hereto as Exhibit 2~~.)~~.

### ~~Facts~~

### Factual Allegations

11.   On June 13, 2013, Mr. Mannina was arraigned before the Superior Court of the District of Columbia on a criminal complaint that charged him with one count each of first degree burglary while armed and third degree sexual abuse while armed.

6.   ~~Supporting police records allege that on Wednesday, June~~ 5, 2013, ~~the Decedent met his supervisor from his workplace, Leslie Perlman, at her~~Mr. Mannina drove to a home on Chesapeake Street~~, NW~~ Northwest in Washington, ~~DC. He had known~~ D.C. to meet with Leslie Perlman, a coworker. Upon information and belief, Mr. Mannina and Ms. Perlman ~~for more than two decades and upon information and belief~~ had an intimate, personal relationship ~~with her~~ outside of work~~.~~

7.12.   ~~for more than twenty years.~~ An altercation ensued~~, resulting~~ between them, which resulted in injuries to Ms. Perlman that required medical treatment ~~and ultimately surgery to repair broken facial bones.~~.

8.13.   Mr. Mannina returned home after ~~the~~ meeting with Ms. Perlman. ~~-~~Despondent ~~over his situation~~and depressed, he did not go to work on June 6th and, that night, attempted suicide by ~~consuming a combination~~ingesting a multi-substance cocktail of drugs and alcohol.

9.14.   ~~The next morning,~~ On June 7th, ~~Ms.~~in the early morning hours, Victoria Mannina could not wake her husband and called for an ambulance. ~~He was admitted to~~ Paramedics rushed him to the emergency room of Montgomery General Hospital, where doctors admitted Mr. Mannina, as recalled by the MPD detective assigned to the case, for a "~~changed~~change in mental state~~" according to the nurse on the unit where Mr. Mannina was a patient.~~." (*See* Preventive Detention Hearing Transcript, June 17, 2013 Tr. at 21-22, a true copy of all relevant transcript pages being attached hereto as Exhibit 3.) High levels of alcohol, opiates, and Tylenol were found in his system and he was found unresponsive. ~~Transcript of Preventive Detention Hearing ("Transcript"), June 17, 2013, at 21-22. (A true and correct copy of relevant pages of the transcript of this hearing is attached as Exhibit 3~~ even to painful stimuli, which was also known to the District. (*Id.*)

10.15.   ~~At first~~During the criminal investigation, Ms. Perlman declined to name ~~the Decedent~~Mr. Mannina as her assailant. ~~Then, on or about Friday, June 7ᵗʰ, Ms. Perlman~~But in post-interviews, she changed her story and told ~~District of Columbia Metropolitan Police Detectives that Mr. Mannina~~ MPD detectives that he was the person who injured her. ~~In the course of subsequent interviews with the police detectives, Ms. Perlman~~She also reported that ~~upon leaving her home, Mr. Mannina declared,~~he said "I lost control" and made the suicidal statement "I guess I'll just ~~blow my brains out." This statement~~go shoot myself," all of which was ~~repeated~~recorded in police records and adopted by MPD Detective Alexander MacBean in

his testimony during the ~~Court's~~ preventive detention hearing ~~on~~. (*See* June 17, 2013 ~~Transcript,~~ Tr. at 10~~.~~)

~~11.~~16. The police arrested Mr. Mannina sometime after 2 ~~pm~~:00 p.m. on Friday, June 7th, while he was still a patient at Montgomery General Hospital. ~~He was still~~ receiving treatment for his attempted suicide. ~~He was non-responsive and despondent as a result of the drug and alcohol~~ and multi-substance overdose ~~and~~. He remained ~~in the hospital~~ there for ~~two more~~three days ~~after his arrest. The~~ during which the police barred his family from seeing him. ~~He~~Having no criminal past and never having been arrested before, Mr. Mannina was ~~most certainly~~ alone, disoriented, and ~~scared~~unaware why he was in ~~his~~the hospital ~~room~~and under 24-hour police ~~guard~~surveillance.

~~12.~~17. On or about ~~Sunday,~~ June ~~9ᵗʰ~~10th, Mr. Mannina was transferred from the hospital to a ~~Montgomery County Jail~~jail facility on Seven Locks Road. ~~He~~ in Montgomery County. On or about June 12th, he was ~~subsequently~~ extradited by MPD transport to ~~the District of Columbia~~300 Indiana Avenue Northwest in Washington, D.C., where he was processed for arrest.

18. ~~On June 17, 2013, the Superior Court of the District of Columbia held a~~ Restrained and still in hospital garments, Mr. Mannina was then brought before a judge on June 13th as "Lockup Number 9" to be formally arraigned on the above-mentioned counts in Superior Court Case No. 2013 CF1 009990. The D.C. Pretrial Services Agency ("PSA") officer who met Mr. Mannina prior to his arraignment observed and thus reported that Mr. Mannina had thoughts and attempts to harm himself.

19. At the government's request, during the arraignment, the court denied Mr. Mannina's release and committed him to D.C. Jail on a three-day hold subject to further order of

the court. Thereafter, he was transported to D.C. Jail where he was processed for intake and received into custody by DCDOC as a pretrial detainee.

20. In June 2013, all detainees and prisoners at D.C. Jail received on-site mental health services from the D.C. Department of Mental Health and clinicians from Unity Health Care, an outside vendor contracted by the District to provide medical health care services to inmates in DCDOC facilities.

21. However, as demonstrated in the audit and investigative findings of Lindsay Hayes per his *Report on Suicide Prevention Practices within the District of Columbia Department of Corrections Central Detention Facility* (the "Hayes Report"), a true copy of such report being attached hereto as Exhibit 4 and incorporated herein by reference, DCDOC had a systemic lack of care for detainees by providing inadequate and irrelevant training to its employees and clinicians that fell below applicable national standards, and a custom of performing hollow inmate medical evaluations that were comprised of cursory, incomplete, or meaningless questions that lead to flawed data and avoidable failures to diagnose and treat seriously ill and obviously afflicted inmates.

22. In June 2013, D.C. Jail also had only nine suicide-resistant cells, even though more than nine inmates were on suicide observation status each day. As a result, DCDOC had a recurring problem and practice of placing suicidal detainees, potentially suicidal detainees, or other detainees in crisis in non-suicide resistant housing that subjected inmates, like Mr. Mannina, to a substantial risk of serious harm or death.

23. During Mr. Mannina's intake and so-called medical evaluation on or about June 13, DCDOC failed to identify the obvious medical needs of Mr. Mannina, leaving his

psychological distress untreated and subjecting him to the unsafe condition of general population and other dangerous policies and practices.

24.    On June 17th, Mr. Mannina returned to Superior Court for his subsequent preventive detention hearing. Per its updated report, the PSA restated its belief for a second time that Mr. Mannina had thoughts and attempts to harm himself.

25.    Mr. ~~Mr.~~ Mannina's counsel thus urged the ~~Court~~court to release Mr. Mannina so that he could receive ~~needed~~the medical care and mental health treatment. ~~During~~ he needed. In response, the ~~hearing, the Court observed the~~court found that Mr. Mannina had "obviously experienced some sort of imbalance ~~at this time" and "[Mr. Mannina]~~," that he "sounds like someone who had everything to lose." ~~"Obviously, Mr. Mannina's a wonderful person in most respects; but based on the evidence, there is something dark floating out there."~~," and that "there's obviously something that's gone wrong here[.]" (*See* June 17, 2013 Tr. at 40, 43.) The court denied his release, re-committing him to D.C. Jail, because it did not see how pretrial supervision or active monitoring would provide sufficient protection to the complainant, Leslie Perlman. (*Id*. at 43.)

26.    Visibly upset, crying, and depressed, Mr. Mannina was then walked back to the holding cells behind the courtroom to be returned to D.C. Jail. He had no occasion to speak to his family or attorney, and the June 17th hearing was the last time he saw either because he committed suicide hours later.

~~13.~~27.  Despite such cries for help, despite the court recognizing that Mr. ~~Mannina's~~Mannina had a fragile mental ~~condition, but also concerned for the safety of the Complainant, the Court refused to permit Mr. Mannina to be released back to the community. Mr. Mannina, depressed and despondent, was returned to the D. C. Jail,~~state, and despite the

10

court alerting for all to hear, including his jailors, that Mr. Mannina had the warning signs of "a desperate man" in need of mental health treatment (*see id.*), the District failed to provide adequate care and act affirmatively to prevent his self-harm. Instead, DCDOC left him in open population housing without ~~having had an opportunity to speak to his family or his attorney. It was the last time he saw either. Transcript at 39-42~~further medical treatment, let alone plans for the same, and gave him a razor blade that he used to take his life.

~~7.	DoC personnel had ample warning from the detective's report and the testimony at the preventive detention hearing that Mr. Mannina was very likely suicidal. Some of the facts they had were:~~

- ~~The Metropolitan Police detective's report that Mr. Mannina had declared an intent to kill himself upon leaving the premises of the complainant;~~
- ~~A nurse on Mr. Mannina's unit advising the detective that the decedent had been admitted to the hospital for a "changed mental state;" after an overdose of drugs and alcohol; and,~~
- ~~The Court observing what everyone could see—that a gentle, kind man had "experienced some sort of imbalance,"~~

~~8.	Nonetheless, defendant Faust's Department knowingly ignored the well-accepted policy, custom and practice of segregating potentially suicidal inmates and placing them on a suicide watch. Had they done what is common prison practice, Mr. Mannina would be alive today.~~

~~9.	Moreover, the DoC, under the direction of Director Faust, adopted a policy of indiscriminately giving prisoners razor blades by which they can harm themselves. Incredibly, the DoC gave Mr. Mannina, whose mental condition had been noticeably deteriorating to the~~

~~point where suicide was foreseeable, the razor that he subsequently used to kill himself, just~~ ~~hours after returning to his cell.~~

28.     The District had ample notice to infer that Mr. Mannina faced a substantial risk of serious harm. Based on, not at the exclusion of all else, the criminal investigation, hospital reporting, MPD reporting, PSA reporting, testimony from the detention hearing, counsel representations from the detention hearing, court findings from the detention hearing, and known facts that Mr. Mannina had been charged with a violent crime of notoriety, was a senior lawyer with the federal government, was a professional incarcerated for the first time, had declared an intent to kill himself, and was arrested in a hospital after a bona fide attempt of suicide, the District had knowledge of Mr. Mannina's vulnerability and that he suffered from mental illness, depression, had attempted suicide and was at a continued risk for suicide.

29.     The DCDOC nonetheless left Mr. Manina untreated and subject to a substantial risk of serious harm that included unnecessary pain, injury, and death.

30.     The District's clear pattern of giving razor blades to inmates, as well as its callous convention of failing to provide prisoners with adequate health care, made the District deliberately indifferent or, at least, negligent to the fact that the DCDOC's lawless razor blade distribution practice and systemic failure to provide due care cause significant injury and a substantial risk of serious harm to vulnerable inmates like Mr. Mannina.

31.     In June 2013, DCDOC routinely distributed razor blades throughout its facilities for inmates to shave without regard to an inmate's mental health. Razor blades were permitted to be taken and used privately by inmates in housing units and cells, and these razor blades were not regulated, collected or accounted for by DCDOC employees in any meaningful or well-preserved way for the welfare of inmates.

32.     Giving razor blades to inmates like Mr. Mannina, whose fragile mental state and risk for self-harm was readily apparent, was an extraordinarily reckless tradition that, upon information and belief, the District knew was problematic and required change and discontinuation because it failed to protect inmates for whom the DCDOC was charged with housing and providing care.

33.     Failing to have adequate resources for suicide prevention and failing to provide relevant mental health training to municipal employees and officers to abate self-harm, as supported by the Hayes Report, was also a deficient custom and recurrent problem that similarly posed a substantial risk of significant injury.

34.     Mr. Mannina was incarcerated under these conditions that posed a̶-substantial r̶i̶s̶krisks of serious harm.

1̶4̶.35.   He killed himself in the early morning hours of June 18, 2013 desperate and D̶e̶f̶e̶n̶d̶a̶n̶t̶ ̶F̶a̶u̶s̶t̶ ̶w̶a̶salone, and the District is responsible for c̶r̶e̶a̶t̶i̶n̶g̶ ̶t̶h̶e̶ ̶c̶o̶n̶d̶i̶t̶i̶o̶n̶s̶ ̶t̶h̶a̶t̶ his wrongful death because it exposed Mr. Mannina to t̶h̶a̶t̶ ̶h̶a̶r̶mthe unsafe conditions it created that ultimately led to his death.

1̶0̶.̶ ̶ ̶ ̶ ̶A̶f̶t̶e̶r̶ ̶M̶r̶.̶ ̶M̶a̶n̶n̶i̶n̶a̶'̶s̶ ̶s̶u̶i̶c̶i̶d̶e̶ ̶a̶n̶d̶ ̶t̶h̶e̶ ̶s̶u̶i̶c̶i̶d̶e̶ ̶o̶f̶ ̶t̶w̶o̶ ̶o̶t̶h̶e̶r̶ ̶i̶n̶m̶a̶t̶e̶s̶ ̶a̶t̶ ̶t̶h̶e̶ ̶D̶.̶C̶.̶ ̶J̶a̶i̶l̶ i̶n̶ ̶2̶0̶1̶3̶,̶ ̶D̶e̶f̶e̶n̶d̶a̶n̶t̶ ̶F̶a̶u̶s̶t̶ ̶c̶o̶m̶m̶i̶s̶s̶i̶o̶n̶e̶d̶ ̶a̶ ̶s̶t̶u̶d̶y̶ ̶o̶f̶ ̶t̶h̶e̶ ̶c̶o̶n̶d̶i̶t̶i̶o̶n̶s̶ ̶a̶t̶ ̶t̶h̶e̶ ̶D̶.̶C̶.̶ ̶J̶a̶i̶l̶ ̶t̶o̶ ̶e̶x̶a̶m̶i̶n̶e̶ ̶t̶h̶e̶ o̶b̶v̶i̶o̶u̶s̶ ̶d̶e̶f̶i̶c̶i̶e̶n̶c̶i̶e̶s̶ ̶i̶n̶ ̶p̶o̶l̶i̶c̶i̶e̶s̶ ̶a̶n̶d̶ ̶p̶r̶a̶c̶t̶i̶c̶e̶s̶ ̶t̶h̶a̶t̶ ̶h̶e̶ ̶h̶a̶d̶ ̶o̶v̶e̶r̶s̶e̶e̶n̶ ̶a̶n̶d̶ ̶i̶m̶p̶l̶e̶m̶e̶n̶t̶e̶d̶ ̶t̶h̶a̶t̶ ̶l̶e̶d̶ ̶t̶o̶ t̶h̶e̶i̶r̶ ̶d̶e̶a̶t̶h̶s̶.̶ ̶ ̶S̶u̶b̶s̶e̶q̶u̶e̶n̶t̶ ̶t̶o̶ ̶M̶r̶.̶ ̶M̶a̶n̶n̶i̶n̶a̶'̶s̶ ̶d̶e̶a̶t̶h̶,̶ ̶u̶p̶o̶n̶ ̶i̶n̶f̶o̶r̶m̶a̶t̶i̶o̶n̶ ̶a̶n̶d̶ ̶b̶e̶l̶i̶e̶f̶ ̶a̶s̶ ̶a̶ ̶r̶e̶s̶u̶l̶t̶ ̶o̶f̶ ̶h̶i̶s̶ d̶e̶a̶t̶h̶,̶ ̶t̶h̶e̶ ̶D̶o̶C̶ ̶c̶h̶a̶n̶g̶e̶d̶ ̶i̶t̶s̶ ̶p̶o̶l̶i̶c̶i̶e̶s̶ ̶o̶f̶ ̶d̶i̶s̶p̶e̶n̶s̶i̶n̶g̶ ̶r̶a̶z̶o̶r̶ ̶b̶l̶a̶d̶e̶s̶ ̶t̶o̶ ̶i̶n̶m̶a̶t̶e̶s̶.̶ ̶ ̶D̶i̶r̶e̶c̶t̶o̶r̶ ̶F̶a̶u̶s̶t̶ r̶e̶c̶o̶g̶n̶i̶z̶e̶d̶ ̶t̶h̶a̶t̶ ̶h̶i̶s̶ ̶p̶o̶l̶i̶c̶i̶e̶s̶ ̶r̶e̶g̶a̶r̶d̶i̶n̶g̶ ̶r̶a̶z̶o̶r̶ ̶b̶l̶a̶d̶e̶s̶ ̶w̶a̶s̶ ̶s̶u̶f̶f̶i̶c̶i̶e̶n̶t̶l̶y̶ ̶s̶e̶r̶i̶o̶u̶s̶ ̶t̶o̶ ̶b̶e̶ ̶d̶i̶s̶c̶o̶n̶t̶i̶n̶u̶e̶d̶ b̶e̶c̶a̶u̶s̶e̶ ̶t̶h̶e̶y̶ ̶f̶a̶i̶l̶e̶d̶ ̶t̶o̶ ̶p̶r̶o̶t̶e̶c̶t̶ ̶t̶h̶e̶ ̶i̶n̶m̶a̶t̶e̶s̶ ̶h̶e̶ ̶w̶a̶s̶ ̶c̶h̶a̶r̶g̶e̶d̶ ̶w̶i̶t̶h̶ ̶h̶o̶u̶s̶i̶n̶g̶.̶

11.   Mr. Mannina killed himself in the early morning hours of June 18, 2013, alone and desperate, his life in total tatters.

12.   By acting recklessly and callously in the face of the obvious and serious harm that the then-existing policy of indiscriminately dispensing razor blades would have on prisoners incarcerated at the D.C. Jail, Defendant Faust demonstrated deliberate indifference to protecting the safety of the decedent.

## Count I
## 1: Violation of Mr. Mannina's Civil Rights Underunder 42 U.S.C. § 1983

36.   Plaintiff incorporates by reference repeats and reiterates each and every allegation contained in the above paragraphs 1 through 26, above and further35 as if fully set forth herein.

15.37.   Plaintiff, as personal representative of the Estate of Paul Mannina, alleges that this claim arises under federal law, 42 U.S.C. § 1983, and is based on the deprivation of Paul Mannina's rights under the due process clause of the Fifth Amendment of the United States Constitution.

13.   There is no dispute that DoC staff did not segregate the decedent from the general population or place him on a 24-hour suicide watch.  Consequently, he was unobserved when he killed himself.  Nor did DoC place Mr. Mannina in a cell designed to protect potential suicide risks.

14.   There is no dispute that DoC staff gave the decedent the razor blade that he used to kill himself.

15.   As Director of the DoC, Defendant Faust has ultimate responsibility for promulgating the rules and procedures for the DoC and for ensuring that these rules and

14

procedures are followed by DoC staff to protect the safety of the prisoners incarcerated at the D.C. Jail.

16.   In the year that Mr. Mannina committed suicide, the suicide rate for incarcerated prisoners in the District of Columbia was three times the national average. "Report: Rash of suicides at D.C. jail point to deep problem with inmates mental health care," *Washington Post,* Nov. 7, 2013.

17.   The D.C. Jail has only nine "suicide resistant" cells for a population of 1,739 inmates as of August, 2013. In the period beginning in 2011, 165 suicides were attempted at the D.C. Jail, according to statistics provided by the DoC. *Id.* To say that suicide attempts were rampant at the D.C. Jail would be an understatement and yet the D.C. Jail was inadequately equipped to manage the risk.

38.   Defendant Faust was aware of the risk posed to the safety of inmates at the jail at the time of Mr. Mannina's death. Yet, he acted recklessly and with Detained prior to trial and not convicted of a crime, Mr. Mannina had the right to be free from *any* form of punishment which, at a minimum, meant that he had the right to adequate medical care and right to be free from the substantial risk of serious harm or unsafe conditions that cause the sufferance of constitutional injuries, including self-harm or self-injurious behavior.

39.   Despite knowledge that the District had or should have had of the serious risks Mr. Mannina faced to harm himself—risks that were so obvious to make the need for preventative action and care abundantly clear because, in part, all inmates in his particular situation face such risks of self-harm—the District showed no concern for his health or safety and disregarded his risk of suicide and need for preventative care.

40.     Because of the District's deliberate indifference to the ~~risks to the safety and well beingobvious~~obvious, known medical needs of Mr. Mannina and ~~fellow inmates posed by overseeing and implementing policies that were subjectively dangerous and for his~~ because of the District's constitutionally inadequate resources to care for suicidal or potentially suicidal detainees like Mr. Mannina, he went without appropriate diagnosis and management of his medical condition and died from the District's failures to treat.

~~16.~~41.  Moreover, or in the alternative, because of the District's systemic failure to train ~~adequately the staff that he oversaw~~, and because of the clear pattern of denying medical care to inmates with serious medical conditions or providing such inmates with care that is so cursory or grossly incompetent that it amounts to a denial of care, as evidenced and exposed by the Hayes Report, the District created an unsafe condition that caused Mr. Mannina's death.

~~18.     As a result, Mr. Mannina lost his life at the hands of Defendant Faust's Department.~~

~~19.     Upon information and belief, as a result of Mr. Mannina's suicide, defendant Faust caused the DoC to change its policies procedures regarding the dispensing of razor blades to prisoners at the D.C. Jail.  By so doing, the defendant tacitly recognized that his policies were grossly deficient in securing the safety of prisoners like Mr. Mannina.~~

42.     And because of the District's brazen practice of making razor blades freely and indiscriminately available to every new detainee, the District showed reckless indifference to the vulnerability of inmates like Mr. Mannina and created the unsafe condition that brought about his untimely death.

43.     The District's misconduct, constitutionally inadequate resources, and its clear

pattern of general indifference as well as systemic failures as a whole, created an environment

that placed suicidal detainees like Mr. Mannina at enormous risk of harm, and the District's

conduct constitutes nothing short of deliberate indifference and a violation of Mr. Mannina's

constitutional guarantee of due process.

## **Count ~~II~~**
## **(2: Negligence~~:~~ (Survival Action)**

44.     ~~Plaintiff incorporates by reference~~Plaintiff repeats and reiterates each and every

allegation contained in the above paragraphs 1 through ~~35, above and~~43 as if fully set forth

herein.

~~17.~~45. Plaintiff further alleges that this claim arises under the District of Columbia

Survival ~~Statutes~~Statute, D.C. Code § 12-101.

~~18.~~46. The ~~DoC~~District owed Mr. Mannina ~~the~~a duty of reasonable care under the

circumstances to protect him from self-harm and ensure his safety as an arrestee and later pretrial

detainee under the custody and control of MPD and DCDOC, respectively.

20.     The DoC breached its duty to due care for the following reasons:

47.     Codified at D.C. Code § 24-211.02 (formerly § 24-442), this duty provides that

the District is "responsible for the safekeeping, care, protection, instruction, and discipline of

persons committed" to its facilities, which has been held to impose on prison authorities at D.C.

Jail and members of MPD alike, a common law duty to exercise reasonable care under the

circumstances in the protection and safekeeping of arrestees, prisoners, and detainees.

48.     Based on the special relationship between the officer and arrestee or jailer and

prisoner, this duty includes a responsibility to prevent the arrestee or prisoner's own suicide.

49. Mr. Mannina had never been arrested or convicted of a crime before and had a heightened risk of suicide while in the complete custody and control of the District.

50. For the reasons set forth above, including the District's unlawful acts, omissions, policies and practices as alleged herein, the District failed to act reasonably to secure Mr. Mannina's safety and breached its duty of care.

21. The ~~DoC staff knew or should have known of the precarious mental state of the Mr. Mannina. After the alleged criminal incident, the Decedent had been hospitalized for a changed mental state and was non-responsive and despondent as a result of a self-inflicted overdose of drugs and alcohol. In short, he was suicidal.~~

22. ~~DoC Staff was apprised of the mental condition of Mr. Mannina when, during the preventive detention hearing, the Decedent's counsel requested that he be placed in a psychiatric facility. Given that Mr. Mannina had no history of violent behavior, DoC staff should have taken notice of his aberrational and despondent behavior.~~

23. ~~DoC staff failed to ensure the safety of the Mr. Mannina by providing him with a razor blade. This razor blade was the instrument by which he killed himself.~~

24. ~~In light of all the facts that DoC possessed at the time of Mr. Mannina's return to the D.C. Jail, DoC staff should have placed Mr. Mannina on a suicide watch, which would have likely saved his life.~~

25. ~~As~~District is therefore guilty of negligence and, as a direct and proximate cause of ~~negligence of the DoC, Mr. Mannina suffered extreme mental distress, hopelessness and mental anguish.~~

26.   ~~As a further direct and proximate cause of DoC's~~such negligence, ~~in the final minutes of his life, Mr. Mannina suffered~~ is liable for Mr. Mannina's injuries including severe physical pain, mental anguish ~~and fear of his impending death.~~

~~19.~~51.   , hopelessness, distress, death and resulting damages suffered by him and his survivors. As a further and direct proximate cause of ~~DoC's~~the District's negligence, Mr. Mannina's estate lost the ~~probable~~ future earnings and other economic and non-economic damages recoverable ~~under the~~per applicable District of Columbia law.

~~20.~~52.   Under D.C. Code § 12-101, Mr. Mannina's right of action for these injuries prior to his death survives in favor of his widow, Victoria Mannina, the ~~Personal Representative~~personal representative of his ~~estate~~Estate.

### Count ~~III~~
### ~~(Negligence~~3: Wrongful Death~~)~~

~~21.~~53.   Plaintiff ~~incorporates by reference~~repeats and reiterates each and every allegation contained in the above paragraphs 1 through ~~46, above,~~52 as if fully set forth herein and further alleges that this claim arises under the District of Columbia Wrongful Death Statute, D.C. Code § ~~§~~16-2701~~,~~ *et seq.*

~~22.~~54.   As a direct and proximate cause of the negligence of the District and its DCDOC and D.C. Jail, ~~the Department of Corrections,~~ Plaintiff, Victoria Mannina, as a widow and next of kin, incurred cremation expenses ~~and~~, similar consequential losses, and the loss of financial support~~, a loss of pecuniary value of services~~ furnished and expected to be ~~performed~~furnished by the Decedent, ~~loss of consortium, loss of companionship and~~together with any ~~additional~~other pecuniary losses or damages recoverable under the statute.~~–~~

## Prayer for Relief

WHEREFORE, your Plaintiff, Victoria Mannina, individually, as the widow of Paul Mannina and as the duly appointed Personal Representativepersonal representative of the Estate of Paul Mannina, deceased, demandprays that judgment be entered against all Defendants, Thomas Faust, Director of the District of Columbia Department of Corrections, the Department of Corrections and the Mayor of the District of Columbia, in her official capacity, inet al., on all counts set forth herein and that Plaintiff be awarded the full and just amount of One Million, Seven Hundred and Fifty-Four Thousand Dollars ($1,754$8,500,000) for the damages to Mr. Mannina and the Plaintiff, plus punitive damages for the wrongful conduct of the Defendants,, costs of suit, including reasonable attorneys' fees allowed pursuant tounder 42 U.S.C. § 1988, plus and pre-judgment and post-judgment interest, costs and whateverany other relief thethat this Court deems just and appropriateproper.

## Jury Demand

Plaintiff hereby demands a trial by jury with respect to each claim in this Second Amended Complaint.

Dated: May 11, 2017 _____ Respectfully submitted,
_____

_____ /s/ Ray M. Aragon _____
_____ RAY M. ARAGON, Bar No. 41822
_____ Press, Dozier & Hamelburg, LLC
_____ 7910 Woodmont Avenue, Suite 1350
_____ Bethesda, Maryland 20814
_____ Tel: (301) 913-5200
_____ Fax: (301) 913-5205

_____ Email: raragon@pressdozierlaw.com
_____ *Counsel for Plaintiff*

_____ ALFRED D. CARRY
_____ Press, Dozier & Hamelburg, LLC
_____ *Cocounsel for Plaintiff*

_____ and

_____ /s/ John Bickerman _____
_____ ___JOHN BICKERMAN

~~DC,~~ Bar No. 423059

_____ Bickerman Dispute Resolution, PLLC
_____ 1455 Pennsylvania~~,~~ NW, Suite 400
_____ Washington, ~~DC~~ D.C. 20004-0017
_____ Tel: (202) 289-0400
_____ Email: jbickerman@bickerman.com
~~202-289-0400~~

_____ *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 11th day of May, 2017 via

the Court's CM/ECF System on the following:

Steven J. Anderson
Office of the Attorney General for the District of Columbia
441 4th Street NW, Suite 630 South
Washington, DC 20001
*Counsel for Defendants*
_____

_____ /s/ Ray M. Aragon _____
_____ Ray M. Aragon
_____ *Counsel for Plaintiff*