**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VICTORIA MANNINA,

*Plaintiff*,

    v.

DISTRICT OF COLUMBIA,

*Defendant*.

No. 1:15-cv-0931-KBJ-RMM

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO
COMPEL PRODUCTION OF DOCUMENTS WITHHELD BY DEFENDANT
AS PRIVILEGED, OR IN THE IN THE ALTERNATIVE,
FOR *IN CAMERA* REVIEW OF WITHHELD DOCUMENTS**

Plaintiff's contends Defendant District of Columbia ("District") is wrongfully

withholding documents Plaintiff requires to prove her case. The nature of an action under 28

U.S.C. Sec. 1983 is that **all evidence needed to prove the District's reckless disregard of**

**Plaintiff's husband's constitutional rights resides with the District. Unless the District is**

**required to produce documents that it has an obligation to produce and is made to explain**

**if, how and when relevant documents were destroyed, then Plaintiff will lose her case in**

**discovery before she has ever had the chance to present her claims to a fact finder.**

Many of these documents have been withheld under unsupported claims that they are

protected by the attorney-client privilege or the deliberative process privilege ("DPP"). In this

motion, Victoria Mannina demonstrates that nearly all of the documents so withheld are subject

to production. Moreover, the privileges that the District relies on are not absolute but must be

balanced against the public's right to know and Plaintiff's need for the evidence necessary to

prove her case, which favors production.

The District has used the DPP and attorney-client privilege to shield Plaintiff from acquiring evidence that would demonstrate the District's culpability and from revealing that it failed to send hold letters to clients that had relevant information that would prove Plaintiff's case.  As a consequence, Plaintiff, the District and this Court may never be able to learn what documents were destroyed.[1]

The District failed to disclose the hundreds of documents it had withheld until just weeks before the close of the second discovery period. Only after it received this first privilege log did Plaintiff realize what it was missing in discovery and went about the painstaking task of noting its objections, document-by-document.  When these obviously inadequate claims were challenged, the District withdrew hundreds of claims (effectively admitting that the vast majority of the privilege claims for the documents it withheld were meritless.) However, the District continued to withhold several hundred more documents on grounds that appear much more based on whether the evidence will hurt the District then whether they are privileged at all.

The District's conduct appears to be rooted in a strategy to deny Plaintiff relevant documents and not in the proper application of privilege.   Because the District has withheld hundreds of documents without just cause, and only belatedly issued any privilege log, then acknowledged most of its claims were baseless, and then produced another fatally-flawed log, judicial intervention in needed.  The Court should take appropriate action to remedy the prejudice the District's behavior has caused Plaintiff and send a message that such conduct is not acceptable.

---

[1] The District has acknowledged in its filing of the "Errata" to its Declaration that it can only recover a subset of the documents destroyed by the Fugitive Unit of the Metropolitan Police Department ("MPD"), although the resubmitted declaration never made the stated correction.

2

I.      **Factual History**

The dispute over privilege has consumed enormous amounts of time and set back Plaintiff's discovery by more than a year.   In the absence of complete discovery, Plaintiff was faced with the Hobson's choice of proceeding with discovery but lacking key documents on which to build a case.  Plaintiff could move forward with incomplete discovery, and be forced to seek relief from the Court to re-depose witnesses at considerable time and expense and which the District would surely oppose.  If she chose the latter, she would open herself to accusations of not diligently pursuing her claim,  She chose the latter course of action, trusting that this Court would see through the improper assertions of privilege and the District's discovery abuse and grant Plaintiff access to documents and the time to conduct reasonable discovery.  Unfortunately, a lengthy delay has ensued and she has incurred substantial costs in attempting to pry relevant documents from the District and seek relief from this Court.

On September 7, 2017, exactly thirty days before the close of the second discovery, precluding any follow-up discovery of potential witnesses identified in the log, the District disclosed its first privilege log.  This appears to Plaintiff to be willful conduct intended to frustrate the Plaintiff's discovery effort.  The September 7th privilege log identified nearly 400 documents (or document groups) for which it claimed privilege from disclosure.  This privilege log failed to meet the procedural requirements of Federal Rule 26(b)(5).   The initial log [ECF 48, Exh. H] was so lacking in detail that it did not allow the Plaintiff to determine whether the legal criteria for either the DPP or the attorney-client privilege had been met.
Moreover, it became patently apparent that where some judgment about the documents could be made, the District's explanations offered for privilege did not meet the substantive requirements for protection from disclosure.

Plaintiff took the time to analyze each of the documents/document groups on the log.[2] The analysis of each document for which privilege was claimed took at least fifteen minutes. The document had to be located in the database and the unredacted elements reviewed for context, authorship, receipt and time frame.  With relatively scant information, a determination was made on whether a valid privilege could be asserted.  In the course of this review, Plaintiff communicated with the District that it had misconstrued or misstated its assertions of privilege with respect to a large majority, indeed, probably most all of the documents for which it asserted privilege.[3]

Then, almost two months after the second discovery deadline had closed and a pending hearing on Plaintiff's complaint about privilege before this Court was imminent, the District sent a revised privilege log (**"Revised Privilege Log"**) **[ECF-48 Exh. I (UNDER SEAL)]** and released a majority of the documents that it had previously wrongfully withheld.  *This act alone should be sufficient to demonstrate the bad faith by which the District had operated because none of the newly-released documents were available when Plaintiff could have used them to identify witnesses and secure their testimony.  But, by then, discovery had been halted and the documents were not of use.  Real prejudice has been visited on Plaintiff.*

A review of the Revised Privilege Log again reveals that the District is still misusing both the DPP and the attorney-client privilege to exclude the most critical evidence that Plaintiff

---

[2]  A copy of the District's September 7, 2017 privilege log ("Original Privilege Log") was filed with the Court UNDER SEAL [ECF-48 Exh. H].  Plaintiff raised the gross inadequacy of the Original Privilege log with the Court in the parties' November 17 Joint Report on Discovery [ECF 47], seeking leave to file motions regarding the District's privilege privilege claims.  *Id.* at 4, 12-14.

[3] While Plaintiff challenges the District's attorney-client privilege and deliberative due process ("DPP") claims, she does not challenge the District's assertions of work product privilege.

needs to prove her case.  The second log provided more detail such that Plaintiff could recognize that the withheld documents might become critical in proving her case.

The inadvertent disclosure of the minutes of a July 22, 2013 meeting of the Suicide Prevention Task Force that the District had claimed under the DPP substantiated Plaintiff's well-founded concern regarding the misuse of the privilege.  **July 22, 2013 Suicide Prevention Task Force Memo was presented to the Court on May 31, 2018 (hearing notebook Tab 4), and also was filed UNDER SEAL in the Court record [ECF 48, Exh. B].**[4]  It contains no legal analysis or policy deliberation.  It is entirely factual in nature but does include several crucial admissions about the subjective knowledge possessed by the District that proves many of  Plaintiff's allegations, including: 1) that District employees knew that Mr. Mannina had previously attempted suicide; 2) Mr. Mannina had been charged with a crime of sexual assault, a risk factor for suicide, but the Department of Corrections ("DOC") relied on his self-reported denial; 3) the court and the Metropolitan Police Department ("MPD") knew that Mr. Mannina was suicidal; 4) information about suicidality of Mr. Mannina and others could have been gathered by just asking the court and other District agencies for this information; and, 5)  inmate problems are a result of staff shortages.

A second violation of the District's right to withhold documents occurred after Plaintiff learned from two witnesses that they had never been advised to preserve documents and that they were unaware of whether any document retention instructions or "hold letters" have been issued.  Plaintiff sought to learn when and to whom hold letters had been sent, the District claimed that these letters were subject to attorney-client privilege and even the existence and basic facts

---

[4] In the May 31st hearing, the District responded that it had not and did not intend to "claw back" this document and maintain its assertion of privilege.  No doubt once the document had been made public, the District could not maintain its assertion for privilege.

related to these letters was privileged.  However, to the extent such retention letters exist, the District never listed them on either of its two privilege logs.

At the May 31 hearing, Plaintiff stated for the first time that these emails that purportedly were document retention instructions were sent to or by the DOC in August of 2013. Counsel's statements to the Court on May 31st were incomplete, at best, and misleading and disingenuous, at worst. Counsel never detailed:

- Whether the instructions were issued by counsel;

- Who the hold emails were sent to;

- When, precisely, the hold emails were sent;

- Whether the message pertained to the incipient Suicide Prevention Task Force and the independent review being conducted by Lindsey Hayes or the potential litigation in connection with Paul Mannina's death by his estate or his wife;

- Whether revisions to the initial hold letters were sent after Plaintiff filed her complaint in June, 2015; and,

- Whether the message directed personnel to maintain records through the end of the litigation;

**Because the District filed misleading declarations and exhibits avoiding discussing whether *any* preservation instructions were issued prior to March 2018, nearly 3 years after the commencement of litigation, and also failed to identify any of these documents on its privilege log, Plaintiff now requests that the District be ordered to produce these letters. Plaintiff further request that the District, be ordered to disclose in writing which District agencies did not receive preservation instructions, and further be ordered to investigate**

**and report to the Court regarding what potentially responsive documents might have been destroyed or discarded.**

The District also tacitly acknowledged at the May 31 hearing that no hold letters were sent to any agency other than the DOC, claiming that it didn't realize that other agencies and their employees were defendants in this action.  This assertion cannot withstand scrutiny.  The initial complaint filed on June 17, 2015 [ECF 1] and the First and Second Amended Complaints [ECF 8, 33] all reference the DoC, the MPD, and "all other District of Columbia personnel that were responsible for the care and custody of the Decedent Paul Mannina."  [*See, e.g.,* ECF 1 at 3-4, ¶ 9].  The District had notice of the involvement or potential involvement of all of these departments and personnel, and was duty-bound to investigate and identify relevant evidence.  Instead, it did nothing.  To this day, the District appears to have failed to instruct the MPD, the Office of the Mayor, the interagency Suicide Prevention Task Force, the DC Department of Behavioral Health, or DC healthcare contractors of their duty and responsibility to maintain evidence related to Mr. Mannina.

It now appears quite likely that the Department of Behavioral Health, then the Department of Mental Health, met with Mr. Mannina just prior to his arraignment after a referral from the Pre-Trial Services Agency. A referral was made because, Ms. Sheena Bagley, the Pre-Trial Services employee, who interviewed Mr. Mannina prior to his arraignment, learned that he was at risk of harming himself and her agency's policy required her to refer him to the then D.C. Department of Mental Health. And, DoC's own investigator, Ben Collins, who investigated Mr. Mannina's suicide was well aware of the role the Department of Behavioral Health might have played in interviewing Mr. Mannina if he had been determined to be suicidal by the Pre-Trial Services Agency.  This knowledge must have been well-known throughout the agency.  Counsel

never looked and so it didn't discover relevant evidence or seek to preserve it.  Even today, after

multiple warnings that it failed to discover and secure relevant evidence, and even after this issue

was raised multiple times with the Court, the District appears to have failed to issue instructions

to maintain documents.  Because of this, large numbers of documents related to Paul Mannina's

suicide or the District's behavior that led to that suicide have likely been destroyed, just as the

MPD's Fugitive Unit destroyed all of Mr. Mannina's records after three years, since it was never

asked to retain them.

Because the District never asserted attorney-client privilege regarding its hold letter(s),

and affirmatively misled Plaintiff on whether hold letters had been sent to all relevant agencies,

the Court should hold that the District has waived its right to do so now and these letters should

now be produced.

## II.  The District Has Wrongly Used the Deliberative Process Privilege to Shield Relevant and Potentially Dispositive Documents from Plaintiff

### A.  The District Fails to Establish A Basis Under the Deliberative Process Privilege to Withhold Most of the Documents for Which It Has Asserted this Privilege

Because the assertion of privilege is a derogation of the production of relevant evidence,

the burden of demonstrating the attachment of the privilege rests with the District not the

Plaintiff.  Plaintiff has devoted considerable time and effort to conducting a particularized review

of each claimed assertion of the DPP.  The District has failed to meet its burden.  Indeed, it is

attempting to shield from discovery the very evidence that Plaintiff needs to prove her case,

which depends on showing a course of conduct that demonstrates subjective knowledge of

deliberate indifference.  If all discussion regarding the prior errors in judgments and deficiencies

in policy are withheld by the District, it will be impossible for Plaintiff to demonstrate the

unreasonable and callous subjective behavior of the District officers -- a necessary part of Plaintiff's constitutional claim.  This is not the law.

The DPP is a sub-species of the work-product privilege.  *See Nat'l Council of La Raza v. U.S. Dep't of Justice,* 411 F.3d 350, 356 (2d Cir. 2005)(citation omitted); *Litton Indus Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 125 F.R.D. 51, 53 (S.D.N.Y.  1989). The rationale for the privilege is to allow government employees to give their opinions and advice without fear of public disclosure that might otherwise chill their willingness to do so.

However, the DPP only protects documents that are pre-decisional and deliberative.  *Judicial Watch, Inc. v. FDA,* 449 F.3d 141, 151 (D.C. Cir.  2006).   A document is "predecisional if 'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.'" *Id*. The exemption protects only "materials [that] can reasonably be said to embody an agency's policy-informed or -informing judgmental process." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). When asserted, the DPP may in some circumstances shield from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8 (2001)*; accord Nat'l Council of La Raza,* at 356.  However, it is equally clear that "factual, investigative" matters are generally not protected.  *EPA v. Fink,* 410 U.S. 73, 87 (1983).  Likewise, documents reflecting a policy that was later adopted by the agency are not protected by the DPP.  *Nat'l Council of La Raza,* 411 F.3d at 356-357 *quoting Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F2d 854 (D.C. Cir. 1980).  These distinctions are crucial and eliminate most of the District's DPP claims.

Conclusory assertions are insufficient to establish the DPP "where no factual support is provided for an *essential* element of the claimed privilege or shield. *Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice,* 823 F.2d 574, 585 (D.C. Cir. 1987). Courts have held that recommendations, draft documents, proposals, suggestions and other subjective documents which reflect the personal opinions of their authors *could be* predecisional. *Tigue v. U.S. Dep't of Justice,* 312 F.3d 70, 80 (2d Cir. 2002).

As Judge K.B. Jackson cogently summarized,

- The DPP extends "*only* to those documents that qualify as *pre*decisional insofar as they were "generated before the adoption of an agency policy" and may "inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position;"

- Claiming a document is a "draft" "does not establish that any document is predecisional or deliberative;"

- A document draft form cannot be withheld as predecisional if it is later "adopted, formally or informally, as the agency position on an issue" or "used by the agency in its dealings with the public;"

- The DPP is also limited to documents that qualify as "deliberative," meaning that "it reflects the give-and-take of the consultative process." Thus, a "document that does not reflect the genuine evolution of an agency's decisionmaking process and instead merely recites factual information which does not bear on [ ] policy formation" is not entitled to DPP protection.

*Conservation Force v. Jewell*, 66 F. Supp.3d 46, 60 (D.D.C. 2014) (Jackson, J.) (internal citations and quotations omitted).

As Judge Jackson emphasized, documents lose their DPP status if the agency formally or informally adopts a policy consistent with the views expressed in the subject documents. *Nat'l Council of La Raza,* 411 F.3d at 356-357 *quoting Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F2d 854 (D.C. Cir. 1980). In such a case, which in fact addresses the vast majority

of the District's DPP claims, the rationale for protecting unfettered discussion of policy options

disappears.

      As the Supreme Court observed,

> The probability that an agency employee will be inhibited from freely advising a
> decision maker for fear that his advice if adopted, will become public is slight.
> First, when adopted, the reasoning becomes that of the agency and becomes its
> responsibility to defend.  Second, agency employees will generally be
> encouraged rather than discouraged by public knowledge that their policy
> suggestions have been adopted by the agency.  Moreover, the public interest in
> knowing the reasons for a policy actually adopted by an agency supports
> [disclosure].

*N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 161 (1975).

      Applying the facts to the law, the Court should start with the core issues in Plaintiff's

complaint — 1) the reckless distribution of razor blades; 2) the failure to communicate with

other agencies about the mental status of Mr. Mannina, specifically, and generally all detainees

that could be a threat to themselves; 3) the failure to train DOC staff to recognize and respond to

detainees that pose a risk to themselves; 4) the failure to conduct regular surveillance of Mr.

Mannina's cell the night he killed himself;  5) the failure to adequately screen and collect

available information from incoming detainees regarding the likelihood that they could be at

risk; and, 6) the failure of the MPD to protect Mr. Mannina once they knew that he was a threat

to harm himself.  On information and belief, Plaintiff asserts that the District's Department of

Behavioral Health had a referral from the DC Pretrial Agency stating that Mr. Mannina had

suffered from recent suicidal thoughts (as reflected in Mr. Mannina's Pretrial Report and the DC

Pretrial Agency's notes reflecting their interview with Mr. Mannina in June 2013).  Such

documents appear to have "disappeared," along with many other crucial documents, but it does

not diminish the District's responsibility to act to protect Mr. Mannina once it became aware of his suicidal condition.[5]

As a preliminary matter, all purely factual documents are not entitled to protection. Therefore, the factual investigation of the circumstances of Mr. Mannina's death are not protected by the DPP.  This conclusion is so obvious, no further explanation is necessary.  Many of the withheld documents relate to the investigation and reporting of facts.  *See* July 22, 2013 minutes of the Suicide Prevention Task Force ("July 22, 2013 Minutes"), which was presented to the Court on May 31, 2013 (hearing notebook, tab 4) previously filed Under Seal [ECF 48 Exh. B].[6]

We now know that the District recognized that it was deficient in regard to many of these core issues and, in hindsight, made improvements.  For example, DOC immediately changed the razor blade distribution and collection policy after Mr. Mannina's suicide.  Consequently, all communications proposing changes to the policy lose protection if they advocated the change that was adopted.  *See* July 22, 2013 Minutes.  Similarly, the District realized that its process of communicating with other agencies and the court needed to be improved.  Actions taken to

---

[5] The District appears to admit that the MPD, the DC Pretrial Agency, the Superior Court, the U.S. Attorney, and apparently the District's Department of Behavioral Health all were aware of Mr. Mannina's suicidal condition. Incredibly, the District appears to base its defense on claiming that there is no liability because (a) these agencies (including District agencies) didn't inform the DoC of Mr. Mannina's suicidal condition; and (b) the DoC never asked for or sought any mental health information about Mr. Mannina or other inmates for whom it was responsible. Exactly how the Department of Corrections' studied ignorance of the mental health of the inmates in its care and complete lack of interest in inquiring from other District agencies with knowledge of Mr. Mannina's suicidal condition might shield the District from liability or responsibility is unclear.  Indeed, in direct contrast, Plaintiff believes the District's studied and knowing indifference and negligence in this and other areas establishes its gross violation of Mr. Mannina's (and other inmates') constitutional rights.  The District itself recognized serious deficiencies in its procedures intended to identify suicidal inmates.  Whatever the legal implications of the District's actions, however, the District is not entitled to hide the facts and evidence.

[6] This is a document that the District initially claimed was protected by the deliberative process privilege, but released in full in discovery and allowed multiple witnesses to discuss in deposition at length and without objection. It was the subject of discussion at the May 31st hearing.  Plaintiff asserts this memorandum, which records and interagency meeting of the Suicide Prevention Task force, simply is not subject to any privilege, and in any case any such arguable privilege has been thoroughly and repeatedly waived.

improve the communication would make these deliberations unprivileged and should be disclosed.  The failures of the intake process were also observed by DOC in its preliminary assessment of its suicide prevention policies after Mr. Mannina's death.  *See* July 22, 2018 Minutes.  It was recognized that intake personnel should have access to charging documents and that the "check-the-box" intake form that relied upon self-reported information from the detainee might not sufficiently disclose the risk that detainees might harm themselves.  *Id.* Improvements in these areas would also make these documents recognizing deficiencies subject to production. To its credit, DoC has taken positive steps in improving its policies.  Because it followed the thoughtful recommendations after review of its acts that contributed to Mr. Mannina's death, it cannot now claim protection for those documents counseling improvements that were adopted. It is the very recognition of the deficiencies that demonstrate the deliberate indifference standard that Plaintiff must prove and that the District resists producing.

### B.  Even if the Deliberative Process Privilege is Properly Asserted, It is Not Absolute

The assertion of the DPP does not guarantee non-disclosure.  This privilege is not absolute and must yield to competing interests.  "Foremost is the interest of the litigants, and ultimately of society, in accurate judicial fact finding."  *In re Franklin Nat'l Bank Sec. Litig.,* 478 F. Supp. 577, 582 (E.D.N.Y. 1979) (Judge Jack Weinstein).  Competing interests for which a court may recognize "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable."  *Id.*, at 583 (citations omitted.); *accord, In re Subpoena Upon Comptroller of Currency, and Secretary of Bd. of*

*Governors of Fed. Reserve Sys.,* 967 F.2d 630, 634 (D.C. Cir. 1992); *Martin v. Valley Nat. Bank of Arizona,* 140 F.R.D. 291, 303-04 (S.D.N.Y. 1991).

Once an agency has made a sufficient showing that documents are entitled to the privilege, the deciding court must "balance the competing interests of the parties. Additionally, the party requesting the information may overcome the privilege by showing a "sufficient need for the material in the context of the facts or the nature of the case . . . or by making a *prima facie* showing of misconduct." *Redland Soccer Club Inc., v. Dep't of Army of U.S.*, 55 F.3d 827, 854 (3d Cir. 1995)(internal citations omitted).

Here the facts of the instant action favor disclosure.  The evidence is highly relevant and unavailable elsewhere.  The District holds virtually all the evidence.  Absent disclosure, the District will defeat Plaintiff's claims by its withholding of documents in discovery. Inmates dying at the hands of the government is indeed an extremely serious issue that deserves public scrutiny.  It is highly unlikely that employees of DOC would withhold their thoughts or not be candid if their views were known.  As the esteemed Judge Weinstein, quoting Justice Brennan observed, the deliberative process privilege reflects a paradox: "'to enable the government more effectively to implement the will of the people, the people are kept in ignorance of the workings of their government.' " *Franklin Nat'l Bank* at 582, *quoting Herbert v. Lande,* 441 U.S. 153, 195 (1979) (Brennan, J., dissenting).  "[J]ustification for the privilege [is therefore] attenuated" "where the public's interest in effective government would be furthered by disclosure." *Id.*  Of particular relevance "where documents sought may shed light on alleged government malfeasance, the privilege is denied." *Id.*  The District's malfeasance is at the very heart of Plaintiff's allegations and, consequently, the District cannot use the DPP to prevent disclosure of its wrongful conduct.

### III.     The District Misapplied and Abused the Attorney-Client Privilege

As with the DPP, the attorney-client privilege is a derogation of the truth-seeking process and must be construed narrowly.  *U.S. v. Nixon,* 418 U.S. 683, 710 and n. 18 (1974). The party claiming the privilege has the burden of proving that it is entitled to do so.  *In re Subpoena Duces Tecum Issued to the Commodity Futures Trading Common,* 439 F.3d 740, 750 (D.C. Cir. 2006).  To establish the privilege, the primary purpose of the communication must be to seek or provide legal advice.  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014). Incidental connection to documents that fail to show that the primary purpose of the communication was to receive or provide legal advice nor was intended to prepare for litigation do not qualify for protection. *U.S. ex rel Barko v. Halliburton Co..,* 74 F.Supp.3d 183, 188 (D.C.D.C. 2014).  Nor will the privilege attach if the document "discloses only that an attorney was consulted and the general topic of the consultation, but not the substance of the communications." *Id.* To be protected, the document must contain the actual legal advice not just the fact of the consultation.  Absent more explanation, copying a lawyer on a communication would not suffice. Finally, disclosure of a document to a non-party that would otherwise be protected loses its protection.  *Navaho Nation v. Peabody Holding Co., Inc.,* 255 F.R.D. 37 45 (DDC 2009) (a litigant who wishes to assert privilege must maintain genuine confidentiality, or the privilege is waived).

The District has sought to shield dozens of documents because Ms. Amato, the DOC's general counsel, was copied on emails, correspondence and memos.  This is not a sufficient basis for asserting the privilege and it is the District that bears the burden for establishing it is entitled

to protect these documents by demonstrating the communication contains or requests legal advice.  For example, Ms. Amato, in her role as a senior policy advisor, attended meetings of the Suicide Prevention Task Force.  These meetings reviewed policy related to preventing suicides. The primary purpose of the Task Force was to improve the performance of its staff and not to prepare for litigation.  None of these documents are entitled to protection. Indeed, many of Ms. Amato's functions were to provide policy advice, draft letters setting forth policy, manage the performance of Unity Health, the DOC contractor that provided certain healthcare services to the agency, and otherwise serve as a senior advisor to the Director.  The overwhelming majority of the communications withheld by the District appear to be unrelated to the provision of legal advice or made in anticipation of litigation, although the privilege log provides such a poor description of her role in communications, it is not always easy to tell.  In many instances, Ms. Amato communicated with non-parties (or at least individuals and entities that the District has argued are non-parties) and thus, these communications are not protected.  It is a significant burden for the District to claim that communications prior to the filing of the complaint in June, 2013 are related to providing legal advice.  Moreover, the District appears to have taken the position that the mere copying of Ms. Amato on communications qualifies for protection. It does not.

IV.     **The District's Privilege Log Is Procedurally Defective**

To satisfy the procedural requirements of a privilege log, a DPP index must "identify the particular agency decision that the record document predates, which is necessary to establish that the document is, in fact, predecisional." *Conservation Force v. Jewell*, 66 F. Supp.3d 46, 60-61 (D.D.C. 2014) (Jackson, J.) (internal citations and quotations omitted).  DPP claims that "merely restate[] the elements of the deliberative process privilege and do[] not actually identify the . . .

relevant agency decision" are insufficient.  *Id.*  "A document's context is the *sine qua non* of the court's assessment of whether or not the document is predecisional and deliberative.  *Id.*

Because the District has failed to comply, even minimally, with the standards of a legally sufficient log, Plaintiff objects to every DPP entry in the log.  The District has had two bites at the apple to satisfy the procedural requirements of a proper privilege log and has failed in most cases to identify policies to which withheld documents pertain.  After the extensive effort Plaintiff took to critique the second privilege log, Defendant stood by all of its privilege claims. To allow it yet another opportunity to fix what it has gotten wrong twice would further delay discovery and prejudice Plaintiff.

To invoke the attorney-client privilege, a party must demonstrate that there has been (a) a communication (b) between client and counsel, (c) made for the purpose of obtaining or providing legal advice, which was (d) intended to be and was in fact kept confidential from all parties outside the attorney-client relationship.  Further, under Rule 26(b)(5)(A), a party withholding information under the attorney-client privilege must expressly name the client and describe the nature of the documents, communications or things not produced or disclosed in a manner that will enable other parties to assess the claim.  Therefore, a party asserting attorney-client privilege should generally include (1) a brief description or summary of the content of the document or communication; (2) the date the document was prepared; (3) the name(s) of the person(s) who prepared the document; (4) the person to whom the document was directed, or for whom it was prepared; (5) the purpose for preparing the document or communication; and (6) the privilege or privileges asserted for the document or communication. See. e.g., 6-26 Moore's Federal Practice - Civil § 26.90.  Failure to comply with Rule 26 requirements "may constitute

an 'implied' waiver of the privilege or protection." *In re Imperial Corp. of America*, 174 F.R.D. 475, 477 (S.D. Cal. 1997).

Review of the District's privilege log reveals that it did not comply with the procedural requirements of Rule 26. Plaintiff has spent an undue amount of time and expense attempting to discern whether the District has any plausible reason to claim the attorney-client privilege. In many instances such a determination is impossible because of the lack of information and conclusory statements that the District has offered. In other instances, as noted *infra*, it seems quite likely that the documents withheld fail to comply with the legal requirements for asserting the privilege. Waiver is the proper sanction for failing to comply with the rules.

V.      **The Court Should Direct the District to Disclose the Hold Letters**

A.   **The District Waived Its Right to Claim Attorney-Client Privilege for Its Hold Letters Because It Did Not Include Them in Its Privilege Log**

The District's failed to follow Rule 26(b)(5) in asserting attorney-client privilege for the hold letters. Indeed, its refusal to even respond to Plaintiff's request for the factual circumstances related to the hold letters constitutes an abuse of discovery that the Court should not tolerate. Plaintiff and the Court still do not know the basic information concerning the District's hold letters that would have been provided in a log had it done so as required by the Rules. The District has not revealed to whom the letters were sent, when the letters were sent, how widely the letters were distributed, whether the letters pertained to this litigation or another purpose and whether the hold letters required its clients to retain documents until the end of this litigation.

The District has already revealed that it did not consider the MPD a "client" until after it reviewed Plaintiff's Second Amended Complaint, despite the initial and every subsequent

complaint references to all DC employees.  The District has also argued to the Court and the

Plaintiff that it considers most DC employees to be non-parties.  Presumably, if the District

doesn't consider DC employees parties or clients then it would not have sent hold letters to them.

Plaintiff and the Court are entitled to know exactly what the District did do and not have

to guess.  The failure to follow the requirements of Rule 26(b)(5) should result in the loss of the

privilege.  The Court should so order.

### B.  Even if the Hold Letters Had Been Included on the Privilege Log, Under Settled Case Law, They Are Still Subject to Disclosure and Are Not Subject to Attorney-Client Privilege

Litigation hold letters are not *per* se privileged.  "A party may discover the steps the

opposing party has taken to preserve relevant information."  *United States, ex rel. Barko v.*

*Halliburton Co., 74 F. Supp. 3d* 183, 191 (D.C.D.C 2014), *citing In re eBay Seller Antitrust*

*Litig.,* No. C 07-01882 JF (RS) 2007 WL 2852364 at *2 (N.D. Cal. Oct. 2, 2007).

The District has the burden of establishing that the privilege attaches to the hold letters.

To do so, it must show that the sender of the hold letters intended to keep the letters confidential.

*Chubb Integrated Sys Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 67 (D.D.C. 1984).  And,

if the letters are widely distributed beyond those necessary to implement the advice, then no

privilege attaches. *Ex Rel Barko*, at 190-91.  Preservation letters are not given blanket protection

from disclosure.  The facts and circumstances of the distribution letters determine the degree of

protection.  In addition, if the letters do not impart legal advice but only state a requirement to

hold and not destroy documents, then no privilege attaches.

Because District counsel refuses to elaborate on even the most basic circumstances in

connection with the distribution and content of the letter, it is impossible to now whether any

protection is necessary or appropriate.  And, in light of counsel's failure to even disclose the

existence of the letters until Plaintiff discovered that documents had been destroyed, it's

statement regarding these letters require close examination by the Court.

**VI.    If the Court Is Not Prepared to Impose the Sanction of Waiver on the District for its Failure to Meet Its Burden of Non-Disclosure, Then The Court Should Conduct *In Camera* Review of the Contested Documents**

Plaintiff contends that there is ample justification to determine that the District has so

badly abused the DPP and attorney-client privileges to shield documents that it should lose the

right to assert either privilege.  If the Court determines otherwise then, unfortunately, there is no

substitute for *in camera* review by this Court.  Plaintiff has only seen a glimpse of the documents

withheld, so its analyses are necessarily incomplete.  However, there are certain obvious

categories of documents that are not protected.  For example, agendas or executive summaries

and minutes of meetings should not be afforded protection.  While these documents may form

the basis of future deliberations, they are primarily a factual recitation of topics to be discussed

and topics actually discussed.  And, to the extent that the minutes or summaries contain

recommendations that are subsequently adopted, they also lose all protection.  Similarly,

investigative reports or summaries of facts, even if they provide the basis for future policy

changes, are not protected communications.  Emails requesting information of what happened

and replies describing facts are similarly unprotected.  Letters to contractors (Unity Health)

would also not be protected because Unity Health is not a government entity and its actions or

inactions or directions to adopt new policies would not be protected.  Of course, these are just a

few examples of the types of documents that Plaintiff believe have been wrongly withheld and

are not exhaustive.  With respect to documents withheld relying upon attorney-client privilege,

absent a showing of the actual provision or request for legal advice or anticipation of litigation,

these documents must also be disclosed.  It is even more difficult to determine from the privilege log whether any of the listed documents qualify for protection.

After its review, the Court could conclude that the District's conduct was so blatant and contrary to law that it should lose its right to claim either the DPP or the Attorney-Client privileges altogether as a proper sanction for the time and expense that Plaintiff has expended to secure documents that it was entitled to receive.  And, its disclosure of two-thirds of the withheld documents after the second discovery deadline had lapsed was an act of bad faith.  As previously observed, a majority of the documents for which the District claimed were protected in its initial privilege log were produced *after the second discovery period closed*.  If after initial *in camera* review by the Court demonstrates a similar pattern of wrongful conduct, the proper sanction should be the altogether loss of the privilege.

### VII.    Conclusion

Plaintiff has demonstrated the gross failure of the District to sustain its burden in justifying withholding dozens of relevant documents.  Moreover, the DPP and attorney-client privilege must be strictly construed and balanced against the Plaintiff's need for the evidence and the public's right to know.  For all these reasons, Plaintiff believes that there is ample justification for the Court to order waiver of the District's right to assert either the DPP or the attorney-client privilege.  Alternatively, if the Court is not prepared to exact this sanction, then Plaintiff respectfully requests that the Court conduct an *in camera* review because there is simply no alternative.  To assist the Court in conducting its review and because there are many documents on the District's log that are irrelevant, Plaintiff is preparing and will provide the Court with a document-by-document synopsis of the evidence for which Plaintiff contends that no privilege attaches and for which it needs to prove her case.

As Judge Grimm observed, "Rule 26(g) charges those responsible for the success or failure of pretrial discovery—the trial judge and the lawyers for the adverse parties—with approaching the process properly: discovery must be initiated and responded to responsibly, in accordance with the letter and spirit of the discovery rules, to achieve a proper purpose ... and be proportional to what is at issue in the litigation, and if it is not, the judge is expected to impose appropriate sanctions to punish and deter." *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354 (D.Md.2008).

To date, discovery in this action has been a failure.  Plaintiff is more than one year behind where she should be.  Documents have been destroyed. Preservation letters have not been sent to key agencies and employees that had relevant information and neither Plaintiff nor the Court knows whether relevant and potentially dispositive documents have destroyed.

The District has not followed the letter or the spirit of the law with respect to its discovery obligations.  The wrongful withholding of documents until after the close of discovery, then the release of a majority of the withheld documents in the face of a hearing and the continued refusal to abide by established legal requirements for claiming privilege have thwarted Plaintiff's efforts to discover the evidence she needs to prove her case.  The District should not be allowed to win its case by its dilatory behavior in discovery.  The Plaintiff looks to this Court to protect its legal rights and insure the integrity of the judicial process that the District seems determined to undermine.

Dated: June 6, 2018                          Respectfully submitted,

                                             /s/ John G. Bickerman
                                             JOHN G. BICKERMAN, Bar No. 423059
                                             Bickerman Dispute Resolution, PLLC
                                             1455 Pennsylvania Avenue, NW, Suite 400
                                             Washington, DC  20004
                                             Tel: (202) 289-3330, (202) 997-0049 (cell)

Email: jbickerman@bickerman.com
*Counsel for Plaintiff*


RAY M. ARAGON, Bar No. 41822
Press, Dozier & Hamelburg, LLC
7910 Woodmont Avenue, Suite 1350
Bethesda, Maryland 20814
Tel: (301) 913-5200
Fax: (301) 913-5205
Email: raragon@pressdozierlaw.com
*Counsel for Plaintiff*