**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VICTORIA MANNINA,<br><br>*Plaintiff*,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>*Defendant*. | No. 1:15-cv-0931-KBJ-RMM |

**PLAINTIFF VICTORIA MANNINA'S OPPOSITION TO**
**DEFENDANT DISTRICT OF COLUMBIA'S**
**RENEWED MOTION FOR A PROTECTIVE ORDER**

As Plaintiff has noted many times, Defendant the District of Columbia (the "District") possesses virtually all of the evidence Plaintiff needs to prove her case.  Plaintiff's claim, pled under 42 U.S.C. § 1983, requires her to analyze the District's procedures and demonstrate that the District engaged in customs, policies or practices in a manner that was recklessly indifferent to her dead husband's constitutional rights.  Such proof usually requires demonstration that a person in authority has either implemented an unconstitutional policy or ignored an official policy or custom that was not being followed. By depriving Plaintiff of the testimony of one of the few senior officers who was present when Mr. Mannina killed himself, the District is irreparably and prejudiciously depriving Plaintiff of her ability to prove her constitutional rights claim.

The District seeks this Court's permission to block access to evidence that would support Plaintiff's claim by preventing her from taking the deposition of Maria Amato, who in addition to being general counsel for the District's Department of Corrections ("DOC") also played a

substantial role in the District's operations, policy implementation and review of its procedures regarding suicide prevention.  As a single example, she was DOC's senior representative on a crucially-important inter-agency Suicide Prevention Task force that had many members from other District agencies and from outside of the District government.  Such inter-agency discussions are clearly not privileged -- the District produced them more than a year ago -- and Ms. Amato shared with the interagency group that "a lot of the inmates coming into the jail have suicide alerts that are not communicated to D.C. DOC [and] there should be more cooperation from the courts."  In discussing Mr. Mannina's death, Ms. Amato pointed out to the group that DOC never learned from the court about Mr. Mannina's suicidal thoughts, and suggested "looking into alert form."  Such conversations, made in an unprivileged policy context nearly two years before litigation was filed, are simply not legal advice and are discoverable.  Plaintiff has a right and a need to take Ms. Amato's deposition.

Ms. Amato overstates the extent of attorney-client privilege that attaches to her communications.  She does not represent any entity other than the DOC.  Consequently, it is black letter law that no privilege will attach when a third party is privy to her statements and is present.  That is precisely the case with respect to the deliberations of the Suicide Prevention Task Force and communications that she had with the expert hired by the DOC after the death of Mr. Mannina and another DOC detainee that same month.  In the former, other District agencies including the Department of Mental Health (now called the Department of Behavioral Health) and several DOC contractors, including Unity Health Care ("Unity") and the Corrections Corporation of America ("CCA") were active participants in the deliberations to review DOC policies and procedures that might have caused the death by suicide of these inmates.

It should be obvious, indeed essential, that Plaintiff would want to know what procedures DOC failed to follow that caused her husband's death. The best source of that information would be the Suicide Prevention Task Force and Ms. Amato was one of the DOC's senior officials that attended those meetings. For example, she notes in the July 22, 2013 minutes that Mr. Mannina was arrested for committing a sexual assault (which is itself a strong risk factor for suicidal behavior) but denied a sexual assault history; as a consequence, DOC was never aware of why Mr. Mannina was arrested until after he was dead.

Plaintiff also has reason to believe that Ms. Amato was actively involved in the review of DOC procedures conducted by Lindsay Hayes, a noted expert in the field. Her communications with Mr. Hayes are not protected. He is not her client and she would not be sharing legal advice but would be providing factual information and assisting him in the conduct of his inquiry. Moreover, the District has identified Mr. Hayes as an expert in this litigation, so none of his contacts with DOC would be subject to privilege.

As countless examples of documents that have either been provided or summarily described in privilege logs that Defendant prepared, Ms. Amato's activities went far beyond providing legal advice. She was a senior official with DOC and a confidant of the Director at the time, Thomas Faust. Ms. Amato is not being straight with the Court when she fails to disclose this other role that she performed.

Lastly, as the Court well knows, the issue of whether adequate litigation hold letters were distributed to key personnel that were in a position to preserve documents is very much in dispute. For the time being, Plaintiff has chosen not to challenge the assertion of privilege related to the substance of the so-called hold letters, one of which was never disclosed to

Plaintiff on any privilege log. However, the actions Ms. Amato took to distribute hold letters she received is exceedingly relevant to Plaintiff's contention and is very much discoverable.

The proper method of exercising attorney-client privilege is to object to a question that seeks such privileged information. It is not to request a blanket protective order to preclude *any testimony whatsoever.* Plaintiff has no intention of invading proper attorney-client privileged communications that Ms. Amato may have had as part of her job. However, Plaintiff is allowed to explore inquiries that would discover factual evidence relevant to her claim. Especially in light of how reluctant the District has been in sharing crucial evidence, up to and including the destruction and loss of key evidence, this Court should not now foreclose an important avenue of learning about such information.

## I.    The Rules of Discovery Entitle Plaintiff to Depose Ms. Amato

### A.    The District Has Not Met Its Heavy Burden Establishing Its Right to a Protective Order

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery. Per its terms, a party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ .P. 26(b)(1). As such, a party may depose "any person" during discovery. Fed. R. Civ. P. 30(a)(1). Under Rule 26(c), a court may grant protective orders where the moving party has demonstrated good cause and the need to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense[.]" *Id.*

However, such protective orders may not be granted lightly: "Indeed, the moving party has a heavy burden of showing extraordinary circumstances based on specific facts" in order to justify a protective order. *Eidos Display, LLC v. Chunghwa Picture Tubes, Ltd.*, 296 F.R.D. 3, 6 (D.D.C. 2013) (internal quotations omitted). The simple reason for requiring such extraordinary

circumstances is that limiting discovery "goes against courts' general preference for a broad

scope of discovery." *Ecomission Solutions, LLC v. CTS Holdings, Inc.*, No. 16-1793, 2016 WL

4506974, at *2 (D.D.C. Aug. 26, 2016) (Sullivan, J.) (*citing U.S. Dep't of the Treasury v.*

*Pension Benefit Guaranty Corp.*, 301 F.R.D. 20, 25 (D.D.C. 2014) (additional citations omitted).

Because the District cannot claim extraordinary circumstances or excessive annoyance,

oppression, embarrassment or inconvenience, it fails to justify the criteria for a protective order

and the Court should correctly deny its request.


    **B.**    **Civil Rights Claims Such As Plaintiff's Are Entitled to Broad Discovery**

       The general policy favoring broad discovery is particularly applicable in civil rights

claims, where the plaintiff is often at an "informational disadvantage" in attempting to establish

her case.  In *Powers-Bunce v. D.C.*, 479 F.Supp.2d 146, 155 (D.D.C. 2007), a civil rights claim

involving a prisoner suicide in the District, the district court "recognize[d] . . . that, under the

circumstance of this [civil rights] case, Plaintiff is at an informational disadvantage and must be

given some leeway in stating a viable [constitutional] claim." *Id.  See also Alston v. Parker*, 363

F.3d 229, 233 n.6 (3d Cir. 2004) ("civil rights plaintiffs . . . often face informational

disadvantages.").  In such cases, a plaintiff may show constitutional violations not only through

formal policies, but also through "persistent and widespread" practices "so permanent and well

settled as to constitute a custom or usage."  *See McKnight v. District of Columbia*, 412 F.Supp.2d

127, 131-32 (D.D.C. 2006).  As the *McKnight* Court found, "a single decision or an act directed

by an official with final decision-making authority" can be official policy establishing a

constitutional claim. *Id.* at 132.

And, broad discovery is appropriate in this action for a second reason.  To prevail, Plaintiff must show that high level officers were recklessly indifferent when they followed an unconstitutional policy or failed to correct an unconstitutional custom.

Ms. Amato is just such a person because, for example, she clearly acted as a high-level policy leader as a member of the interagency (and thus non-privileged) Suicide Prevention Task Force, when she opined not only on suicide prevention policy, but also how those policies had worked and not worked in the case of Paul Mannina. She cannot be exempt from discovery.

Even if she also has legal duties at DOC, she made these non-legal statements and observations in a non-privileged policy discussion that took place nearly two years before this litigation was filed.  The District seeks to make Ms. Amato entirely unavailable to Plaintiff for discovery.  Such a determination would be highly prejudicial to Plaintiff, and unjustly deny crucial testimony from a high ranking DOC official on entirely relevant, non-privileged issues.

### C.    No Special Protection Attaches to In-House Counsel

Contrary to the District's assertions, its in-house attorneys are not entitled to special protection. "[T]he Federal Rules of Civil Procedure create no special presumptions or exceptions for lawyers, or anyone else—even a sitting President of the United States." *Philip Morris*, 209 F.R.D. at 19 (*citing Clinton v. Jones*, 520 U.S. 681 (1997)). Rule 26(b)(1) broadly permits discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). Although Ms. Amato is entitled to protect privileged materials, she is not entitled to hide behind her legal license.

### II.    Plaintiff is Entitled to Depose Ms. Amato Because She is a DOC Senior Policy Officer

Ms. Amato and the District mislead the Court when they identify only the legal duties she held.  It is not disputed that she had a legal function and that some of her activities have attorney

client privilege.  What is at issue here is whether the District can block her testimony regarding the substantial policy and operational activities she performed.  The evidence demonstrates that she is a high-ranking officer of the DOC and also performs the role as an operating officer.  She is not entitled to shield her operational and policy duties she performed because she also conducted protected legal activities.  A few examples of activities that she performed that have come to light through the production of documents and the disclosure the District made on its privilege log demonstrate beyond any doubt that she was a high-ranking agency officer who performed non-privileged activities.

### A.  Suicide Prevention Task Force

The DOC convened the Suicide Prevention Task Force shortly after Mr. Mannina and another inmates committed suicide in the same month at DOC's Central Detention Facility ("DC Jail"). The Suicide Prevention Task Force was intended to review fully the policies and procedures of the DOC to determine how they contributed to the rash of suicides at the DC Jail that was dramatically higher than the national average.

### 1.    As the Highest Ranking DOC Officer on the Task Force, Ms. Amato's Activities and Statements Contradict the District's Argument of Exclusive Protected Attorney-Client Duties.

The July 22, 2013 minutes from the Suicide Prevention Task Force illustrate Ms. Amato's active participation in non-legal policy.  A copy of the July 22, 2013 Suicide Prevention Task Force minutes is attached as Exhibit 1. Importantly, they also relate to the very issues that Plaintiff needs to discover to prevail in her claims. Here are some of the direct quotes from these minutes:

- "Ms. Amato stated that there should be a review for segregation;"

- "Ms. Amato asked what the ACA [American Correctional Association] standards are for Mental Health;"

- "Ms. Amato asked how many false/negatives show up for suicide;"

- "Ms. Amato stated that the group as a whole needs to make the recommendation that there are inmate problems due to a staffing shortage;"

- "Ms. Amato stated that a lot of the inmates coming into the jail have suicide alerts that are not communicated to D.C. DOC there should be more cooperation from the courts;" [sic]

- "Ms. Amato suggested looking into an [inmate suicide] alert form;"

- With regard to Mr. Mannina's suicide: "Ms. Amato stated that the inmate denied sexual assault history, yet he was arrested for committing a sexual assault;" and,

- "Ms. Amato stated that the court never notified the D.C. Department of Corrections about the inmate's suicidal thoughts."

These observations, none of them privileged, indicate Ms. Amato was deeply involved in addressing suicide prevention issues at DOC.  Even without Ms. Amato's testimony, they demonstrate that:

- DOC's top officials were aware at the time of Mr. Mannina's death that DOC often was unaware of whether an inmate was suicidal;

- The evidence to date also indicates that, as of mid-2013, DOC almost never looked outside DOC -- not to the Metropolitan Police Department, not to the Department of Behavioral Health, and not even at inmate arrest reports -- to determine an inmate's suicide risks; and,

- While being arrested for sexual assault is, in and of itself, a very strong known risk factor for inmate suicide, both DOC and Unity failed even to read Mr. Mannina's arrest report, remaining studiously ignorant of the sexual assault charges against him until after his death.

Plaintiff's case depends on being able to prove that high-ranking executives were aware of these issues, and Ms. Amato (a high-ranking DOC executive) clearly was aware, yet the District asks the Court to slam the discovery door on this crucial evidence.

### 2. Ms. Amato's Communications and Participation on the Suicide Prevention Task Force Are Not Privileged Because Third Parties Were Present.

The Suicide Prevention Task Force included participants from other District agencies and Unity, a contractor to the DOC with potentially independent liability for Mr. Mannina's death. Any attorney-client privilege that could possibly have existed – and Plaintiff believes none did – would have been vitiated by the presence of non-parties.  Ms. Amato's only possible client is the DOC, not other District agencies and certainly not Unity.  No privilege would attach to her participation in the Suicide Prevention Task Force.

### 3. The Information Sought By Plaintiff from Ms. Amato Is Highly Relevant

As Ms. Amato's quotes from the Suicide Prevention Task Force minutes so clearly show, she has opined on the applicable [American Correctional Association] standards for mental health, the policy of segregating suicidal detainees, the identification of suicidal detainees, staffing issues that could be causally connected to "inmate problems" and presumably suicides, review of the court alert program, the lapse in communicating Mr. Mannina's suicidal tendencies and the failure to identify the charge under which Mr. Mannina was arrested.  (Sexual assault crimes are a predictor of suicidal tendencies.)  To state these observations is to demonstrate both

the relevance Ms. Amato's knowledge has to Plaintiff's claim and the policy role Ms. Amato had at DOC.

Plaintiff would want to examine Ms. Amato on all of these observations and gather relevant evidence on the DOC's failure to protect Mr. Mannina and discover evidence demonstrating the reckless indifference the District paid to Mr. Mannina.

**B.  Court Alert Program — Ms. Amato Was "The Best and Most Legally Appropriate" Person to Receive Alerts.**

After a rash of suicides at the Oak Hill Youth Correctional Facility, the Court Alert program was established in 2005 to improve communication between the Courts, its related agencies and the DOC to prevent needless suicides or other avoidable medical emergencies. According the DOC Medical Director, Dr. Beth Mynett, Ms. Amato was the DOC point person for implementing and overseeing the Court Alert program for the DOC.  Indeed, she was more than that.

Dr. Mynett testified that because of federal privacy law restrictions under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), "it's best and most legally appropriate for all of these inquiries and statements to go through her . . . ."  Mynett Dep. at 77. Relevant pages of Ms. Mynett's Deposition are attached as Exhibit 2.  Dr. Mynett further explained how when Ms. Amato received an alert that she then "will send me and [M]edical something that she received from the court or one of legal services with some notification about a medical or a mental health concern about somebody." Mynett at 76. Ms. Amato "is the major source" of such factual information from outside DOC. *Id.  Id.* If Pretrial Services "ha[s] a concern about somebody's mental health state they would discuss it with Ms. Amato." Mynett at 127. When asked how courts may notify DOC "of concerns they have about suicidality" Dr. Mynett said "you'll have to ask Ms. Amato." Mynett and 75-76.

Contrary to Ms. Amato's Declaration, her staff, even as of today, believes that she is the prime conduit of information for medical and suicidal alerts. Not surprisingly, she was also the lead senior DOC official who interacted with outside organizations regarding alerts.

Dr. Mynett testified that Ms. Amato worked outside the agency on "medical alerts" intended to inform DOC of crucial information, such as a detainee's risk of suicide, which DOC failed to gather in Mr. Mannina's case. Dr. Mynett said: "[T]here were numerous conversations, I believe, with DOC leadership and our legal counsel, Maria Amato, to judges to, you know, [to] let them [know] about how much this information is needed and to work on strengthening, you know, communication and the need for this information to be expressly delivered to us." Mynett Dep. at 74-75.  Dr. Mynett also discussed "Court Alerts being referred to that Ms. Amato will send me and [M]edical something that she received from the court or one of legal services with some notification about a medical or a mental health concern about somebody." Mynett at 76. Ms. Amato "is the major source" of such factual information from outside DOC. *Id.  Id.* If Pretrial Services "ha[s] a concern about somebody's mental health state they would discuss it with Ms. Amato." Mynett at 127. When asked how courts may notify DOC "of concerns they have about suicidality" Dr. Mynett said "you'll have to ask Ms. Amato." Mynett Dep. at 75-76.

Documents produced by the District detail Ms. Amato's day-to-day involvement with the Court Alert program and communicating about suicidal detainees.  For example, an email chain, dated February 14, 2013, from a DC Superior Court employee to Maria Amato details how the Court Alert program was broken.  Despite receiving a Court Alert about a detainee who was a suicide risk from Superior Court, DOC personnel were unaware of an inmate's heightened suicide risk, alarming the Judge that sent the alert.  Ms. Amato followed up with an email to the

relevant staff to determine why there was a breakdown in communication and what remedial steps should be taken.  An annotated copy of this email chain is attached as Exhibit 3.

Another email on February 8, 2012, from Ms. Amato to individuals at the Office of the Attorney General, DOC and Deputy Mayor Paul Quander identified a high profile inmate who went on a cycle of hunger strikes that endangered his life. An annotated copy of this email is attached as Exhibit 4. And, another email dated, May 6, 2014, from Assistant US Attorney Jelahn Stewart to Maria Amato described a suicidal detainee. Maria Amato forwarded this information to the appropriate DOC staff. correctional officers at the DC Jail, who presumably took appropriate protective actions. A annotated copy of this email is attached as Exhibit 5.

Yet another email from Maria Amato on January 9, 2013 to Unity staff and the DC Jail warden communicated an alert from Judge Robinson regarding a detainee with a history of suicide attempts, who had been arrested for child sexual assault.  An annotated copy of this email is attached as Exhibit 6.

What these emails show is that Ms. Amato was frequently involved receiving warnings and advising DOC staff about suicidal detainees.  In Mr. Mannina's case, the Pre-Trial Services counselor who interviewed Mr. Mannina prior to his detention hearing on June 17, 2013, recorded his suicidal thoughts and the Judge that conducted this hearing observed his precarious mental state.  Had this information been collected by DOC, it seems likely that they would have put Mr. Mannina under a suicide watch and not given him the razor blade with which he slit his throat. Needless to say, if the Court Alert program had functioned properly for Mr. Mannina, his life would likely have been spared.

Nor does Ms. Amato's claims that the Court Alerts program was not a DOC program change the analysis.  Her statements in her affidavit, first that DOC did not set up the Court Alert

program [ECF 97-3 ¶ 13], and second that six months following Mr. Mannina's suicide she wrote a letter encouraging courts to provide information to DOC [*Id.* ¶ 15], which are clearly intended to exonerate DOC, actually have the opposite effect, as they appear to demonstrate that until well after three inmates died by suicide in seven months in 2013:

- *DOC never actively reached out to the Courts, the MPD, defense counsel, or any other sources in order to proactively gather information on suicidality among its inmates*;

- DOC never created its own program, or played an active role in the Court Alerts program.  Only after Mr. Mannina and several others died in the span of a few months did Ms. Amato "suggest[] looking into an alert form [for DOC]," as she noted at the July 22, 2013 Suicide Prevention Task Force meeting.

This evidence leads to the conclusion that, at the time of Mannina's death, DOC *made no effort whatsoever to reach outside DOC to gather available information on suicidal inmates.*

Whether this gross failure of responsibility amounts to a constitutional violation is a crucial issue that will be before the Court.  Plaintiff believes these and other failures will establish such violations.  DOC cannot be allowed to block all access to the information, as it attempts to do through the instant Motion.

Ms. Amato's actions are highly relevant especially to Ms. Mannina's civil rights claim but they also may prove her negligence claim.  The District's reckless indifference to a policy meant to prevent suicides and that, if implemented property could have prevented Mr. Mannina's death, is precisely the evidence that Plaintiff is entitled to discover and would need to prove at trial.  Ms. Amato possesses relevant and crucial information.  As a senior official at DOC, Plaintiff needs and is entitled to her deposition testimony.

### C.  Lindsay Hayes Report

Shortly after Mr. Mannina's suicide, the DOC also retained an outside expert, Lindsay Hayes, to evaluate DOC's policies and procedures.  Mr. Hayes, a nationally recognized expert, issued a highly critical report of the DOC's procedures and recommended numerous steps it should immediately take to prevent future suicides.  Plaintiff believes that Ms. Amato had substantial interaction with Mr. Hayes and, indeed, may have been DOC's point person in providing Mr. Hayes documents and access to key personnel.  Obviously, none of these activities constitute the provision of legal services.  Both the Hayes report and the underlying information upon which he relied are discoverable and, despite numerous requests, have never been produced.  Ms. Amato may well have the only knowledge of what information Mr. Hayes received and what happened to that information.  She should be required to share her knowledge with Plaintiff.

### D.  Litigation Hold Letters

As the Court is well aware, Plaintiff believes that the District failed to notify the custodians of relevant evidence to preserve documents.  Per the Court's order on October 17th [ECF-94], Plaintiff filed its Motion for Spoliation on October 26th and the motion will be ripe for decision later this month.  In the course of pursuing this issue, the District cites two hold letters that were issued to Ms. Amato by counsel from the Office of the Attorney General.  (The District has refused to reveal the substance of the letter claiming that it is privileged, although one letter was never disclosed on any of the District's privilege logs. While Plaintiff reserves the right to challenge the District's privilege claim at a later date, what should not be in dispute is that the distribution of the letter is discoverable.)

The District's claim that it satisfied its obligation to preserve documents is directly contradicted because Dr. Beth Mynett, the DOC's Medical Director, testified that she never received any direction to preserve documents and has no idea if documents were destroyed.  Ms. Amato is the only person who knows what happened after she received these letters.  Plaintiff is entitled to learn directly from Ms. Amato what actions she took to preserve documents and why Ms. Mynett never received proper instructions.

III.     **Ms. Dede Pearson is One of the Very Few People That Could Testify to What Ms. Amato Did and Likely Had Responsibility for Carrying Out Her Policy Directives**

Ms. Pearson is a paralegal in the General Counsel's office at DOC.  She reports directly to Ms. Amato.  From review of documents produced in discovery and from the privilege logs provided to Plaintiff, it is obvious that Ms. Pearson is a key member of Ms. Amato's staff who has been charged with executing Ms. Amato's instructions.

Ms. Pearson likely has knowledge of all of Ms. Amato's activities cited *infra*.  If these activities are not protected from discovery by attorney client privilege for Ms. Amato, then they aren't protected for Ms. Pearson either.  To the extent that Ms. Pearson attended meetings with or on behalf of Ms. Amato or executed the policies that Ms. Amato ordered, she has relevant, discoverable information.  Also, as Plaintiff has been led to believe, if Ms. Amato directed her staff to distribute litigation hold letters to DOC employees, then Ms. Pearson would be the person whom she likely told and would possess the most relevant information as to what happened.

IV.   *Shelton* **Does Not Apply Where the Deponents Are Fact Witnesses to Pre-Litigation Conduct.**

The proposed deponents are not opposing counsel, but rather percipient fact witnesses to pre-litigation matters about the suicide prevention practices and culture at the DOC's detention and treatment facilities.

The District cites *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986) to demand that Plaintiff run a gauntlet of limitations before taking the requested depositions.  In Shelton, the court required that several criteria be met before opposing counsel could be asked certain questions at deposition: (1) no other means exist to obtain the information; (2) the information sought is relevant and non-privileged; and (3) the information is crucial to the preparation of the case. *Shelton*, 805 F.2d at 1327.  However, as this Court has found, these criteria "limit deposition questions of attorneys in only two instances: (1) when trial and/or litigation counsel are being deposed, and (2) when such questioning would expose litigation strategy in the pending case. . . .  a careful review of these [post-*Shelton*] cases reveals that the three criteria only apply to depositions of trial counsel—or counsel directly representing the party in the pending litigation—and then only if the deposition would reveal litigation strategy in the pending case." *United States v. Philip Morris, Inc.*, 209 F.R.D. 13, 17-18 (D.D.C. 2002) (Kessler, J.) (finding *Shelton* criteria inapplicable to prevent deposition of in-house counsel on pre-litigation matters).  *See also Gould Incorporated v. Mitsui*, 825 F.2d 676, 680 (2d Cir. 1987) (*Shelton* applies where concern is that the "thought processes of counsel in relation to pending or anticipated litigation would be exposed"); *Sadowski v. Gudmundsson*, 206 F.R.D. 25 (D.D.C. 2002) (trial counsel may be deposed on non-privileged factual information); *Amicus Communications, L.P. v. Hewlett-Packard Company, Inc.*, No. 99-0284, 1999 WL 33117227

(D.D.C. Dec. 3, 1999) (Robinson, M.J.) (opposing counsel could be deposed on non-privileged and factual material).

Plaintiff is not deposing "trial counsel—or counsel directly representing the [District] in the pending litigation." *Philip Morris*, 209 F.R.D. at 18. Furthermore, Plaintiff is not seeking to depose Amato or Pearson about the District's tactical defense plans related to this case. Plaintiff is only seeking testimony about non-privileged factual matters that are separate and apart from the District's litigation strategy in this matter.  Thus, the *Shelton* case does not protect Ms. Amato or Ms. Pearson from deposition.

### V.    Ms. Amato Possesses Information That Is Unavailable Elsewhere

Regrettably, there are very few senior DOC officers at DOC that were present during the events in question who are still working at the agency.  Director Faust has retired and moved to California.  As a confidant of the Director, Ms. Amato possesses knowledge that no other witness that Plaintiff could depose has.  Moreover, Ms. Amato interacted with other agencies; her office on 14th Street made it much more likely that she came in contact with the DC Council, the Office of the Mayor and other relevant agencies that could have potential responsibility for Mr. Mannina's death.  No other official would have interacted with Superior Court, the Marshals Service and PSA regarding policies and operations related to suicide prevention.  She would have been the lead senior DOC officer responsible for coordinating with these other agencies with respect to Court Alert program.

### VI.    The Harm to Plaintiff Far Outweighs the Inconvenience to Ms. Amato; Justice Requires that She Testify Under Oath to Her Non-Privileged Knowledge of DOC Operations.

Plaintiff would like to ask Ms. Amato questions on highly relevant issues to Plaintiff's claim, but the District refuses to produce her. Of course, there are privilege concerns whenever

an attorney is deposed, but in this case Ms. Amato clearly is an important factual witness, too. The District is entirely capable of sorting out what issues are privileged and which are not. However, Ms. Amato should be ordered to testify. Plaintiff intends to ask her questions about the issues described in this memorandum and is entitled to pursue through further questioning any leads to discoverable evidence that emerges from her answers.  The proper practice for the District to object to privileged information is to make those objections during the deposition; it is not to foreclose the deposition.

The same is true of Dede Pearson. Although she is a paralegal, she also appeared to do much of the organization for the Suicide Prevention Task Force and to work on investigations of suicides with people outside of the General Counsel's office, including the Office of Investigative Services. Plaintiff does not dispute that some of her work is protected by privilege, but that does not shield her from being questioned about non-privileged events. The District has withheld these witnesses for months and should be ordered to produce them immediately.

For the foregoing reasons, the District's Motion to shield Maria Amato and Dede Pearson should be denied.

Dated: November 9, 2018                      Respectfully submitted,


/s/ Ray M. Aragon
RAY M. ARAGON, Bar No. 41822
Press, Dozier & Hamelburg, LLC
7910 Woodmont Avenue, Suite 1350
Bethesda, Maryland 20814
Tel: (301) 913-5200
Fax: (301) 913-5205
Email: raragon@pressdozierlaw.com
*Counsel for Plaintiff*

JOHN G. BICKERMAN, Bar No. 423059
Bickerman Dispute Resolution, PLLC
1455 Pennsylvania Avenue, NW, Suite 400
Washington, DC  20004

18

Tel: (202) 289-3330, (202) 997-0049 (cell)
Email: jbickerman@bickerman.com
*Counsel for Plaintiff*