# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VICTORIA MANNINA | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 15-931 (KBJ/RMM) |
|  | ) |
| DISTRICT OF COLUMBIA, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## <u>MEMORANDUM OPINION</u>

Although the Federal Rules of Civil Procedure permit discovery of a broad range of

matters, the Rules also require courts to manage discovery to avoid undue cost or burden.  Thus,

discovery may be limited where a party has access to more convenient sources of the same

information.  Defendant the District of Columbia ("Defendant" or "the District") sought a

protective order preventing the depositions of two witnesses—the former General Counsel of one

of the Defendant's agencies (Maria Amato),[1] and a litigation paralegal who has worked on this

case (Dede Pearson).  *See* Def.'s 2d Mot. Protective Order ("Def.'s Mot.") at 1, ECF No. 97.

Plaintiff Victoria Mannina ("Plaintiff" or "Ms. Mannina"), opposed that motion, contending that

she should be permitted to depose both witnesses, and has identified sixteen proposed topics to

address in those depositions.  *See* Pl.'s Mem. Opp'n Def.'s Mot. Protective Order ("Pl.'s

Mem."), ECF No. 98; Pl.'s Notice Proposed Topics Deps. Maria Amato and Dede Pearson

("Deps. Topics"), ECF No. 92.  After considering the parties' submissions and attachments

---

[1] Ms. Amato was the General Counsel of the Department while the pending motion was being briefed but does not currently hold that position.

thereto,[2] the Court granted-in-part and denied-in-part Defendant's Second Motion for Protective Order in a Memorandum Order issued September 30, 2019. Mem. Order, ECF No. 130. This Memorandum Opinion sets forth the reasoning for that ruling in more detail.

## BACKGROUND

This case arises from the suicide of Paul Mannina ("Mr. Mannina"), and Ms. Mannina brings this action as widow and representative of Mr. Mannina's estate. 2d Am. Compl., ECF No. 33. Ms. Mannina alleges that, in June 2013, Mr. Mannina died while in the custody of the District's Department of Corrections ("DOC") at its Central Detention Facility ("D.C. Jail"). *Id.* at ¶¶ 1, 35. Ms. Mannina brings civil rights claims under 42 U.S.C. § 1983 and the Due Process Clause of the Fifth Amendment, and also brings tort claims including negligence and wrongful death. *See id.* at ¶¶ 36–54. During discovery, Ms. Mannina noticed the depositions of Ms. Amato and Ms. Pearson. *See* Def.'s Mot., Ex. 4 ("Dep. Notices"), ECF No. 97-6. The District moved for a protective order to prevent the deposition of Ms. Amato and Ms. Pearson. *See* Def.'s Mot. at 1.

### I. Factual Background

When the District's Motion was filed, Ms. Amato had been the General Counsel for the District's Department of Corrections ("DOC") since 2006. Def.'s Mot., Ex. 1 ("Amato Decl.") at ¶ 1, ECF No. 97-3. As General Counsel, Ms. Amato provided legal advice and legal sufficiency reviews on a range of issues affecting DOC, including inquiries from outside parties, Memoranda of Understanding, and Freedom of Information Act requests. *See id.* at ¶ 4. In this litigation, Ms. Amato helped manage DOC's preservation duties, including forwarding instructions from the Office of the Attorney General ("OAG") and reviewing the Complaint to

---

[2] Def.'s Mot.; Pl.'s Mem.; Def.'s Reply Mem. Supp. Mot. Protective Order ("Def.'s Reply"), ECF No. 104.

identify relevant information.  *Id.* at ¶¶ 5, 6.  Ms. Amato also supervised DOC's preparation of written discovery responses, identified appropriate Rule 30(b)(6) witnesses, and provided "legal advice and comments on draft motions, oppositions and other filings."  *Id.* at ¶¶ 8–9.  Ms. Amato did not have operational authority to manage inmates' mental health services.  *Id.* at ¶¶ 4, 21.  She also lacks personal knowledge of Mr. Mannina.  *Id.* at ¶ 10.  Ms. Amato did not create the "Court Alerts Program," *id.* at ¶ 13, a program established in 2005 to improve communications between the D.C. courts and D.C. Jail.  *See* Pl.'s Mem. at 10.  Ms. Amato did, however, send a letter on behalf of DOC to the District of Columbia Bench and Bar, explaining expansions to that program in December 2013.  Amato Decl. at ¶¶ 14–19; *see also* Amato Decl., Ex. 3 (copy of letter to District of Columbia Bench and Bar), ECF No. 97-3.

Ms. Pearson has been a paralegal in DOC's Office of the General Counsel since 2012.  Def.'s Mot., Ex. 2 ("Pearson Decl.") at ¶ 1, ECF No. 97-4.  Ms. Pearson, under the direction and supervision of the General Counsel, prepares responses to discovery requests, identifies Rule 30(b)(6) witnesses, and executes litigation holds.  *Id.* at ¶ 3.  In this litigation, Ms. Pearson requested copies of documents related to Mr. Mannina, arranged fact witness and Rule 30(b)(6) witness depositions, and assisted OAG by responding to document requests and other inquiries.  *Id.* at ¶ 4.  Ms. Pearson has no personal knowledge of Mr. Mannina's death and has no involvement in the operations of the D.C. Jail.  *Id.* at ¶¶ 5–6.

## II. Procedural Background

On October 27, 2017, Judge Ketanji Brown Jackson referred this matter to the undersigned Magistrate Judge for management of discovery.  *See* 10/27/2017 Min. Order; 10/27/2017 Random Case Referral.  On November 17, 2017, Ms. Mannina noticed the depositions of Ms. Amato, Ms. Pearson, two other DOC employees, and the District under Rule

30(b)(6). Dep. Notices at 1.[3] On January 29, 2018, the District moved for a protective order to prevent the proposed depositions of Ms. Amato and Ms. Pearson. Mot. Protective Order, ECF No. 54.

On September 29, 2018, upon review of the parties' submissions and the arguments presented at a motions hearing, the Court denied the District's motion without prejudice. Mem. Order, ECF No. 90. The Court found that the District had not provided evidence to either meet its burden to show the depositions would be unduly burdensome, or to shift the burden to Ms. Mannina by showing that Ms. Amato was trial counsel. *Id.* at 9. The Court also found that Ms. Mannina had not clearly defined the topics on which she sought to depose Ms. Amato and Ms. Pearson.

On October 5, 2018, Ms. Mannina filed a Notice with proposed deposition topics for Ms. Amato and Ms. Perason. Deps. Topics. The District subsequently filed its Renewed Motion for Protective Order. Def.'s Mot. Ms. Mannina filed an Opposition to the Motion, and the District filed a Reply. *See* Pl.'s Mem.; Def.'s Reply. The Court granted-in-part and denied-in-part the Motion in a Memorandum Order issued on September 30, 2019. Mem. Order, ECF No. 130. This Memorandum Opinion sets forth the reasoning for that Order in greater detail.

## LEGAL STANDARD

### I. Fed. R. Civ. P. 26

Under Rule 26(b)(2), "the court must limit the frequency or extent of discovery . . . [if] the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P.

---

[3] In their brief, Defendants assert that Ms. Mannina noticed the depositions on November 11, 2017. Def.'s Mem. at 2. Ms. Mannina does not address this discrepancy in her brief, and the timing is immaterial to the undersigned's analysis.

26(b)(2)(C)(i).  The court also must limit discovery that is "outside the scope permitted by Rule 26(b)(1)."  Fed. R. Civ. P. 26(b)(2)(C)(iii).  Rule 26(b)(1) limits discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).[4]

The court may also "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).  Ordinarily, the party requesting the protective order bears the burden of showing good cause "by demonstrating specific evidence of the harm that would result."  *Jennings v. Family Mgmt.*, 201 F.R.D. 272, 275 (D.D.C. 2001); *see also Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C. 1998) ("The party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one.").  Courts reviewing such motions generally employ a balancing test "weighing the movant's proffer of harm against the adversary's 'significant interest' in preparing for trial."  *Jennings*, 201 F.R.D. at 275; *see also Alexander*, 186 F.R.D. at 75.

## II.  *Shelton v. American Motors Corporation*

When evaluating requests to depose opposing trial counsel, some courts in this Circuit have applied a standard articulated by the Eighth Circuit in *Shelton v. American Motors Corp.,* 805 F.2d 1323 (8th Cir. 1986).  Under *Shelton*, a party seeking to depose trial counsel may only

---

[4] While proportionality has always been pertinent to the review of the scope of discovery, the 2015 amendments highlighted its significance.  *See Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.,* 322 F.R.D. 1, 6 n.3 (D.D.C. 2017) ("The 2015 amendments have brought to the forefront of Rule 26 the concept of proportionality."); *Prasad v. George Washington Univ.,* 323 F.R.D. 88, 91 (D.D.C. 2017) (noting that Rule 26 was amended "to emphasize the need for proportionality in discovery and to 'encourage judges to be more aggressive in identifying and discouraging discovery overuse'") (citing Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment).

do so by meeting three factors: "(1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and non-privileged; and (3) that the information is crucial to the preparation of the case." *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.,* 263 F.R.D. 1, 8 (D.D.C. 2009) (citing *Jennings,* 201 F.R.D. at 277). Thus, *Shelton* shifts the burden to the party seeking discovery, as opposed to the party seeking a protective order, "when the potential deponent is opposing counsel." *Guantanamera Cigar Co.,* 263 F.R.D. at 8; *see also Coleman v. District of Columbia*, 284 F.R.D. 16, 18 (D.D.C. 2012) ("When a party seeks to depose opposing counsel, the normally permissive discovery rules become substantially less so."). The *Shelton* standard deems depositions of litigation counsel presumptively burdensome because they may "undermine attorney-client communications, present unique opportunities for harassment, disrupt opposing counsel's preparation, may lead to opposing counsel's disqualification, and may spawn collateral litigation on issues of privilege, scope, and relevancy." *Coleman*, 284 F.R.D. at 18 (citing *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.,* 276 F.R.D. 376, 380–82 (D.D.C. 2011)).

## DISCUSSION

**I. The Court Reviews the Motion for Protective Order under the Framework of Rule 26 instead of *Shelton.***

The D.C. Circuit has not addressed whether to adopt the *Shelton* test, but some courts in this Circuit have applied *Shelton* when reviewing requests to depose attorneys. *See United States v. All Assets Held in Account Number XXXXXXX*, 13-cv-1832 (JDB), 2019 WL 95605 at *4 (D.D.C. Jan. 3, 2019) (discussing authority within the Circuit); *Guantanamera Cigar Co.,* 263 F.R.D. at 9 (applying *Shelton*); *Coleman,* 284 F.R.D. at 18 (applying *Shelton*). Given that *Shelton* appears more restrictive than the rules that otherwise govern discovery, other courts have expressed reluctance to follow *Shelton. See United States v. Philip Morris Inc.,* 209 F.R.D. 13,

19 (D.D.C. 2002) ("Defendants' broadbrush view of *Shelton* would allow parties to avoid discovery on subject matter that would otherwise be discoverable under the Federal Rules."); *see also In re Subpoena Issued to Dennis Friedman,* 350 F.3d 65, 72 (2d Cir. 2003) (Sotomayor, J.) ("[T]he standards set forth in Rule 26 require a flexible approach to lawyer depositions whereby the judicial officer supervising discovery takes into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship.").  Although the Court requested supplemental briefing regarding the potential applicability of the *Shelton* framework, *see* Mem. Order, ECF No. 90, the information the parties have provided demonstrates that the nature and scope of the proposed depositions of Ms. Amato and Ms. Pearson exceed the permissible bounds of discovery under Rule 26. Consequently, the Court need not determine whether to adopt the more restrictive *Shelton* test, or whether Ms. Amato and Ms. Pearson should be deemed trial counsel under *Shelton*, and instead will resolve this Motion under Rule 26.  *Accord All Assets Held in Account Number XXXXXXXX,* 2019 WL 95605, at *4 (declining to decide whether to follow *Shelton* and applying Rule 26).

## II. The Proposed Depositions of Ms. Amato and Ms. Pearson are Not Proportional to the Needs of the Case and Would Cause Undue Burden

Permitting Ms. Mannina to depose Ms. Amato and Ms. Pearson on all the proposed topics would be disproportional to the needs of the case, although some of the proposed areas of inquiry are relevant and non-privileged.  First, much of the proposed deposition testimony is likely to be redundant, because Ms. Mannina has already deposed at least sixteen other individuals.  Second, the proposed depositions would burden the District by risking the inadvertent disclosure of privileged information and interfering with Ms. Pearson's ability to assist in the Defendant's case.  As explained below, narrowing the proposed discovery to permit Ms. Mannina to depose Ms. Amato by written question regarding a narrowed list of topics best

balances Ms. Mannina's interest in building her case with the District's interest in avoiding undue burden.

### A. The Proposed Depositions Would Add Little Value to Ms. Mannina's Case

Ms. Mannina proposes deposing Ms. Amato and Ms. Pearson on at least sixteen specific topics. *See* Deps. Topics at 2–4. The District asserts that it has already provided the information sought through other witnesses and documentary evidence. Def.'s Mem. P. & A. Supp. Renewed Mot. Protective Order ("Def.'s Mem.") at 6–14, ECF No. 97-1. Ms. Mannina responds that Ms. Pearson and Ms. Amato have information other witnesses lack. Pl.'s Mem. at 15–16. Because Rule 26 requires a fact-specific inquiry, the Court addresses the added benefit of deposing Ms. Amato and Ms. Pearson on each topic in turn. *See, e.g., Oxbow Carbon & Minerals,* 322 F.R.D. at 6 ("[A]ll proportionality determinations must be made on a case-by-case basis."); *Alexander,* 186 F.R.D. at 75 (request for a protective order must be supported by "a specific demonstration of facts").

1. The DOC's suicide prevention policies, including their effectiveness in compliance with these policies, as well as both witnesses' nonprivileged actions in proposing, formulating, and enforcing these policies[5]

Although the DOC's suicide prevention policies are relevant to Ms. Mannina's claims, Ms. Mannina has already obtained, or could obtain, testimony on this topic from other witnesses, including Dr. Beth Mynett and Dr. Diana Lapp. Dr. Mynett, the DOC's Medical Director and Health Services Administrator, testified as both a fact and 30(b)(6) witness about DOC's suicide prevention policy and training. Def.'s Mem., Ex. 3 ("Summary Chart") at 2, ECF No. 97-5. Dr.

---

[5] This topic is distinct from the Suicide Prevention Task Force, addressed in Discussion II.A.9, *infra*.

Lapp, Unity Healthcare's deputy chief medical officer, testified about Unity's and DOC's suicide prevention policies, training, and compliance.[6]  *See id.*

Ms. Amato and Ms. Pearson are unlikely to provide non-duplicative, relevant testimony regarding this topic.  Ms. Amato lacks "operational authority," and as general counsel did not "propose," "formulate," or "enforce" suicide prevention policies, except to review their legal sufficiency.  Amato Decl. at ¶ 4.  Ms. Pearson similarly does not "propose," "formulate," or "enforce" suicide prevention policies.  Pearson Decl. at ¶ 3.  Even if Ms. Amato and Ms. Pearson have some non-privileged knowledge of DOC's compliance with its suicide prevention policies, medical officers, like Dr. Mynett and Dr. Lapp, are more likely to offer meaningful testimony.

### 2. The deaths of four DOC inmates by suicide, including Plaintiff's decedent Paul Mannina, in a single year from 2013 to 2014

Although the four suicide deaths between 2013 to 2014, including Mr. Mannina's, are relevant to this case, Ms. Mannina has already obtained, or could obtain, testimony on this topic from several witnesses, including Katherine Grosso, Ben Collins, and Wanda Patten.  For example, Ms. Grosso, a forensic investigator for the District's Office of the Chief Medical Examiner, testified about her investigation of Mr. Mannina's death in preparation of the autopsy report.  Summary Chart at 3.  Mr. Collins, Director of DOC's Office of Investigative Services, testified about his preparation of DOC's investigative report on Mr. Mannina's suicide.  *Id.* at 2.  Ms. Patten, DOC's Interim Deputy Director of Operations, who supervised Mr. Collins' preparation of the investigative report, testified about DOC's investigations of Mr. Mannina's suicide and communications about the investigative report.  *Id.* at 3; Def.'s Mem. at 8.  The

---

[6] Unity Healthcare provides all healthcare to individuals incarcerated at D.C. Jail.  *See* Def.'s Mem. at 8.

District also has produced the investigative report into Mr. Mannina's death, as well as the investigative reports for the other three suicides. Def.'s Mem. at 8.

Ms. Amato and Ms. Pearson are unlikely to provide non-duplicative, relevant testimony regarding this topic. Neither Ms. Amato nor Ms. Pearson has personal knowledge of Mr. Mannina or his suicide. *Id.* at 7. Further, even if Ms. Amato's or Ms. Pearson's factual knowledge is non-privileged, their testimony is likely to overlap with the reports and testimony of investigators like Mr. Collins. *See* Def.'s Reply at 4. Thus, neither proposed witness is likely to share any "unique" information. *See Jennings,* 201 F.R.D. at 278 (allowing deposition where plaintiff's counsel was "in a unique position to testify as to the information defendants [sought]").

### 3. DOC's internal unprivileged communications and actions regarding suicidal inmates

This topic appears to significantly overlap with Topic 2, which seeks information regarding four suicides in 2013 and 2014. *See supra,* Discussion II.A.2. To the extent this topic encompasses potential testimony that is distinct from Topic 2, Ms. Mannina has already obtained, or could obtain, testimony on communications and actions regarding suicidal inmates from other witnesses, including Dr. Beth Mynett and Wanda Patten. Def.'s Mem. at 7–8. Dr. Mynett testified about mental health care at D.C. Jail and DOC's records regarding any mental health care that DOC provided or should have provided Mr. Mannina. Summary Chart at 2. Mr. Patten testified about internal communications regarding the investigative report on Mr. Mannina's suicide and DOC communications with Unity Healthcare. Summary Chart at 3. The District has also produced nine years of emails reporting DOC actions taken when inmates threaten or attempt suicide, and the relevant policies. *See* Def.'s Mem. at 8–9.

Ms. Mannina has not demonstrated that Ms. Amato or Ms. Pearson would add any non-duplicative testimony on this topic. There is no reason to believe that Ms. Pearson has personal knowledge of this subject area, given her responsibilities as a litigation paralegal. *See* Pearson Decl. at ¶ 3. To the extent that Ms. Amato may have had nonprivileged communications about suicidal inmates with other parties, those other parties are more appropriate deponents. *See generally Guantanamera Cigar Co.,* 263 F.R.D. at 9 (deposition of litigation counsel is duplicative where "information regarding meetings and a relationship between two people are in fact known to both people."); *Coleman,* 284 F.R.D. at 19 (parties should first seek testimony from non-attorney witnesses before "jumping straight" to litigation counsel). Further, given that Dr. Mynett testified as both an individual and 30(b)(6) witness, Ms. Mannina had an opportunity to obtain testimony on this topic that reflects the full scope of DOC's knowledge, even if Dr. Mynett's or other witnesses' personal knowledge is more limited.

> 4. DOC's understanding that it was failing to gather information on inmate suicidality from outside DOC and the effect thereof

Although information concerning DOC's knowledge of the scope and effects of its alleged failure to gather information from outside sources regarding inmate suicidality is relevant to Ms. Mannina's claims, she has already obtained, or could obtain, testimony on this topic from several witnesses including Wanda Patten, Shellie Chisholm, and Dr. Beth Mynett. Ms. Patten testified about the manner in which DOC shared information with Pretrial Services. Summary Chart at 3. Dr. Mynett testified about the Court Alerts Program, a D.C. Superior Court system for communicating medical information from the Superior Court to the D.C. Jail Medical Office. *Id.* at 2. Ms. Chisholm, a program officer in the Records Department at DOC, testified about the District's access to the files of Unity Healthcare, the U.S. Attorney's Office, Pretrial Services, D.C. Superior Court, and the Court Alert system. *Id.* at 4; Def.'s Mem. at 10.

Witnesses from non-DOC entities have also testified regarding their exchange of information with DOC. Alexander MacBean, an investigator with the Metropolitan Police Department ("MPD"), testified about information sharing between Pretrial Services and MPD. Summary Chart at 2. Dr. Fidelis Doh, Director of Intakes for Unity Healthcare, testified about the Court Alerts Program as it relates to medical staff at Unity Healthcare. *Id.* Also, Sheena Baynes-Bagley, a Pretrial Services officer, testified about information sharing between Pretrial Services and the D.C. Department of Behavioral Health ("DBH"), MPD, and DOC. *Id.* at 3.

Ms. Mannina has not demonstrated that Ms. Amato or Ms. Pearson would be likely to have relevant, non-duplicative, testimony regarding this topic. Ms. Chisholm testified as a 30(b)(6) witness regarding DOC's access to information possessed by outside entities including MPD, Pretrial Services, and the Superior Court, and in that capacity should have comprehensively addressed this topic. Although Ms. Amato acknowledged that she played a role in coordinating communications across agencies, that is insufficient to demonstrate that she is likely to have information beyond that presented in the 30(b)(6) depositions and other witnesses' testimony. *See* Amato Decl. at ¶ 4(s).

### 5. The history of the "Court Alert" program

The history of Court Alert program has some potential relevance to this case to the extent that details regarding the program's origin may identify known deficiencies in the transmission of information about a defendant's suicide risks or other mental health concerns to DOC. However, as the program was developed in 2005, approximately eight years before Mr. Mannina's death, its history is less relevant than most of the other topics at issue in the Motion. Amato Decl., Ex. 2. In any event, Ms. Mannina has already obtained, or could obtain, testimony regarding this topic from other witnesses, including Shellie Chisholm, Dr. Beth Mynett, Wanda Patten, and Dr. Fidelis Doh. Ms. Chisholm, Dr. Mynett, Ms. Patten, and Dr. Doh all testified

about the Court Alert program, and Ms. Mannina could have explored the history of that program during their depositions. Summary Chart at 2–3. Further, to the extent Ms. Mannina bases her request for Ms. Amato's testimony on Ms. Amato's alleged role in "originating" the Court Alerts program, *see* Deps. Topics at 3, Ms. Mannina is mistaken; Ms. Amato did not create the Court Alerts program, as it was established before she became DOC's General Counsel. Def.'s Mem. at 9–10; Amato Decl. at ¶ 13.

> 6. <u>Ms. Amato's coordination with other agencies, such as MPD, DBH, or other courts, regarding the Court Alert program or any proposed system to share information on inmate suicidality</u>

Ms. Mannina has already obtained, or had an opportunity to obtain, testimony about DOC's coordination with other agencies regarding systems to share information on inmates' suicide risks through her depositions of other witnesses, including Shellie Chisholm, Dr. Beth Mynett, Wanda Patten, and Dr. Fidelis Doh. As noted above, Ms. Chisholm, Dr. Mynett, Ms. Patten, and Dr. Doh all testified about the Court Alerts program. Summary Chart at 2–3. In addition, Sheena Baynes-Bagley testified about information sharing between Pretrial Services and other agencies, including DOC, DBH, and MPD. *Id.*

However, Ms. Mannina has demonstrated that deposing Ms. Amato might yield further information that she could not obtain through other witnesses. Ms. Amato did not create the Court Alerts program. *See* Amato Decl. at ¶ 13. After Mr. Mannina's death, Ms. Amato signed a letter (on behalf of DOC Director Thomas Faust) asking members of the District of Columbia Bench and Bar to include a notice to DOC if a defendant receives information in court that may increase the risk for suicide, and explained the procedures DOC would take upon receiving such a notice. *See id.* at ¶¶ 13–19 & Ex. 3. Although Ms. Amato did not designate herself as the point of contact for such alerts when she sent the letter, Dr. Mynett testified that she believed "there were numerous conversations. . . with DOC leadership and our legal counsel, Maria

Amato, to judges" regarding DOC's need for information about medical or mental health concerns about inmates. Pl.'s Mem., Ex. 2 ("Mynett Dep.") at 74:22–75:2. Further, when asked how courts may notify DOC "of concerns they have about suicidality," Dr. Mynett answered "You'll have to ask Ms. Amato." *Id.* at 75:19–76:2. Ms. Amato also acknowledges that she has received emails from attorneys and others regarding increased suicide risks of individuals incarcerated at D.C. Jail, although she forwards those requests to the appropriate DOC and Unity Healthcare employees. Amato Decl. at ¶ 20. Thus, deposing Ms. Amato would give Ms. Mannina an opportunity to discover additional information given Ms. Amato's unique role in the Court Alerts program.

The parties dispute the relevance of any information Ms. Amato may possess regarding the Court Alerts program. The District asserts that no Court Alert was issued for Mr. Mannina, and thus the Court Alert program is not proximately related to Mr. Mannina's death. *See* Def.'s Mem. at 10 n.3; Def.'s Reply at 5. Ms. Mannina counters that testimony about Court Alert would shed light on whether DOC actively participated in Court Alerts or otherwise reached out to outside entities to gather information about its inmates' suicide risks. Pl.'s Mem. at 13. Ms. Mannina has demonstrated a sufficient connection between this area of inquiry and her claims to clear the relatively low bar of establishing relevance during discovery. *See generally Food Lion, Inc. v. United Food and Comm. Workers Intern. Union, AFL-CIO-CLC,* 103 F.3d 1007, 1012 (D.C. Cir. 1997). Thus, Ms. Amato's role in drafting the letter to the District of Columbia Bench and Bar and her role in coordinating information between DOC and other entities are relevant topics for which there is no available alternative source. These topics do not include the history of the Court Alert program before Ms. Amato's involvement, other individuals' roles in the

Court Alert program, or hypothetical actions Ms. Amato may have taken under different circumstances.

       7.  <u>Ms. Amato's actions as DOC's "point person" on the Court Alerts Program</u>

This topic significantly overlaps with Topic 6, and Ms. Amato may provide relevant non-duplicative testimony regarding the Court Alerts program for the reasons discussed regarding Topic 6. It is unnecessary for the Court to decide whether Ms. Amato was a "point person." *See* Def.'s Mem. at 10; Pl.'s Mem. at 10. Ms. Amato clearly coordinated with other agencies on behalf of DOC and received emails regarding medical alerts, even if she was not responsible for running or overseeing DOC's involvement with the Court Alerts program.

       8.  <u>Ms. Amato's unprivileged communications and directions to other District employees and contractors with regard to the Court Alert program, and more generally, the management of mental health services at the DC Jail</u>

Communications regarding the Court Alert program and mental health services at D.C. Jail are relevant for the reasons noted above. *See supra,* Discussion II.A.5. While relevant, Ms. Mannina, has already obtained, or could obtain, testimony about this topic from other witnesses, including Shellie Chisholm, Dr. Beth Mynett, Wanda Patten, and Dr. Fidelis Doh. As previously described, Ms. Chisholm, Dr. Mynett, Ms. Patten, and Dr. Doh all testified about the Court Alerts program. Summary Chart at 2–3. Ms. Chisholm was the District's designated 30(b)(6) witness regarding Court Alerts, and in that capacity provided testimony reflecting the full scope of the District's knowledge of the Court Alerts program. Pl.'s Mem. at 10. Dr. Mynett also testified about mental health care at the D.C. Jail. *Id.* at 2. Dr. Doh also testified about Mr. Mannina's medical intake evaluation. *Id.*

It is unlikely that Ms. Amato, a lawyer with no oversight over mental health services, has additional information on the "management of mental health services at the DC Jail," beyond

what Dr. Mynett and Dr. Doh, who are both medical officers, have already provided.  Ms. Amato neither conducted clinical evaluations, nor provided or managed mental health services for D.C. Jail inmates.  Amato Decl. at ¶¶ 17, 21.  Ms. Amato also was not responsible for reviewing and processing Court Alerts, and when she received information about an individual's suicide risk she forwarded it to the appropriate DOC and Unity Healthcare employees.  *Id.* at ¶¶ 19–20; Def.'s Mem. at 10.  Accordingly, Ms. Amato is unlikely to have any nonduplicative relevant information to add to other witnesses' testimony on these topics.

To the extent Ms. Mannina seeks testimony about District employees' and contractors' communications or statements to Ms. Amato regarding those subject areas, Ms. Mannina can explore that topic by deposing the non-counsel parties to those communications or statements.  *See supra,* Discussion II.A.3. (citing *Guantanamera Cigar Co.,* 263 F.R.D. at 9).

9. Ms. Amato's and Ms. Pearson's actions with regard to and knowledge of the inter-agency Suicide Prevention Task Force ("SPTF") and the Suicide Prevention and Intervention Improvement Team ("SPIIT")

The SPTF and SPIIT are potentially relevant to Ms. Mannina's claims to the extent that information about those groups reveals steps that the District could or should have taken to prevent Mr. Mannina's suicide.  While relevant, Ms. Mannina has already obtained, or could obtain, testimony about the SPTF and SPIIT from other witnesses, including Dr. Beth Mynett, Dr. Diana Lapp, and Wanda Patten.  Dr. Mynett testified about the SPTF's recommendations and their implementation, as well as DOC's work with SPIIT.  Summary Chart at 2.  Dr. Lapp and Dr. Mynett were both directly involved in formulating and implementing the Task Force's recommendations.  Def.'s Mem. at 11.  Ms. Patten testified about SPIIT.  Summary Chart at 3. In addition, to the extent Ms. Mannina seeks testimony about communications or statements that Ms. Amato and Ms. Pearson made to others regarding these topics, Ms. Mannina can depose the

non-counsel parties to those communications or statements. *See supra,* Discussion II.A.3. (citing *Guantanamera Cigar Co.,* 263 F.R.D. at 9).

Ms. Amato and Ms. Pearson are unlikely to provide non-duplicative, relevant testimony regarding the SPTF or SPIIT. Ms. Amato reviewed the Task Force's recommendations for legal sufficiency, but her responsibilities as General Counsel did not include setting DOC suicide prevention policy. Def.'s Mem. at 10; Def.'s Reply at 3; Amato Decl. at ¶ 11; Amato Decl. at ¶ 4 (listing responsibilities as General Counsel). Ms. Pearson's description of her responsibilities as a litigation paralegal shares "no nexus" with the task forces. Def.'s Mem. at 10; Pearson Decl. at ¶¶ 3–4.

### 10. The DOC's razor control policies

The DOC's razor control policies are potentially relevant to Ms. Mannina's claims because Mr. Mannina used a razor to commit suicide. *See* Pl.'s Mem. at 12. While relevant, Ms. Mannina has already obtained, or could obtain, testimony about the DOC's razor control policies from other witnesses, including Ben Collins, Sharon Cain Smith, and Wanda Patten. Mr. Collins testified about DOC's razor control policies. Summary Chart at 2. Ms. Cain Smith, a major of operations at DOC, testified about razor and contraband policies, including the distribution and collection of razors. *Id.* at 3. Ms. Patten also testified about razor policy. *Id.*

Ms. Mannina has not shown that Ms. Amato or Ms. Pearson are likely to have non-duplicative, relevant testimony about DOC's razor control policies. Both witnesses deny having any operational authority or independent knowledge of this topic. Def.'s Mem. at 11. Ms. Amato knows only what she learned from reviewing the razor control policies for legal sufficiency. Amato Decl. at ¶ 22. Ms. Pearson has no knowledge of the operations of DC Jail and her job duties do not encompass setting policy. Pearson Decl. at ¶¶ 3, 6.

11. The DOC's daily practice of destroying records regarding razor distribution to prisoners

This proposed topic appears to concern whether the District destroyed hypothetical records. As noted in the Memorandum Order resolving Ms. Mannina's Motion Regarding Spoliation, the Court will not permit further discovery regarding the District's alleged spoliation of relevant records. *See* Mem. Order, ECF No. 129. Consequently, despite Ms. Amato and Ms. Pearson's role in reviewing and preparing the District's discovery responses, Ms. Mannina cannot depose them regarding this topic.

12. DOC noncompliance (and DOC contractor noncompliance) with mandatory suicide training requirements

Ms. Mannina's request for records regarding alleged noncompliance with mandatory suicide training requirements appears to significantly overlap with Topic 1, as both relate to "DOC's suicide prevention policies." There is no basis to subject Ms. Amato or Ms. Pearson to a deposition regarding Topic 1, despite the potential relevance of the subject area. *See supra,* Discussion II.A.1. To the extent the topics do not fully overlap, Ms. Mannina has already obtained, or could obtain, testimony on this topic from other witnesses, including Dr. Beth Mynett and Dr. Diana Lapp. Dr. Mynett testified about suicide prevention training, including compliance with training requirements. Summary Chart at 2. Dr. Lapp also testified about suicide prevention training and compliance with training requirements. *Id.* There is no reason to believe that Ms. Amato or Ms. Pearson would have non-duplicative, relevant testimony, given the nature of their responsibilities. *See* Amato Decl. at ¶¶ 4, 11; Pearson Decl. at ¶ 3.

13. DOC communications and information regarding treatment of suicidal inmates

This topic appears to significantly overlap with Topic 3, as both relate to DOC's "communications . . . regarding suicidal inmates." There is no basis to subject Ms. Amato or

Ms. Pearson to a deposition regarding Topic 3, despite the potential relevance of the subject area. *See supra,* Discussion II.A.3. To the extent that this proposed topic encompasses areas beyond the scope of Topic 3, Ms. Mannina has already obtained, or could obtain, testimony on this topic from other witnesses, including Dr. Beth Mynett and Ms. Wanda Patten. Def.'s Mem. at 7–8. Dr. Mynett testified about mental health care at D.C. Jail and DOC's records regarding mental health care that was or should have been given to Mr. Mannina. Summary Chart at 2. Ms. Patten testified about communications about the investigative report on Mr. Mannina's suicide and communications with Unity Healthcare. *Id.* at 3. Ms. Mannina also has received nine years of emails reporting DOC actions taken when inmates threaten or attempt suicide, and the relevant policies have been produced. *See* Def.'s Mem. at 8–9.

Ms. Amato and Ms. Pearson are unlikely to offer non-duplicative, relevant testimony on this topic. Ms. Mannina does not identify what communications or information she still lacks after deposing other witnesses. Ms. Amato has "no operational role in providing or managing mental health services for inmates at the D.C. Jail." Amato Decl. at ¶ 21. Thus, Ms. Amato cannot be expected to have substantive information about the treatment of suicidal inmates beyond any communications that were forwarded or sent to her in her role as DOC's legal representative. Assuming that there are nonprivileged communications to which Ms. Amato was privy, Ms. Mannina can depose the non-counsel parties to those communications or statements. *See supra,* Discussion II.A.3. (citing *Guantanamera Cigar Co.,* 263 F.R.D. at 9). There is no reason to believe that Ms. Pearson would provide any relevant testimony because her duties as a litigation paralegal do not encompass the treatment of inmates at D.C. Jail. *See* Pearson Decl. at ¶ 6. Thus, her only likely exposure to relevant communications would have occurred through her preparation of discovery responses on behalf of other witnesses. *See id.* at ¶ 4.

14. <u>DOC's work on suicidality with non-DOC entities, including Unity Healthcare and Lindsey Hayes</u>

Ms. Mannina also seeks records regarding DOC's coordination with other entities regarding inmates' tendency to commit suicide.  Although this topic is potentially relevant to Ms. Mannina's claims, she already has obtained, or could obtain, testimony on this topic from other witnesses, including Dr. Diana Lapp and Lindsey Hayes.  Dr. Lapp, the deputy chief medical officer for Unity Healthcare, testified about Unity's and DOC's policies for suicide prevention. Summary Chart at 2.  Mr. Hayes has been noticed as an expert witness and is the proper party to examine regarding information his work on suicidality.  *See* Def.'s Mem. at 11.  Although Ms. Mannina asserts that Ms. Amato "may well have the only knowledge of what Mr. Hayes received and what happened to that information," *see* Pl.'s Mem. at 14, Ms. Mannina has not shown why she cannot obtain the same testimony from Mr. Hayes himself.  Further, as noted above, neither Ms. Amato nor Ms. Pearson had operational involvement in addressing the mental health needs of suicidal D.C. inmates.  *See supra,* Discussion, II.A.13.

15. <u>Communications, written or oral, with the DOC's Director related to agency policy that could have impacted detainees like Mr. Mannina</u>

Ms. Mannina also seeks to depose Ms. Amato about communications with DOC's Director, Mr. Thomas Faust, regarding agency policies that may have impacted detainees like Mr. Mannina.   As noted above, Ms. Mannina has already obtained, or could obtain, testimony about relevant agency suicide prevention policies from other witnesses, including Dr. Beth Mynett and Dr. Diana Lapp.  *See supra,* Discussion II.A.1 (addressing "DOC's suicide prevention policies")*.*

However, Ms. Mannina has demonstrated that she should be allowed to explore this topic with Ms. Amato.  Ms. Mannina asserts that Ms. Amato, as General Counsel, was a "confidant of the Director" and thus, seems to seek communications shared exclusively between Ms. Amato

and Director Faust.[7]  Pl.'s Mem. at 17.  Further, unlike other parties to the communications that

Ms. Mannina seeks, Director Faust has retired and resides in California, making him an

inconvenient witness.  *Id.*  Thus, Ms. Amato's communications with Director Faust related to

agency policy that could have impacted detainees like Mr. Mannina is a relevant topic for which

there is no alternative source.

<blockquote>16. <u>Ms. Amato's and Ms. Pearson's actions to distribute litigation hold directions to DOC employees, and their actions and the actions of DOC employees to preserve documents in this litigation</u></blockquote>

This proposed topic appears to concern whether the District adequately preserved

potentially relevant records.  As noted in the Memorandum Order resolving Ms. Mannina's

Motion Regarding Spoliation, the Court will not permit further discovery regarding the District's

alleged spoliation of evidence.  *See* Mem. Order, ECF No. 129.  Consequently, despite Ms.

Amato and Ms. Pearson's role in reviewing and preparing the District's discovery responses, Ms.

Mannina cannot depose them regarding this topic.

Further, Ms. Mannina has already obtained testimony on this topic from other witnesses,

including Jennifer Postell.  Ms. Postell, a DOC employee, testified about the District's

interrogatories and her role in collecting and producing responsive documents in response to a

litigation hold issued in this case.  Summary Chart at 3; Def.'s Mem. at 12–13.

<blockquote>B.    *Deposing Ms. Amato and Ms. Pearson Would Significantly Burden the District*</blockquote>

The fact that Ms. Amato is a former General Counsel and Ms. Pearson is a litigation

paralegal informs the assessment of the burden that the proposed discovery would impose.  The

---

[7] To the extent that Ms. Mannina also seeks to explore this topic with Ms. Pearson, she has not demonstrated that she should be permitted to do so.  There is no reason to believe that Ms. Pearson, as a paralegal, would have any nonprivileged relevant information to add to the discovery that has been obtained or would be available from other witnesses.

parties dispute the extent to which those roles warrant limiting discovery. The District asserts that deposing DOC's General Counsel and a litigation paralegal would burden the District by "chill[ing] attorney-client communications." Def.'s Mem. at 4. Ms. Mannina responds that, while "some of [Ms. Amato's] activities have attorney client privilege," the District should not be allowed to block non-privileged testimony regarding "policy and operational activities she performed." Pl.'s Mem. at 6–7.

Attorney depositions may chill attorney-client communications, even if limited to relevant, non-privileged topics, because of the risk of inadvertently disclosing privileged information. *See, e.g., Sterne Kessler,* 276 F.R.D. at 380–81 ("Allowing depositions of opposing counsel, even if these depositions were limited to relevant and non-privileged information, may disrupt the effective operation of the adversarial system by chilling the free and truthful exchange of information between attorneys and their clients."). Attorney depositions also risk revealing "mental impressions, which are protected work product." *Coleman,* 284 F.R.D. at 20; *see also All Assets Held in Account Number XXXXXXXX,* 2019 WL 95605, at *4 (deposition of non-privileged matters "may lead to the revelation of privileged work product, including [counsel's] legal theories of the case").

Here, the deposition topics at issue heighten the risk of inadvertent disclosure. For example, Ms. Mannina seeks communications between Ms. Amato and Director Faust in light of Ms. Amato's role as "a confidant of the Director." *See supra,* Discussion II.A.15. Many of these confidential communications between General Counsel and Director are likely to be privileged. Ms. Mannina also seeks deposition testimony on suicide prevention policies that Ms. Amato is only familiar with through her review of the legal sufficiency of DOC policies and recommendations. *See supra,* Discussion II.A.1.; Def's Mem. at 7. Inquiring into Ms. Amato's

legal work also risks disclosing privileged information. Further, Ms. Mannina seeks testimony regarding Ms. Amato and Ms. Pearson's work with investigators involved in this case. *See supra,* Discussion II.A.2. Inquiring into Ms. Amato or Ms. Pearson's work with investigators may reveal their theories of the case, and thus disclose protected work-product.

Further, the proposed deposition of Ms. Pearson, even if limited to relevant, non-privileged topics, would detract from Ms. Pearson's ability to aid in the District's defense.[8] *See, e.g., All Assets Held in Account Number XXXXXXXX,* 2019 WL 95605, at *5 ("The deposition of trial counsel also strains the adversarial process itself."). Ms. Pearson has been closely involved in the District's defense. Ms. Pearson provides litigation support for the filing of motions and assists in coordinating representation between OAG and DOC staff. Pearson Decl. at ¶¶ 3(f), (g).

Thus, the proposed depositions would significantly burden the District, even if some of the information that Ms. Mannina seeks is not privileged. *See, e.g., Gilmore v. Palestinian Interim Self-Government Auth.,* 843 F.3d 958, 968 (D.C. Cir. 2016) (motion to compel was properly denied because, even if materials were not privileged, discovery would impose on "important interests" and cause undue burden).

### III. Ms. Mannina Shall Be Permitted to Depose Ms. Amato Only, through Written Questions Only

As discussed above, although the District has identified more convenient and less burdensome sources for *most* of the proposed deposition topics, Ms. Amato is the most convenient—and possibly the only—source for two of the proposed topics. First, Ms. Amato is the most convenient source on her role in the "Court Alerts" program, including her role in drafting the letter to the District of Columbia Bench and Bar. Although Ms. Mannina has deposed other witnesses on this topic, those witnesses have indicated that only Ms. Amato is

---

[8] The same would be true for Ms. Amato if she were the current General Counsel.

capable of answering the questions posed. Second, Ms. Amato is the most convenient source on her communications with Director Faust. Although Director Faust is also capable of testifying to these communications, he is less accessible as a witness.

The lack of alternative sources does not, however, diminish the burden imposed on the District. Even a limited oral deposition on these topics risks inadvertent disclosure of privileged material or work product. The Court must therefore fashion discovery in a way to balance the parties' competing interests.

"Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton,* 523 U.S. 574, 598 (1998); *see also United States v. Microsoft,* 165 F.3d 952, 959 (D.C. Cir. 1999) (describing Rule 26(c) as "highly flexible"). Protective orders may "deny discovery completely, limit the conditions, time, place, or topics of discovery, or limit the manner in which the confidential information is to be revealed." *Univ. of Mass. v. Roslin Inst.*, 437 F. Supp. 2d 57, 60 (D.D.C. 2006).

Rule 31 allows for deposition by written questions. Fed. R. Civ. P. 31. A written deposition will allow Ms. Mannina to seek the information she desires, while balancing the District's concerns of inadvertent disclosure and interference with its defense. Written deposition will allow the District to review the questions posed, carefully determine whether Ms. Mannina inquires into privileged materials, and object accordingly. The Court may then review the objection, if necessary. Fashioning discovery in this limited manner allows Ms. Mannina some of the discovery she seeks, without causing an undue burden to the District. *See Coleman,* 284 F.R.D. at 20 (plaintiff not entitled to attorney deposition, but permitted written

interrogatories); *All Assets Held in Account Number XXXXXXXX,* 2019 WL 95605, at *9 (denying attorney deposition but granting "limited additional interrogatories").

There is no reason to believe that Ms. Pearson can offer testimony on these two topics that Ms. Amato cannot offer.  In fact, it is unclear whether Ms. Pearson would be able to testify to these topics *at all*.  For example, Dr. Mynett did not indicate that Ms. Pearson could answer questions regarding the Court Alerts program, although Dr. Mynett *did* identify Ms. Amato in her answers.  Ms. Mannina's need to depose Ms. Amato on her communications with Director Faust stems from their unique relationship—which, by definition, cannot be shared by Ms. Pearson.

Thus, the Court will permit Ms. Mannina to depose Ms. Amato by written question on (1) her personal involvement in the Court Alerts program (including her role in sending the letter to the District of Columbia Bench and Bar); and (2) her communications with Director Faust related to agency policies that could have impacted detainees like Mr. Mannina.  The District remains free to assert privilege or work-product defenses in response to the written deposition questions.

DATE: February 4, 2020
_____

Signed: _____
                Magistrate Judge Robin M. Meriweather